UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | |
|---|---|
| STEAMFITTERS LOCAL 449 PENSION FUND, On Behalf of Itself and All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>STURM, RUGER & COMPANY, INC., MICHAEL O. FIFER and THOMAS A. DINEEN,<br><br>Defendants. | Case No.<br><br><u>CLASS ACTION</u><br><br>COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS<br><br><u>DEMAND FOR JURY TRIAL</u><br><br>August 13, 2009 |

## NATURE OF THE ACTION

1.      This is a securities class action on behalf of purchasers of Sturm, Ruger & Company, Inc. ("RGR" or the "Company") common stock during the period from April 23, 2007 to October 29, 2007, inclusive (the "Class Period"), against RGR and certain of its officers and directors ("Defendants") for violations of the Securities Exchange Act of 1934 (the "Exchange Act").

2.      RGR is primarily engaged in the design and manufacture of firearms, including rifles, pistols and shotguns. The Company sells its products through a small number of "independent" wholesale distributors. During 2005 and 2006, declining demand for RGR's products caused the Company to carry large quantities of inventories. Defendants attributed RGR's disappointing 2005 financial results to inefficient manufacturing processes that prevented the Company from meeting peak customer demand. During 2005, the Company's profit margins declined by 350 basis points. RGR reported losses for the third and fourth quarters of 2005 and declining year-over year earnings for the first six months of 2006. RGR common shares languished as a result, trading to a low of $5.56 per share during the second quarter of 2006.

3.      Shortly after the September 2006 arrival of Defendant Michael O. Fifer ("Fifer") as the Company's new Chief Executive Officer ("CEO"), RGR instituted a number of "lean" manufacturing and purchase order processes purportedly allowing the Company to target production to peak customer demand and reduce inventory quantities. Most of these changes were put in place during the fourth quarter of 2006. Market reaction to Fifer's turnaround efforts was positive as RGR common shares traded above $13 per share during March 2007, an increase of more than 80% from September 2006.

4.      As detailed herein, RGR's return to profitability appeared to be well underway when the Company reported double-digit increases in firearms sales and shipments during the first and second quarters of 2007. In addition, RGR reported that it was continuing to reduce inventory

levels. Following a significant inventory reduction during 2006, the Company continued to reduce inventories by an additional $25.5 million during the first six months of 2007. The price of RGR common stock responded positively to these seemingly improving financial results, reaching a Class Period high of $22.50 per share on August 8, 2007.

5.      In fact, however, by the start of the Class Period, Defendants knew or recklessly disregarded that the Company's current production levels, shipments to distributors and sales levels could not be sustained. By the first quarter of 2007, RGR's ongoing inventory reduction had reduced the Company's component part inventories across many product lines simultaneously, increasing the risk that RGR's production volumes and firearm's sales would decline. In addition, Defendants failed to disclose that certain December 2006 changes initiated by RGR, which affected the timing and frequency of purchase orders received from its "independent" distributors, had artificially accelerated the Company's sales to distributors during the first six months of 2007. Defendants revealed in an SEC filing for the third quarter of 2007, that distributors' inventories of the Company's unsold products had increased by more than 37% during the Class Period, increasing the risk that distributors would reduce their future purchases, in the near term. This is exactly what happened in the third quarter of 2007 when distributors reduced their purchase order quantities by more than 29%.

6.      The truth came out on October 24, 2007, when the Company announced that its firearm sales for the third quarter of 2007 fell 26%, resulting in a loss of $0.03 per share. While the Company does not issue guidance, Wall Street consensus estimates for RGR's earnings were $0.13 per share. In an October 24, 2007 letter to shareholders, Defendant Fifer admitted that the sales decline was attributable to inventory reductions that had cut "too deeply."

7. Following this news, the price of RGR common stock fell by $6.45 per share, closing at $10.65 per share – a one-day decline of more than 37% on volume of 4.1 million shares.

8. Prior to the disclosure of these adverse facts, RGR insiders, including Defendant Thomas A. Dineen ("Dineen"), the Company's Treasurer and Chief Financial Officer ("CFO"), sold more than 309,000 shares of their personally held RGR common stock generating proceeds of more than $6.3 million.

## JURISDICTION AND VENUE

9. The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder. Jurisdiction is conferred by Section 27 of the Exchange Act.

10. Venue is proper pursuant to Section 27 of the Exchange Act as Defendants conduct business in this District, the wrongful conduct took place here, and the Company's principal executive offices are located in Southport, Connecticut, where the day-to-day operations of the Company are directed and managed.

## PARTIES

11. Plaintiff Steamfitters Local 449 Pension Fund purchased RGR common stock as detailed in the attached Certification and was damaged thereby.

12. Defendant RGR specializes in the design, manufacture and sale of firearms. The Company's headquarters are located at One Lacey Place in Southport, Connecticut. As of April 4, 2009, the Company had over 19 million shares issued and outstanding that publicly trade on the New York Stock Exchange (the "NYSE") under the ticker symbol "RGR."

13. Defendant Fifer joined the Company as CEO on September 25, 2006 and was named to the Board of Directors on October 19, 2006. He was later named as President of RGR.

14.     Defendant Dineen became Vice President on May 24, 2006 and has served as Treasurer and CFO of RGR since May 6, 2003.

15.     Fifer and Dineen are referred to herein as the "Individual Defendants."

## DEFENDANTS' SCIENTER

16.     The Individual Defendants, by virtue of their high-level positions with RGR, participated in the management of RGR, were involved in the day-to-day operations of RGR at the highest levels, and were privy to confidential proprietary information concerning RGR and its business, operations and financial condition, and were aware of or deliberately disregarded that their false and misleading statements caused the Company's stock to trade at inflated prices. Because of their managerial positions with RGR, each had access to the adverse undisclosed information about RGR's business, financial condition and prospects, and knew or deliberately disregarded that the adverse facts alleged herein rendered their positive Class Period representations materially false and misleading.

17.     The Individual Defendants were personally familiar with RGR's inventory and manufacturing requirements and distributor sell-through, because they closely monitored production and shipment schedules via reports from RGR's operations, sales and finance departments, which were generated and provided to them on a regular basis. These reports summarized the Company's purchase orders, production and manufacturing schedules, inventory levels and dealer inventories and sell-though. As a result of their monitoring, each of the Individual Defendants knew or recklessly disregarded that RGR would be unable to meet its production and shipping schedules because it did not have enough inventory on hand following the reductions that took place during 2006 and the first half of 2007. Defendants also knew or recklessly disregarded that some of the Company's dealers were likely to curtail future purchases from the Company due to a build-up of unsold products.

18. Moreover, during the Class Period, certain of the Individual Defendants and other Company insiders sold thousands of shares of their personally-held common stock for aggregate proceeds of nearly $6.6 million. These insiders occupied the following positions during the Class Period: (i) Defendant Dineen, Vice President, Treasurer and CFO; (ii) Leslie Gasper, Corporate Secretary; (iii) Stephen Sanetti, Vice Chairman of the Board, President, Chief Operating Officer ("COO") and General Counsel; and (iv) Robert Stutler, Vice President. Their Class Period sales, which were suspicious and unusual in amount and timing, are depicted in the following chart:

| Last Name | First Name | Position | Date | Shares | Price | Proceeds |
|---|---|---|---|---|---|---|
| DINEEN | THOMAS | CFO, various | 7/30/2007 | 27,089 | | $527,000 |
| | | | | 27,089 | | $527,000 |
| GASPER | LESLIE | Corporate Secretary | 8/7/2007 | 2,000 | $21.65 | $43,300 |
| | | | 8/7/2007 | 1,200 | $21.40 | $25,680 |
| | | | 8/7/2007 | 1,200 | $21.75 | $26,100 |
| | | | 8/7/2007 | 1,000 | $21.20 | $21,200 |
| | | | 8/7/2007 | 1,000 | $21.70 | $21,700 |
| | | | 8/7/2007 | 1,000 | $21.81 | $21,810 |
| | | | 8/7/2007 | 1,000 | $21.83 | $21,830 |
| | | | 8/7/2007 | 1,000 | $21.85 | $21,850 |
| | | | 8/7/2007 | 900 | $21.00 | $18,900 |
| | | | 8/7/2007 | 800 | $21.10 | $16,880 |
| | | | 8/7/2007 | 800 | $21.25 | $17,000 |
| | | | 8/7/2007 | 100 | $21.87 | $2,187 |
| | | | 8/7/2007 | 12,000 | $21.87 | $262,440 |
| | | | 7/31/2007 | 37,827 | | $773,000 |
| | | | | 61,827 | | $1,293,877 |
| SANETTI | STEPHEN | COO, various | 7/31/2007 | 151,307 | | $3,093,000 |
| | | | | 151,307 | | $3,093,000 |
| STUTLER | ROBERT | Vice President | 8/24/2007 | 1,427 | $19.11 | $27,270 |
| | | | 8/24/2007 | 473 | $19.07 | $9,020 |
| | | | 8/24/2007 | 439 | $19.14 | $8,402 |
| | | | 8/24/2007 | 300 | $19.13 | $5,739 |
| | | | 8/24/2007 | 200 | $19.12 | $3,824 |
| | | | 8/24/2007 | 200 | $19.08 | $3,816 |
| | | | 8/24/2007 | 200 | $19.07 | $3,814 |
| | | | 8/24/2007 | 100 | $19.10 | $1,910 |
| | | | 7/31/2007 | 77,733 | | $1,589,000 |
| | | | | 81,072 | | $1,652,796 |
| | | | Total: | 321,295 | | $6,566,673 |

## BACKGROUND

19. Defendant RGR is principally engaged in the design, manufacture, and sale of firearms. Approximately 92% of the Company's total sales for the year ended December 31, 2007 were from the firearms segment, which included sales of rifles, shotguns, pistols and revolvers. The Company's firearms are sold through a small number of "independent" wholesale distributors, principally to the commercial sporting market. It derives the balance of its sales from sales of commercial investment castings, which are molds used to manufacture component parts.

20. RGR was formed in 1949 by William B. Ruger, who remained RGR's Chairman, CEO and Treasurer until his retirement. He was succeeded by his son, William B. Ruger, Jr., who assumed the roles of Chairman and CEO in October 2000 until retiring in February 2006. In May 2006, RGR reported that 2005 was another "disappointing year" marked by inefficient manufacturing processes which prevented the Company from capitalizing on several new successful products, including two handguns, a .44 Magnum revolver called the "Flattop Blackhawk," and a .357 Magnum revolver called the "New Vaquero." Despite high levels of components inventory, the Company was unable to shift manufacturing resources to meet increasing orders for its products. RGR common stock languished as a result, trading to a low of $5.56 per share during the second quarter for the period ended June 30, 2006.

21. In late September 2006, Defendant Fifer joined RGR as its CEO, at which time he instituted a number of "lean" processes aimed at mending the Company's ailing manufacturing methods and cutting bloated inventory levels that he claimed masked a number of operating inefficiencies. During the fourth quarter of 2006, RGR changed from an annual production cycle to a "demand-pull" production system that was designed to limit production quantities to meet customer demand. The changeover coincided with RGR mandating the frequency that its

distributors placed orders with the Company. Prior to December 2006, distributors had placed one cancelable annual order; during December, however, the Company began receiving firm, non-cancelable purchase orders on a more frequent basis, with most orders for immediate delivery.

22. According to Defendants these measures resulted in continued reductions in RGR's inventories, as follows: $24 million (-21%) during 2006; $16.5 million (-19%) during the first quarter of 2007; and $10.1 million during the second quarter of 2007.

## FALSE AND MISLEADING STATEMENTS ISSUED DURING THE CLASS PERIOD

23. On or about April 23, 2007, RGR issued a press release announcing the filing of its quarterly report on Form 10-Q for the three months ended March 31, 2007 (the "March 10-Q"). The March 10-Q, signed by Defendant Dineen, indicated that RGR's sales for the first quarter were $48.4 million (an increase of $1 million as compared to the previous year) and that firearms sales were $43.6 million (an increase of $2.8 million as compared to the same quarter the previous year). The Company reported net earnings of $0.36 per share bolstered by certain one-time gains from sales of non-manufacturing assets to the Ruger family and a startling increase in RGR's gross profit margins of 1100 basis points. According to market reports, the Company was expected to earn $0.09 per share. The March 10-Q discussed RGR's ongoing inventory reduction efforts and the effect they had on RGR's first quarter financial results, provided, in pertinent part:

> During the three months ended March 31, 2007 gross inventories were reduced by $16.7 million, compared to a decrease in gross inventories of $3.0 million in the comparable prior year period. Inventories are not expected to increase above the March 31 levels during the remainder of 2007. *The 2007 reduction resulted in a liquidation of LIFO inventory quantities carried at lower costs that prevailed in prior years as compared with the current cost of purchases, the effect of which decreased costs of products sold by approximately $4.4 million and increased gross margin by 9.2% of sales in the three month period ended March 31, 2007.* LIFO adjustments of $1.0 million resulted in an increase in cost of products sold in the comparable prior year period. [Emphasis added.]

24. The March 10-Q also made representations concerning Defendant Fifer's December 2006 changes, which affected the placement of orders received from RGR's "independent distributors." Specifically, the March 10-Q provided, in pertinent part, as follows:

> In prior years, the Company received one cancelable annual firearms order in December from each of its distributors. Effective December 1, 2006 the Company changed the manner in which distributors order firearms, and began receiving firm, non-cancelable purchase orders on a frequent basis, with most orders for immediate delivery.
>
> During the three months ended March 31, 2007, firearms orders received totaled $58.9 million, and order backlog increased $11.6 million from $16.2 million on December 31, 2006 to $27.8 million on March 31, 2007. Because of the aforementioned change in the manner in which distributors now order firearms, comparable data for the first quarter of 2006 is not meaningful.

25. On or about July 24, 2007, RGR issued a press release announcing that it had filed its quarterly report on Form 10-Q for the three months ended June 30, 2007 (the "June 10-Q"). The June 10-Q, signed by Defendant Dineen, indicated that RGR's sales for the second quarter were $42.1 million, an increase of $6.8 million (or 19.4%) as compared to the same quarter last year. In addition, firearms sales were $39.6 million for the second quarter, an increase of $10.3 million (or 35.4%) over the same quarter the previous year. The June 10-Q discussed RGR's continuing inventory reduction efforts and the effect they had on RGR's first quarter financial results, providing, in pertinent part, as follows:

> During the three and six months ended June 30, 2007 gross inventories were reduced by $10.1 million and $26.6 million, respectively, compared to increases in gross inventories of $7.2 million and $4.3 million in the comparable prior year periods. Inventories are not expected to increase above the June 30 levels during the remainder of 2007. The 2007 reduction resulted in LIFO income and decreased cost of products sold of $6.1 million and $10.6 million for the three and six months ended June 30, 2007, respectively.

26. The June 10-Q also reported that shipments of firearms products to the Company's distributors increased by 31.8% during the second quarter 2007 as compared to the prior year, and made representations concerning Defendant Fifer's December 2006 changes (which affected the

placement of orders received from RGR's independent distributors). The June 10-Q provided, in pertinent part, as follows:

> Firearms unit shipments increased 31.8% for the three months ended June 30, 2007 when compared to the second quarter of 2006. Rifle shipments increased 49.3% from the comparable prior year period due to strong demand and product availability. Revolver shipments increased 19.8% from the comparable prior year period. Pistol shipments increased 18.8% from the comparable prior year period. Shotgun shipments increased 35.8% from the comparable prior year period.
>
> * * *
>
> In prior years, the Company received one cancelable annual firearms order in December from each of its distributors. Effective December 1, 2006, the Company changed the manner in which distributors order firearms, and began receiving firm, non-cancelable purchase orders on a frequent basis, with most orders for immediate delivery.

|  | Three Months Ended | |
|---|---|---|
|  | June 30, 2007 | March 31, 2007 |
| Orders Received | $39.1 | $58.9 |
| Ending Backlog | $23.3 | $27.9 |

27. The statements set forth above in the March 10-Q and June 10-Q were materially false and misleading, because they failed to disclose, *inter alia*, the following facts which were then existing, known or recklessly disregarded by Defendants:

(a) that the reductions in inventory balances by RGR in the first and second quarters of 2007 had reduced the Company's parts and components inventories below efficient levels, preventing RGR's manufacturing units from meeting production and shipment schedules and resulting in the Company's inability to sustain current or historical sales levels;

(b) that RGR's "backlog" of unfilled purchase orders was materially inflated because of the Company's inability to meet current production and shipping schedules due to inventory shortages;

(c) that orders received from the Company's independent distributors were artificially boosted by the Company's mandated change to firm and noncancellable purchase order submissions and was not reflective of actual demand for the Company's products;

(d) that RGR's independent distributors were carrying large quantities of the Company's unsold products, increasing the risk that these distributors would reduce or curtail their future purchases; and

(e) that based on the above, Defendants had no reasonable basis for their positive statements and opinions concerning RGR's current financial performance and condition.

28. On October 24, 2007, RGR announced that its firearm sales for the third quarter of 2007 fell 26%, resulting in a loss of $0.03 per share. While the Company does not typically issue guidance, Wall Street consensus estimates for RGR's earnings were $0.13 per share. In an October 24, 2007 letter to shareholders, Defendant Fifer admitted that the sales decline was attributable to inventory reductions that had cut "too deeply." In addition, the Company's Form 10-Q for the three months ended September 30, 2007 revealed – for the first time – that inventories of unsold RGR products held by the Company's independent distributors had increased by more than 37% during the second quarter of 2007, indicating that RGR's products were not selling through to end user retail customers.

29. Following this news, the price of RGR common stock fell by $6.45 per share, closing at $10.65 per share – a one-day decline of more than 37% on volume of 4.1 million shares.

## CLASS ACTION ALLEGATIONS

30.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all those who purchased RGR common stock during the Class Period and were harmed thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

31.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, RGR common shares were actively traded on the NYSE, and the Company had over 56.9 million shares of stock outstanding. As such, while the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by RGR or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

32.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

33.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

34.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

   (a)     Whether Defendants violated the federal securities laws;

  (b) Whether Defendants omitted and/or misrepresented material facts, including those facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

  (c) Whether Defendants knew or recklessly disregarded that their statements were false and misleading;

  (d) The extent of damage sustained by Class members and the appropriate measure of damages.

35. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## LOSS CAUSATION/ECONOMIC HARM

36. During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of RGR stock and operated as a fraud or deceit on Class Period purchasers of RGR stock by misrepresenting the Company's operations and prospects. When Defendants' falsehoods, misrepresentations and omissions were disclosed, the price of RGR stock fell precipitously as the artificial inflation dissipated. As a result of their purchases of RGR stock during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

37. Defendants' false and misleading statements and omissions had the intended effect and caused RGR stock to trade at artificially inflated levels throughout the Class Period, reaching a Class Period high of $22.50 per share on August 8, 2007, before collapsing to $10.65 per share on October 25, 2007 – a 52% decline.

38.　　The decline in the price of RGR stock was a direct result of the nature and extent of the public revelation, at least partially, of Defendants' fraud. The timing and magnitude of the decline in the price of RGR stock negates any inference that the loss suffered by Plaintiff and other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to the defendants' fraudulent conduct. The economic loss, *i.e.*, damages, suffered by Plaintiff and other members of the Class was a direct result of Defendants' fraudulent scheme to artificially inflate the price of RGR stock and the subsequent significant decline in the value of RGR stock when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

## COUNT I

### Violation of Section 10(b) of the Exchange Act and Rule 10b-5
### Against All Defendants

39.　　Plaintiff repeats and realleges each and every allegation above as if set forth herein.

40.　　During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

41.　　Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they:

　　　　(a)　　employed devices, schemes and artifices to defraud;

　　　　(b)　　made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c) engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of RGR's publicly traded securities during the Class Period.

42. Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for RGR stock. Plaintiff and the Class would not have purchased RGR stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements.

43. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of RGR stock during the Class Period.

## COUNT II

### Violation of Section 20(a) of the Exchange Act
### Against the Individual Defendants

44. Plaintiff repeats and realleges each and every allegation above as if set forth herein.

45. The Individual Defendants acted as controlling persons of RGR within the meaning of Section 20(a) of the Exchange Act as alleged herein. By reason of their positions as officers and/or directors of RGR, and their ownership of RGR stock, the Individual Defendants had the power and authority to cause RGR to engage in the wrongful conduct complained of herein.

46. By reason of such conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of itself and the Class, prays for judgment as follows:

A. Determining that this action is a proper class action, designating Plaintiff as Lead Plaintiff and certifying Plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Lead Counsel;

B. Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C. Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D. Awarding such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMAND

Plaintiff hereby demands a trial by jury on all claims and issues so triable.

DATED: August 13, 2009

DISERIO MARTIN O'CONNOR &
  CASTIGLIONI LLP
JONATHAN P. WHITCOMB (ct15014)

_____
Jonathan P. Whitcomb

One Atlantic Street
Stamford, CT 06901
Telephone: 203/358-0800
203/348-2321 (fax)

COUGHLIN STOIA GELLER RUDMAN
  & ROBBINS LLP
SAMUEL H. RUDMAN
DAVID A. ROSENFELD
JOSEPH RUSSELLO
58 South Service Road, Suite 200
Melville, NY 11747
Telephone: 631/367-7100
631/367-1173 (fax)

*Attorneys for Plaintiff*

## CERTIFICATION OF NAMED PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

STEAMFITTERS LOCAL 449 PENSION FUND ("Plaintiff") declares:

1. Plaintiff has reviewed a complaint and authorized its filing.

2. Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3. Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4. Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action:

| Security | Transaction | Date | Price Per Share |
|---|---|---|---|

*See* attached Schedule A.

5. Plaintiff has not sought to serve or served as a representative party for a class in an action filed under the federal securities laws except as detailed below during the three years prior to the date of this Certification:

*Kapur v. USANA Health Sciences, Inc., et al.* No. 2:07CV177DAK (D. Utah)
*In re NexCen Brands Inc. Sec. Litig.*, No. 1:08-cv-04906-AKH (S.D.N.Y.)

6. The Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery,

STURM RUGER

except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 6th day of August, 2009.

STEAMFITTERS LOCAL 449 PENSION FUND

By: _____

Its: _____

## SCHEDULE A

## SECURITIES TRANSACTIONS

**Acquisitions**

| Date Acquired | Type/Amount of Securities Acquired | Price |
|---|---|---|
| 08/29/2007 | 600 | $18.23 |
| 09/18/2007 | 200 | $17.46 |
| 10/04/2007 | 300 | $18.51 |
| 10/08/2007 | 1,800 | $18.41 |