UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| In re STURM, RUGER & COMPANY, INC. SECURITIES LITIGATION | ) ) ) | Master File No. 3:09-cv-01293-CFD |
| | ) | CLASS ACTION |
| | ) | |
| This Document Relates To: | ) ) | CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS |
| ALL ACTIONS. | ) ) | OF FEDERAL SECURITIES LAWS |
| | ) | DEMAND FOR JURY TRIAL |

Plaintiff Steamfitters Local 449 Pension Fund ("Lead Plaintiff" or "Plaintiff"), by and through its attorneys, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based on the investigation of its counsel, which included, without limitation: a review of United States Securities and Exchange Commission ("SEC") filings by Sturm, Ruger & Company, Inc. ("Sturm Ruger" or the "Company"), as well as regulatory filings and reports, securities analysts' reports and advisories about the Company, press releases and other public statements issued by the Company, media reports about the Company and interviews with former employees of the Company. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of purchasers of Sturm Ruger common stock during the period from April 23, 2007 to October 24, 2007, inclusive (the "Class Period"), against Sturm Ruger and certain of its officers and directors ("Defendants") for violations of the Securities Exchange Act of 1934 (the "Exchange Act").

2.      Defendant Sturm Ruger is primarily engaged in the design and manufacture of firearms, including rifles, pistols, revolvers and shotguns in the United States. The Company sells its products through a select number of "independent" wholesale distributors.

3.      Prior to the Class Period, in 2005 and 2006, declining demand for Sturm Ruger's products caused the Company to carry massive quantities of firearm inventory that far exceeded any demand it was realizing from its customers. During that time, the Company's profit margins declined by 350 basis points. Defendants attributed Sturm Ruger's disappointing 2005 financial results to inefficient manufacturing processes that caused delays in shipping the Company's products to customers. Sturm Ruger common shares languished as a result, trading to a low of $5.56 per share during the second quarter of 2006.

4.      In late 2006, after reporting losses for the third and fourth quarters of 2005 and declining year-over-year earnings for the first six months of 2006, Sturm Ruger vowed to make several changes in the Company and instituted a number of "lean" manufacturing and purchase order processes which would purportedly allow the Company to target production around peak customer demand and thereby reduce excess inventory.

5.      Accordingly, in September 2006, Sturm Ruger installed Defendant Michael O. Fifer ("Fifer") as the Company's new Chief Executive Officer ("CEO"). Fifer was responsible for leading the Company's transformation to lean manufacturing in order to remedy the production and excess inventory problems that had afflicted Sturm Ruger in prior years. Market reaction to Fifer's turnaround efforts was positive as Sturm Ruger common shares traded above $13 per share during March 2007, an increase of more than 80% from September 2006.

6.      Rather than repair Sturm Ruger's problems, however, Defendant Fifer's transformation plan only lead to increased production and inventory issues.

7.      As detailed herein, Sturm Ruger's return to profitability appeared to be well underway when the Company reported double-digit increases in firearm sales and shipments during the first and second quarters of 2007. In addition, Sturm Ruger reported that it was continuing to reduce inventory levels. Following a significant inventory reduction during 2006, the Company continued to reduce inventories by an additional $26.6 million during the first six months of 2007. The price of Sturm Ruger common stock responded positively to these seemingly improving financial results, reaching a Class Period high of $22.58 per share on August 7, 2007.

8.      In fact, however, by the start of the Class Period, Defendants knew or recklessly disregarded that, despite their positive statements about the transformation plan, the Company's current production levels, shipments to distributors and sales levels could not be sustained because Sturm Ruger was quickly working through its component part inventory during the first half of 2007

and was experiencing significant production problems. These problems prevented the Company's manufacturing units from meeting production and shipment schedules.

9.      By the first quarter of 2007, it was clear to Sturm Ruger senior management that the financial profits experienced as a result of the Company's inventory cuts would not be long-lasting. Sturm Ruger was experiencing several setbacks in its attempt to "go lean," which adversely affected its firearm production levels. These setbacks were aggravated by Sturm Ruger's ongoing inventory reduction, which had reduced the Company's component part inventories across many product lines simultaneously, increasing the risk that Sturm Ruger's production volumes and firearm sales would decline.

10.      In addition, Defendants failed to disclose that certain December 2006 changes initiated by Sturm Ruger, which affected the timing and frequency of purchase orders received from its "independent" distributors, had artificially accelerated the Company's sales to distributors during the first six months of 2007.

11.      Despite these problems, Defendants made numerous misrepresentations and omissions concerning, among other things, Sturm Ruger's transformation plan and the success of the Company's inventory reductions. Defendants also failed to update their prior statements regarding the positive changes at the Company as a result of Defendant Fifer's implementation of various lean manufacturing processes. Those false and misleading statements inflated the value of Sturm Ruger's stock, which the market valued on the basis of, among other things, the success of the Company's transformation plan and earning ability.

12.      The truth came out on October 24, 2007, when the Company announced that its net sales for the third quarter of 2007 fell over 23%, resulting in a loss of $0.03 per share. While the Company does not issue guidance, Wall Street consensus estimates for Sturm Ruger's earnings were $0.14 per share. In an October 24, 2007 letter to shareholders, Defendant Fifer admitted that the

sales decline was attributable to production problems and inventory reductions that had cut "too deeply."

13.     Following this news, the price of Sturm Ruger common stock fell by $6.45 per share, closing at $10.65 per share – a one-day decline of more than 37% on volume of 4.2 million shares.

14.     One month before the disclosure of these adverse facts, Sturm Ruger insiders, including Defendant Thomas A. Dineen ("Dineen"), the Company's Treasurer and Chief Financial Officer ("CFO"), sold more than 321,000 shares of their personally-held Sturm Ruger common stock, generating proceeds of more than $6.5 million.

## JURISDICTION AND VENUE

15.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act [15 U.S.C. §§78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder [17 C.F.R. §240.10b-5].

16.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act.

17.     Venue is proper in this District pursuant to 28 U.S.C. §1391(b) and Section 27 of the Exchange Act. Many of the acts and transactions giving rise to the violations of law complained of herein, including the preparation and dissemination to the investing public of materially false and misleading statements, occurred in this District. In addition, Sturm Ruger maintains its principal executive office at One Lacey Place, Southport, Connecticut.

18.     In connection with the acts, conduct and other wrongs complained of herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to the United States mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

19.     By Court Order dated January 11, 2010, Steamfitters Local 449 Pension Fund was appointed Lead Plaintiff in this case. As detailed in the certification previously filed in this litigation

- 4 -

and incorporated by reference herein, Lead Plaintiff Steamfitters Local 449 Pension Fund purchased Sturm Ruger common stock during the Class Period and was damaged thereby.

20.     Defendant Sturm Ruger specializes in the design, manufacture and sale of firearms. The Company's headquarters are located at One Lacey Place in Southport, Connecticut.  As of February 19, 2010, the Company had over 19 million shares issued and outstanding that publicly trade on the New York Stock Exchange (the "NYSE") under the ticker symbol "RGR."

21.     Defendant Fifer was, at all relevant times, Sturm Ruger's CEO.  Fifer joined the Company as CEO on September 25, 2006 and was named to the Board of Directors on October 19, 2006.  He was later named as President of Sturm Ruger.  Defendant Fifer certified Sturm Ruger's quarterly reports on Form 10-Q for the periods ending March 31, 2007 ("Q1 2007 10-Q"), June 30, 2007 ("Q2 2007 10-Q") and September 30, 2007 ("Q3 2007 10-Q"), which were filed with the SEC on or about April 23, 2007, July 24, 2007 and October 24, 2007, respectively.  In addition, Defendant Fifer drafted, reviewed, or approved other public statements on behalf of the Company during the Class Period, including those made during an annual meeting held on April 24, 2007.

22.     Defendant Dineen was, at all relevant times, Vice President, Treasurer and CFO of Sturm Ruger.  Dineen became Vice President of the Company on May 24, 2006 and has served as Treasurer and CFO of Sturm Ruger since May 6, 2003.  Defendant Dineen signed and certified the Q1 2007 10-Q, Q2 2007 10-Q and Q3 2007 10-Q.  In addition, Defendant Dineen drafted, reviewed, or approved other public statements on behalf of the Company during the Class Period, including those made during an annual meeting held on April 24, 2007.

23.     Defendants Fifer and Dineen are collectively referred to herein as the "Individual Defendants."

24.     During the Class Period, the Individual Defendants, as senior executive officers and/or directors of Sturm Ruger, were privy to confidential and proprietary information concerning

Sturm Ruger, its operations, finances, financial condition as well as present and future business prospects. Because of their positions with the Company, the Individual Defendants had access to material adverse non-public information concerning Sturm Ruger via internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or Board of Director meetings and committees thereof, and via reports and other information provided to them in connection therewith. Because of their possession of such information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

25.     The Individual Defendants are liable as direct participants in the wrongs complained of herein. In addition, the Individual Defendants, by reason of their status as senior executive officers and/or directors of the Company, were "controlling persons" within the meaning of Section 20(a) of the Exchange Act and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein. Because of their positions of control, the Individual Defendants were able to and did, directly or indirectly, control the conduct of Sturm Ruger's business.

26.     As senior executive officers and/or directors and as controlling persons of a publicly traded company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, and was, and is, traded on the NYSE and governed by the federal securities laws, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with respect to Sturm Ruger's financial condition, performance, growth, operations, financial statements, business, products, markets, management, earnings and present and future business prospects, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of Sturm Ruger common stock would be based upon truthful and accurate information. The

Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

27.     The Individual Defendants are liable as participants in a fraudulent scheme and course of conduct, which operated as a fraud or deceit on purchasers of Sturm Ruger common stock by disseminating materially false and misleading statements and/or concealing material adverse facts.  The scheme: (i) deceived the investing public regarding Sturm Ruger's business, operations and management and the intrinsic value of Sturm Ruger securities; (ii) enabled Defendant Dineen and other Sturm Ruger insiders to sell 321,295 shares of their personally-held Sturm Ruger stock for gross proceeds in excess of $6.5 million; and (iii) caused Plaintiff and members of the Class (defined below) to purchase Sturm Ruger common stock at artificially inflated prices.

## CLASS ACTION ALLEGATIONS

28.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all those who purchased Sturm Ruger common stock during the Class Period and were harmed thereby (the "Class").  Excluded from the Class are Defendants, the officers and directors of the Company at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

29.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Sturm Ruger common shares were actively traded on the NYSE.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Sturm Ruger or its transfer agent and may be notified of the

pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

30.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

31.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

32.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

        (a)     whether Defendants violated the federal securities laws;

        (b)     whether Defendants omitted and/or misrepresented material facts, including those facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

        (c)     whether Defendants knew or recklessly disregarded that their statements were false and misleading; and

        (d)     the extent of damage sustained by Class members and the appropriate measure of damages.

33.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## CONFIDENTIAL SOURCES

34.     The allegations made herein are further supported by the first-hand knowledge of three confidential witnesses ("CWs").  These informants are former Sturm Ruger employees who provided facts from various departments within the Company.  As detailed below, each CW served in a position at Sturm Ruger which provided them with access to the information they are alleged to possess.

35.     Confidential Witness 1 ("CW 1") is a former Sturm Ruger Document Control Manager who was employed at the Company from August 2004 through February 2008.  As Document Control Manager, CW 1 was responsible for rewriting regulations and maintaining clear records of any changes made to firearms manufactured by the Company.  CW 1 had experience with lean manufacturing and, as part of Sturm Ruger's transition to lean manufacturing, CW 1 structured a new data system to better track records of product changes.

36.     Confidential Witness 2 ("CW 2") is a former Product Engineer at Sturm Ruger's Pine Tree Castings Division.  The Pine Tree Castings Division, located in Newport, New Hampshire, manufactures steel investment castings, including many of the component parts used to make Sturm Ruger firearms.  CW 2 was employed by the Company from December 2005 through December 2007.  As a Product Engineer, CW 2 oversaw the castings manufactured by Sturm Ruger and was responsible for ensuring that the castings were manufactured to specification.

37.     Confidential Witness 3 ("CW 3") is a former General Manager of Sturm Ruger's Pine Tree Castings Division.  CW 3 was employed at Sturm Ruger for 35 years until his departure in the end of December 2006.  As General Manager, CW 3 reported directly to former CEO William B. Ruger, Jr.

## SUBSTANTIVE ALLEGATIONS

### Background

38.     Defendant Sturm Ruger is principally engaged in the design, manufacture, and sale of firearms.  Approximately 92% of the Company's total sales for the year ended December 31, 2007 were from the firearms segment, which included sales in four industry product categories – rifles, shotguns, pistols and revolvers.  The Company's firearms are sold through a small number of "independent" wholesale distributors, principally to the commercial sporting market.  The distributors purchase Sturm Ruger's products directly from the Company and resell to retail firearm dealers who, in turn, resell to individual consumers.  Each distributor carries the entire line of firearms manufactured by Sturm Ruger for the commercial market.  As of December 31, 2007, Sturm Ruger had a total of twenty-three (23) distributors servicing various markets.

39.     Sturm Ruger derives the balance of its sales from precision investment castings, which are manufactured from steel alloys.  Investment castings are sold either directly or through manufacturers' representatives to companies in a variety of industries.  The investment casting segment also produces many of the basic metal component parts of the firearms manufactured by the Company, including barrels and triggers.

40.     Sturm Ruger produces its firearms and investment castings products out of its Newport, New Hampshire and Prescott, Arizona manufacturing facilities.  These facilities house the Company's principal production, research, development, engineering, design, shipping and sales.  Third parties supply the Company with certain raw materials and component parts for the firearm and investment casting products.  However, according to CW 1 and CW 2, most of the component parts for Sturm Ruger's firearms are produced in-house.

41.     Sturm Ruger was formed in 1949 by William B. Ruger, who remained Sturm Ruger's Chairman, CEO and Treasurer until his retirement.  He was succeeded by his son, William B. Ruger, Jr., who assumed the roles of Chairman and CEO in October 2000 until retiring in February 2006.

**Prior to the Class Period, Sturm Ruger**
**Experienced an Inflation in Inventory**

42.     Beginning in 2005 and continuing throughout 2006, Sturm Ruger faced a number of manufacturing and marketing challenges, including excess inventory, congested factories, batch processing, aging product lines and reduced engineering and marketing staff.

43.     Excess gun and component part inventory was especially a problem at Sturm Ruger in 2005 and 2006.  During that time, the Company undertook an inventory count and found that it had stockpiles of firearms that far exceeded any demand it was realizing from customers.  Indeed, as of June 30, 2006, Sturm Ruger's net inventories (which included inventories of finished products, as well as materials and products in process) were valued at $50.4 million.

44.     In May 2006, Sturm Ruger reported that 2005 was another "disappointing year" marked by inefficient manufacturing processes which prevented the Company from capitalizing on several new successful products, including two handguns, a .44 Magnum revolver called the "Flattop Blackhawk," and a .357 Magnum revolver called the "New Vaquero."

45.     Sturm Ruger reported losses for the third and fourth quarters of 2005 and declining year-over-year earnings for the first six months of 2006.  Despite high levels of component parts inventory, the Company was unable to shift manufacturing resources to meet increasing orders for its products.  Sturm Ruger common stock languished as a result, trading to a low of $5.56 per share during the second quarter for the period ended June 30, 2006.

**Sturm Ruger's Transformation Plan – The "Ruger Business System"**

46.     In the midst of Sturm Ruger's inventory problems, Defendant Fifer succeeded William B. Ruger, Jr. as Sturm Ruger's CEO in September 2006.  Fifer's hiring was cast as an extremely positive development and he was viewed as a strong executive who could transform Sturm Ruger.

47.     Defendant Fifer believed that in order for Sturm Ruger to remain competitive, the Company would have to make some changes.  As a result, he instituted an eight-component transformation plan based on lean manufacturing[1] (known internally as the "Ruger Business System").

48.     The elements to the transformation plan included, among other things, strategy deployment (a step-by-step planning, implementation and review process for managing change during the lean transformation); operational excellence, or kaizen, which focused on improvement in manufacturing and the elimination of waste at the Company; aggressive new product development; plans to expand the Company by possible acquisition opportunities; and leveraging the Company's brand through marketing and advertising initiatives.

49.     Under the transformation plan, Defendant Fifer made several changes at Sturm Ruger, including employing a new management team and introducing a number of "lean" processes.  The goal of the transformation plan was to mend the Company's ailing manufacturing methods and cut bloated inventory levels that Defendant Fifer claimed masked a number of operating inefficiencies.

50.     One of the first changes made under the plan was Sturm Ruger's alteration to its communications policy.  Starting November 1, 2006, the Company curiously decided that it would offer less information to investors and, as a result, stopped holding meetings with individual investors or analysts, discontinued the narrative portion of its quarterly financial press releases and ceased issuing financial forecasts or earnings guidance.  Then, on February 12, 2007, only two months prior to the Class Period, Sturm Ruger issued a press release announcing that it will no

---

[1]     Lean manufacturing is an operational strategy that seeks to produce a high level of throughput with a minimum amount of inventory.  It is derived from the Toyota Production System and is designed to decrease the time between customer order and shipment by eliminating sources of waste.

longer provide an earnings release on an annual or quarterly basis in advance of the filing of its Form 10-K or Forms 10-Q.

51.     The most significant changes, however, were to Sturm Ruger's inventory practices. The Company, under the express direction of Fifer, made enormous cuts to its raw materials, component parts, work in progress and finished goods inventories.  Indeed, as shown in the chart below, Sturm Ruger reduced its inventory by $24 million (-21%) during 2006, $16.5 million (-19%) during the first quarter of 2007 and $10.1 million during the second quarter of 2007.

- Steady reduction in raw materials, work in process, and finished goods



52.     The following chart summarizes Sturm Ruger's inventories from December 2006 – June 2007:

| | Gross Inventories | Net Inventories |
|---|---|---|
| December 31, 2006 | $87.5 million | $24.4 million |
| March 31, 2007 | $70.9 million | $14.7 million |
| June 30, 2007 | $60.9 million | $11.6 million |

53.     In a press release dated December 15, 2006, Sturm Ruger assured that it would monitor the Company's inventory and "conduct physical inventories at the end of 2006 and at the end of each quarter in 2007."

54.     As part of the transition plan, Sturm Ruger also changed from an annual production cycle to a "demand-pull" production system that was designed to limit production quantities to meet customer demand.  In the past, the Company adjusted production schedules to consume on-hand raw materials and work-in-progress inventories, regardless of customer demand for the finished goods.  This led to increased inventory.  However, under Sturm Ruger's new system, production was driven solely by customer demand.

55.     In addition, Sturm Ruger changed the manner in which distributors ordered firearms.  In previous years, each distributor placed one cancelable annual order.  Effective December 1, 2006, however, the Company began receiving firm, non-cancelable purchase orders on a more frequent basis, with most orders for immediate delivery.  Distributors submitted rolling 90 day forecasts of their projected needs.  The Company's goal was to ship all of the ordered items within 24 hours from the finished goods inventory.

56.     According to Sturm Ruger's 2006 Annual Report to Security Holders, these changes began to yield real benefits for Sturm Ruger's shareholders and customers.  In a letter to shareholders submitted with the 2006 Annual Report and filed with the SEC on or about April 3, 2007, Defendant Fifer, along with the Chairman of Sturm Ruger's Board of Directors, stated, in pertinent part, as follows:

> 2006 was a year of significant transition at Ruger, and we are pleased to tell you that the Company ended the year with improvements in many areas.  The changes started during the year are beginning to yield real benefits for our shareholders, customers, and employees.
>
> Our Board of Directors is now composed almost entirely of independent, highly experienced hands-on managers, including current and former CEOs.  They bring a wealth and breadth of experience to the Board and are actively involved with the management of the Company.  An example of this is the Executive Operations Committee of the Board formed in 2006, which meets frequently with management to review both strategic direction as well as the plans and results of current operations and initiatives.  This group is a tremendous resource for the management team.

Our CEO, Michael Fifer, who came on board in late September, has been an outstanding engineer of change. He has added key people and skills to the management team, and shifted the management style from top-down to one that more fully engages all levels in decision-making and responsibility for performance.

\*          \*          \*

These changes have generated a sense of excitement in the Company and amongst our customers that Ruger is moving in a very positive direction. Morale is greatly improved. Demand and on-time order fulfillment are up. Employees are fully engaged, and we see nothing but opportunities ahead of us.

57.     The market reacted positively to Defendant Fifer's efforts to transform Sturm Ruger. Indeed, during March 2007, Sturm Ruger common shares were trading above $13 per share, an increase of more than 80% from September 2006, when Fifer first joined the Company.

58.     However, as detailed further herein, Defendant Fifer's aggressive transformation plan and inventory reductions were much more difficult to implement than Defendants had originally anticipated and did not remedy the manufacturing and inventory problems that plagued the Company in 2005 and 2006. Instead, Defendant Fifer's transformation plan changed too much, too quickly, was not as positive as had been represented and caused the Company to experience additional production problems and inventory shortages. As a result of these problems, Sturm Ruger was unable to meet customer orders and subsequently experienced a net loss of $0.03 cents per share for the third quarter of 2007.

### Throughout the Class Period, Sturm Ruger Was Suffering From a Host of Undisclosed Problems

**Production Difficulties**

59.     Once Sturm Ruger started implementing its transition plan and making cuts to inventory, a collection of production problems arose. Among other things, the Company experienced problems with its machinery and tools, manufacturing problems, long machine changeover times and issues with vendor supply. These problems caused the Company to fall behind in production.

60.     CW 1 noted that part of the problem was that under the transformation plan, the new Sturm Ruger management established cellular manufacturing, *i.e.,* an assembly-line format for manufacturing its firearms.  In prior years, Sturm Ruger firearms had been assembled by hand with one person assembling the product from beginning to end (*i.e.,* "batch production").  Unlike batch production, cellular manufacturing works on the principle of one-piece flow, in that all of the manufacturing operations within the cell are conducted in a continuous sequence.

61.     The Company also altered the manner in which employees working on the assembly lines were paid.  Whereas, prior to the transformation plan, employees were paid "piecework" (*i.e.*, a certain amount for each 100 pieces produced), Sturm Ruger employees were now paid an hourly rate regardless of how many firearms or firearm component parts were produced.

62.     While the shift to cellular manufacturing was intended to minimize the time for a single product to flow through the entire production process, according to CW 1, the approach actually slowed production.  CW 1 estimated that where Sturm Ruger was previously able to manufacture 400 to 500 revolvers per day in the Newport facility, with the new cellular manufacturing format, they were only manufacturing between 50 and 100 units per day.  CW 1 explained that this was, in part, because the assembly-line employees were paid an hourly rate and were not as skilled as the individuals that previously assembled an entire product.  CW 3 similarly indicated that the change to an hourly payment decreased employees' incentive to work quickly, while the cellular manufacturing format resulted in employees in the assembly-line waiting for the preceding person to finish what they were working on before they could begin to work on a firearm.

63.     For Sturm Ruger to "break-even," the Company was required to produce a volume of approximately 1,700 to 1,800 firearms per day.  Amounts above this volume contributed approximately $1 million of pre-tax operating profit per quarter for each additional 100 firearms produced.

64.     Defendants knew they were not meeting their production goals because, as CW 1 noted, there were internal reports showing Sturm Ruger's manufacturing goals compared to the actual production achieved each day.  Specifically, the daily goal was a certain percentage of the backlog divided by the number of weeks remaining to deliver the product.  CW 1 gave the example that if there was a particular order that needed to be delivered in 10 weeks and the manufacturing facility had only been able to produce a certain number of firearm units until that point, it would be determined how many units would need to be manufactured each day to "catch up."

65.     Sturm Ruger's production problems were masked from the market during the first and second quarters of 2007.  Indeed, the only reason that the Company was able to report profits during those quarters was because it was selling off its old firearm inventory and working through its component part inventory and, therefore, did not incur the expense of manufacturing new materials and products.  In the third quarter of 2007, however, the manufacturing inefficiencies and lack of on-hand inventory caused Sturm Ruger to miss its targets and prevented the Company from keeping up with distributor demand.

66.     With regard to Sturm Ruger's vendor supply issues, according to CW 3, they occurred as a result of Sturm Ruger's decision to modify the payment terms with its vendors/suppliers.  Whereas the Company had previously paid its vendors within 10 days, CW 3 noted that, around October or November of 2006, Sturm Ruger's new management decided to push back the payment term to 90 days.  CW 3 attended a meeting with Sturm Ruger senior staff and its Board of Directors, in which he/she expressed concern that the later payment period would not guarantee deliveries and supplies whenever needed.  According to CW 3, the 90 day payment terms likely impacted Sturm Ruger's ability to meet production demand and have supplies on hand for orders received during the Class Period.

**Extreme Cuts in Inventory Prevented Sturm Ruger From Meeting Orders**

67.     The production problems Sturm Ruger experienced during the Class Period were exacerbated by Sturm Ruger's severe inventory cuts.  According to CW 1, the transition to lean manufacturing caused the Company to work through most of the inventory that had been piling up under the previous management in 2005 and the first half of 2006.  This included a significant reduction in work-in-progress inventory and component part inventory during the first half of 2007.

68.     CW 3 stated that most of the castings (including those used as firearm component parts) required a two-month lead time and, thus, it was essential to keep a two-month supply on hand to meet firearm orders.  CW 3 noted that the new management under Defendant Fifer were not knowledgeable about manufacturing firearms or the castings for firearms and were focused on manufacturing only those castings needed for current firearm orders.  Concerned, CW 3 warned the new management that the castings inventory would not be on hand when needed if Sturm Ruger was only manufacturing as much inventory as necessary for immediate orders.

69.     CW 2 confirmed that under the transformation plan, Sturm Ruger employees were required to produce only as many component parts as would be used to manufacture the firearms so that the Company would not carry excess raw materials in its inventory.

70.     As detailed herein, during the Class Period, Defendants regularly represented that the transformation plan was improving production and that Sturm Ruger had adequate quantities of raw materials for its firearms.  However, according to CW 1, as a result of Sturm Ruger's inventory reductions, the Company did not have the pieces and parts on hand to meet customer orders and target production volumes.  CW 2 confirmed that during the Class Period, Sturm Ruger became increasingly behind in production and had difficulty meeting production goals.

71.     At the same time that Sturm Ruger was experiencing production problems, according to CW 1, the Company also had a huge number of orders from distributors.  Sturm Ruger's sudden

increase in orders was due to the Company's new order policy in which distributors were permitted to make non-cancelable purchase orders on a more frequent basis.

72.     With increasing orders coming in during the Class Period, CW 1 elaborated that Sturm Ruger was unable to manage its inventory of raw materials and, with the new transformation plan implemented by Sturm Ruger management, the Company could not manufacture firearms quickly enough to meet the increasing orders.  As a result, Sturm Ruger's distributors were "clamoring" to have their orders fulfilled.

73.     As Defendants knew, the extreme reductions in inventory balances by Sturm Ruger during the first and second quarters of 2007 reduced the Company's parts and component inventories below efficient levels and prevented the Company from meeting production and shipment schedules, thereby causing Sturm Ruger's backlog of unfilled purchase orders to be materially inflated.

**Sturm Ruger's Distributors were Carrying Large Quantities of Unsold Firearms**

74.     In addition, as a result of Sturm Ruger's change in its order policy permitting distributors to make several non-cancelable purchase orders throughout the year, the number of sales made to Sturm Ruger's distributors during the first six months of 2007 was artificially increased.

75.     While sales to distributors during the first and second quarters of 2007 increased, the amount of unsold products in the distributors' inventories also increased.  Indeed, as Defendants later admitted in Sturm Ruger's Q3 2007 10-Q, distributor inventory increased from 57,126 units during the fourth quarter of 2006, to 78,805 units during the second quarter of 2007, an increase of more than 37%.

76.     Despite this Class Period increase in distributor inventories of unsold products, Defendants failed to disclose the risk that distributors would reduce their future purchases of Sturm Ruger products in the near term.  It was only at the end of the third quarter, in its 3Q 2007 10-Q, that

- 19 -

the Company disclosed that distributor inventories of Sturm Ruger unsold products had increased and resulted in reduced purchase order quantities of more than 29%.

**Senior Management at Sturm Ruger Knew About the Company's
Production and Inventory Problems**

77.    Defendants, and most Sturm Ruger senior managers, knew about the production and inventory problems plaguing the Company during the Class Period.  Under the supervision of Defendant Fifer, Sturm Ruger's management was intensely focused on rapidly implementing the transformation plan and employed numerous mechanisms designed to monitor the Company's orders, production and inventory.  These indicators demonstrated to Defendants that Sturm Ruger was not meeting its production goals and was quickly running out of component part inventory to meet customers' demands.

78.    Sturm Ruger's Executive Operations Committee met frequently with management to review the plans and results of the Company's operations and initiatives and to discuss Sturm Ruger's transformation plan.  The Executive Operations Committee was established on August 1, 2006 to collaborate with Sturm Ruger's executive team during the transition in the management of the Company.  Among other things, the Executive Operations Committee was responsible for establishing and implementing a strategic business plan for Sturm Ruger that enabled growth and profitability, developing and implementing the Ruger Business System, conducting oversight of Company operations and business performance (including operations and strategy deployment reviews with executive management) and ensuring collaboration and communication with management.  According to Sturm Ruger's 2008 Proxy Statement, the Executive Operations Committee held ten meetings during 2007 and six meetings with Sturm Ruger's Board of Directors, including Defendant Fifer.

79.    Moreover, according to CW 1 and CW 2, daily production meetings in Sturm Ruger's Newport, New Hampshire facility were held throughout the Class Period.  During those meetings,

which were attended by the Company's vice presidents, managers and engineers, Sturm Ruger's inability to meet its production goals was discussed.  CW 1 explained that the previous day's manufacturing results were posted during the meetings and the numbers were broken down by gun model, the total number of units from the previous day, the number that was forecasted and how "far off" the Company was from their targets.  CW 1 also noted that the difference between Sturm Ruger's daily manufacturing targets and the actual manufactured firearm units the Company produced continued to widen throughout 2007.

80.   Defendants and senior management also had knowledge regarding Sturm Ruger's inventory.  As CW 1 indicated, Sturm Ruger used a custom-made Material Requirements Planning ("MRP") system and spreadsheets to track inventory.

81.   Despite the production and inventory shortage problems at Sturm Ruger, senior management – including Defendants Fifer and Dineen – knowingly or recklessly disregarded the information they had about the difficulties the Company was experiencing in implementing the transformation plan and the failure to meet customer orders.  Defendants not only ignored MRP reports showing that the Company was running out of inventory necessary to meet distributors' demands, but also disregarded information presented during daily production meetings that showed that the Company was not meeting production goals and would be unable to produce its firearms quickly enough to meet orders.

82.   The production and inventory problems during the Class Period – that Defendants knowingly or recklessly disregarded – ultimately caused Sturm Ruger to experience a net loss of $0.03 per share during the third quarter of 2007.  In a letter to shareholders, Defendant Fifer admitted that the disappointing third quarter results were a result of "reduc[ing] component part inventories too deeply across too many product lines simultaneously, which was a principal cause of [the Company's] reduced production volume during the quarter."

## PRE-CLASS PERIOD MATERIALLY
## FALSE AND MISLEADING STATEMENTS

83.     Approximately two weeks prior to the Class Period, on or about April 3, 2007, Sturm Ruger filed its 2006 Annual Report to Security Holders.  Along with the 2006 Annual Report, the Company submitted a letter to its shareholders signed by Defendant Fifer and the Chairman of Sturm Ruger's Board of Directors, Vice Admiral James E. Service, which positively described the Ruger Business System and the changes made as a result of Defendants' efforts to implement lean manufacturing.  The letter stated, in pertinent part, as follows:

> 2006 was a year of significant transition at Ruger, and we are pleased to tell you that ***the Company ended the year with improvements in many areas.  The changes started during the year are beginning to yield real benefits for our shareholders, customers, and employees.***

> Our Board of Directors is now composed almost entirely of independent, highly experienced hands-on managers, including current and former CEOs.  They bring a wealth and breadth of experience to the Board and are actively involved with the management of the Company.  An example of this is the Executive Operations Committee of the Board formed in 2006, which meets frequently with management to review both strategic direction as well as the plans and results of current operations and initiatives.  This group is a tremendous resource for the management team.

> ***Our CEO, Michael Fifer, who came on board in late September, has been an outstanding engineer of change.***  He has added key people and skills to the management team, and shifted the management style from top-down to one that more fully engages all levels in decision-making and responsibility for performance.  He has gone on to lead the management team in:

> - Adopting lean practices throughout the Company;

> - Implementing new internal measurement systems;

> - Changing compensation systems to emphasize performance;

> - Enhancing communications throughout the Company;

> - Increasing the transparency of communications with our shareholders by enhancing the content and "plain English" presentation of the MD&A section of our 10-Q and 10-K filings;

> - Converting under-utilized assets to cash for the benefit of our shareholders;

- 22 -

- Making the voice-of-the customer a critical step in our planning process for both new product development and strategic direction; and

- Changing the way we accept orders, forecast demand, and plan our production.

***These changes have generated a sense of excitement in the Company and amongst our customers that Ruger is moving in a very positive direction. Morale is greatly improved. Demand and on-time order fulfillment are up. Employees are fully engaged, and we see nothing but opportunities ahead of us.*** [Emphasis added].

84. The statements referenced above in ¶83 about the positive changes made and expected at Sturm Ruger as a result of Defendant Fifer's transformation plan were materially false and misleading because the Company's production problems prevented Sturm Ruger from fulfilling customer orders and meeting production schedules in a timely manner. Moreover, as these problems intensified during the Class Period, Defendants had a duty to correct and update these representations.

85. The statements referenced above in ¶83 remained alive and uncorrected throughout the Class Period.

## MATERIALLY FALSE AND MISLEADING STATEMENTS MADE DURING THE CLASS PERIOD

86. The Class Period begins on April 23, 2007. On that date, Sturm Ruger filed its Form 10-Q for the first quarter of 2007, the period ended March 31, 2007. The Q1 2007 10-Q, signed by Defendant Dineen, indicated that Sturm Ruger's net sales for the first quarter were $48.4 million (an increase of $1 million as compared to the same quarter during the previous year) and that firearm sales were $43.6 million (an increase of $2.8 million as compared to the same quarter during the previous year). The Company reported net earnings of $0.36 per share (more than seven times greater than year-earlier results) bolstered by certain one-time gains from sales of non-manufacturing assets to the Ruger family and a startling increase in Sturm Ruger's gross profit margins of 1100+ basis points. According to market reports, the Company was expected to earn $0.09 per share. The

Q1 2007 10-Q discussed Sturm Ruger's ongoing inventory reduction efforts and the effect they had

on Sturm Ruger's first quarter financial results, stating, in pertinent part:

> During the first quarter of 2007, inventory quantities were reduced. This reduction in
> inventory levels is expected to continue through year-end. This reduction will result
> in a liquidation of LIFO inventory quantities carried at lower costs prevailing in prior
> years as compared with the current cost of purchases. Although the effect of such a
> liquidation cannot be precisely quantified at the present time, ***management believes***
> ***that if a LIFO liquidation continues to occur in 2007, the impact may be material***
> ***to the Company's results of operations for the period but will not have a material***
> ***impact on the financial position of the Company. The Company estimates that the***
> ***impact of this liquidation on the results of operations for the period ended March***
> ***31, 2007 was to reduce cost of products sold by $4.4 million.***
>
> \*       \*       \*
>
> During the three months ended March 31, 2007 gross inventories were reduced by
> $16.5 million, compared to a decrease in gross inventories of $3.0 million in the
> comparable prior year period. Inventories are not expected to increase above the
> March 31 levels during the remainder of 2007. The 2007 reduction resulted in a
> liquidation of LIFO inventory quantities carried at lower costs that prevailed in prior
> years as compared with the current cost of purchases, the effect of which decreased
> costs of products sold by approximately $4.4 million and increased gross margin by
> 9.2% of sales in the three month period ended March 31, 2007. LIFO adjustments of
> $1.0 million resulted in an increase in cost of products sold in the comparable prior
> year period.
>
> \*       \*       \*
>
> ***Cash provided by operating activities was $18.1 million and $4.7 million for the***
> ***three months ended March 31, 2007 and 2006, respectively. The increase in cash***
> ***provided is principally a result of a decrease in inventory, improved net income and***
> ***various fluctuations in operating asset and liability accounts during the first three***
> ***months of 2007 compared to the first three months of 2006.*** [Emphasis added].

      87.    The Q1 2007 10-Q also made representations concerning Defendant Fifer's

December 2006 changes, which affected the placement of orders received from Sturm Ruger's

"independent distributors." Specifically, the Q1 2007 10-Q provided, in pertinent part, as follows:

> Backlog
>
> In prior years, the Company received one cancelable annual firearms order in
> December from each of its distributors. Effective December 1, 2006 the Company
> changed the manner in which distributors order firearms, and began receiving firm,
> non-cancelable purchase orders on a frequent basis, with most orders for immediate
> delivery. During the three months ended March 31, 2007, ***firearms orders received***

*totaled $58.9 million, and order backlog increased $11.6 million from $16.2 million on December 31, 2006 to $27.8 million on March 31, 2007.* Because of the aforementioned change in the manner in which distributors now order firearms, comparable data for the first quarter of 2006 is not meaningful.

*       *       *

Firearms unit shipments increased 2.2% for the three months ended March 31, 2007. *Rifle shipments increased 9.5% as demand remained strong for the Ruger 10/22 rimfire rifles and Mini-14 centerfire rifles.* Revolver shipments decreased 6.6%, from the first quarter of 2006, due almost entirely to the discounted 2006 sale of 5,000 units of a discontinued single-action revolver. Eliminating the effect of this 2006 shipment, revolver sales would have increased 10.0% from the comparable 2006 quarter. *This comparison better reflects the greater availability and continued strong demand of revolver models, particularly the Ruger New Vaquero.* Shotgun shipments increased 9.4% and pistol shipments remained consistent with the prior year period. [Emphasis added].

88.    Defendants' statements regarding the effect of Sturm Ruger's inventory reductions and "strong demand" for its products were relied upon by Wall Street analysts and cited in publicly available analyst reports. For example, based on Sturm Ruger's positive first quarter results, CL King & Associates raised its 2007 estimate for the Company from $.40 to $.50 to reflect the strong quarter.

89.    The next day, on April 24, 2007, Sturm Ruger held an annual meeting (the "Meeting") for its stockholders and filed the text of the Meeting presentation with the SEC. During the Meeting, Defendants stated that the Company was "implementing a business system that relentlessly pursues the elimination of all non-value-added activities from every business process with the ultimate goal of providing World-Class quality, delivery and service to its customers at the lowest possible cost." Throughout the Meeting presentation, Defendants boasted about the changes made as a result of the Ruger Business System and presented before and after pictures of the changes to the Company's business and operations. For example, Defendants discussed the improvements to batch processing of firearm scope rings and the Company's reduction of over 4,000-5,000 units of work in progress to only 9 units. Defendants further stated that, prior to the Ruger Business System, it took seven employees to produce 800-1000 scope rings per day; whereas, since the

implementation of the Ruger Business System, it took only four employees to produce 1,300-1,500 units per day – thereby increasing productivity by 144%.

90.     Defendants also made positive statements regarding the Company's inventory cuts during the Meeting presentation, stating that Sturm Ruger's reduction in inventory "simplified product line for trade customers and end users," "[e]liminated low volume / low margin items," and "[e]nsured that profitable niche markets are still served."   Defendants also promised that a "[s]ignificant reduction in inventory" would "result[] in better cash flow" and noted that the inventory reduction of $16.5 million during the first quarter of 2007, resulted in an operating cash flow of $17.3 million for Sturm Ruger.

91.     In direct response to the Company's Q1 2007 10-Q and Meeting presentation, Sturm Ruger's stock rose from $12.05 to $13.39, an 11% increase, on heavy trading volume.

92.     On or about July 24, 2007, Sturm Ruger filed its Form 10-Q for the second quarter of 2007, the period ended June 30, 2007.  The Q2 2007 10-Q, signed by Defendant Dineen, indicated that Sturm Ruger's net sales for the second quarter were $42.1 million, an increase of $6.8 million (or 19.4%) as compared to the same quarter for the previous year.  In addition, firearm sales were $39.6 million for the second quarter, an increase of $10.3 million (or 35.4%) over the same quarter the previous year.  The Company reported net earnings of $0.23 per share (almost four times greater than the previous year results during the second quarter).  The Q2 2007 10-Q discussed Sturm Ruger's continuing inventory reduction efforts and the effect they had on Sturm Ruger's first quarter financial results, providing, in pertinent part, as follows:

> During the three and six month periods ended June 30, 2007, inventory quantities were reduced.  This reduction in inventory levels is expected to continue through year-end.  This reduction will result in a liquidation of LIFO inventory quantities carried at lower costs prevailing in prior years as compared with current cost of purchases.  Although the effect of such a liquidation cannot be precisely quantified at the present time, ***management believes that if a LIFO liquidation continues to occur in 2007, the impact may be material to the Company's results of operations for the period but will not have a material impact on the financial position of the***

*Company.  The Company estimates that the impact of this liquidation on the results of operations for the three and six month periods ended June 30, 2007 was to reduce cost of products sold by $6.5 and $16.2 million, respectively.*

*        *        *

During the three and six months ended June 30, 2007 gross inventories were reduced by $10.1 million and $26.6 million, respectively, compared to increases in gross inventories of $7.2 million and $4.3 million in the comparable prior year periods. Inventories are not expected to increase above the June 30 levels during the remainder of 2007.  *The 2007 reduction resulted in LIFO income and decreased cost of products sold of $6.1 million and $10.6 million for the three and six months ended June 30, 2007, respectively.*  [Emphasis added].

With regard to raw material inventory, Sturm Ruger's Q2 2007 10-Q made the following representations:

Third parties supply the Company with various raw materials for its firearms and castings, such as fabricated steel components, walnut, birch, beech, maple and laminated lumber for rifle and shotgun stocks, wax, ceramic material, metal alloys, various synthetic products and other component parts. There is a limited supply of these materials in the marketplace at any given time that can cause the purchase prices to vary based upon numerous market factors.  *The Company believes that it has adequate quantities of raw materials in inventory to provide ample time to locate and obtain additional items at then-current market cost without interruption of its manufacturing operations.*  However, if market conditions result in a significant prolonged inflation of certain prices or if inadequate quantities of raw materials can not be obtained, the Company's manufacturing processes could be interrupted and the Company's financial condition or results of operations could be materially adversely affected.  [Emphasis added].

93.    The Q2 2007 10-Q also made representations concerning Defendant Fifer's December 2006 changes (which affected the placement of orders received from Sturm Ruger's independent distributors) and reported that shipments of firearm products to the Company's distributors increased by 31.8% during the second quarter 2007 as compared to the prior year.  The Q2 2007 10-Q provided, in pertinent part, as follows:

In prior years, the Company received one cancelable annual firearms order in December from each of its distributors.  Effective December 1, 2006, the Company changed the manner in which distributors order firearms, and began receiving firm, non-cancelable purchase orders on a frequent basis, with most orders for immediate delivery.

Three Months Ended
- 27 -

|  | June 30, 2007 | March 31, 2007 |
|---|---|---|
| Orders Received | $39.1 | $58.9 |
| Ending Backlog | $23.3 | $27.9 |

\*       \*       \*

***Firearms unit shipments increased 31.8% for the three months ended June 30, 2007 when compared to the second quarter of 2006.  Rifle shipments increased 49.3% from the comparable prior year period due to strong demand and product availability.  Revolver shipments increased 19.8% from the comparable prior year period.  Pistol shipments increased 18.8% from the comparable prior year period. Shotgun shipments increased 35.8% from the comparable prior year period.*** [Emphasis added].

94.     The market reacted positively to Sturm Ruger's announcement of its second quarter earnings and, in direct response, the Company's stock increased 10%, closing at a trading price of $18.55 the day after the Q2 2007 10-Q was filed.  Commenting on Sturm Ruger's financials, an analyst at CL King & Associates stated that, "[t]he results were outstanding" and "[f]irearm revenues exploded to upside, up 35% as it appears the company is making progress in manufacturing enough product to meet demand."  The analyst continued, "we think Sturm Ruger is hitting on all cylinders."

95.     The statements set forth above in ¶¶86-87, 89-90, 92-93 were materially false and misleading, because they failed to disclose, *inter alia*, the following facts which were then existing, known or recklessly disregarded by Defendants:

(a)     that the reductions in inventory balances by Sturm Ruger in the first and second quarters of 2007 had reduced Sturm Ruger's parts and components inventories below efficient levels, preventing Sturm Ruger's manufacturing units from meeting production and shipment schedules and resulting in the Company's inability to sustain current or historical sales levels;

(b)     that contrary to Defendants' statements that Sturm Ruger had "adequate quantities of raw materials in its inventory," the Company's extreme inventory cuts to its component parts and raw materials were not sufficient to meet customer orders and target production volumes;

(c)     that Sturm Ruger's "backlog" of unfilled purchase orders was materially inflated because of the Company's inability to meet current production and shipping schedules due to inventory shortages and production problems;

(d)     that Sturm Ruger's increase in product shipments during the first and second quarters of 2007 were caused by the Company selling through its inventory and **_not_** a result of increased productivity;

(e)     that orders received from the Company's independent distributors were artificially boosted by the Company's mandated change to firm and non-cancelable purchase order submissions and was not reflective of actual demand for the Company's products;

(f)     that Sturm Ruger's independent distributors were carrying large quantities of the Company's unsold products, increasing the risk that these distributors would reduce or curtail their future purchases; and

(g)     that based on the above, Defendants had no reasonable basis for their positive statements and opinions concerning Sturm Ruger's current financial performance and condition.

## THE TRUTH IS REVEALED

96.     On October 24, 2007, Sturm Ruger announced that its net sales for the third quarter of 2007 fell over 23%, resulting in a net loss of $617,000, or $0.03 cents a share, for the quarter.  The results represented a sharp reversal from Sturm Ruger's financials reported during the first half of 2007.  While the Company does not typically issue guidance, Wall Street consensus estimates for Sturm Ruger's earnings were $0.14 per share for the third quarter.

97.     In an October 24, 2007 letter to shareholders, Defendant Fifer admitted that the sales decline was attributable to inventory reductions that had cut "too deeply" and stated, in pertinent part, as follows:

**To the Shareholders of Sturm, Ruger & Co., Inc.,**

The third quarter of 2007 was a major disappointment, especially following the strong first and second quarters in 2007.  My goal in writing this letter is to put the third quarter results into context, explaining the breadth of the ongoing transformation of Ruger, and to give you the information you need to better estimate Ruger's intrinsic value.

I am optimistic that Ruger can grow and prosper, but the transformation will take time and progress will not always be smooth.  Sometimes it will follow the old adage, "two steps forward and one step back."

*        *        *

**Product Manufacturing**

The first major step in transformation of our manufacturing was a deliberate, severe reduction in inventory and elimination of the practices that produced it.  We reduced inventory by $28.3 million in the second half of 2006 and $26.6 million in the first half of 2007.

Inventory masks problems in the production process.  ***By reducing inventory, challenges from poor machinery and tool reliability, manufacturing issues, long machine changeover times, and vendor supply issues are all brought to the forefront.  Because there is not spare inventory to draw upon, these challenges need to be addressed in real time, with a focus on permanent corrective actions that address the root cause problems.***  That is a very painful process in the short term, fraught with line stoppages and operating within a firefighting environment.  It requires expanded engineering resources and training for front line supervisors and perseverance in the face of sometimes seemingly insurmountable obstacles.

*        *        *

We concluded during the third quarter that ***we had reduced component part inventories too deeply across too many product lines simultaneously, which was a principal cause of our reduced production volume during the quarter.***  We have consequently slowed our rapid, wide spread draw down of inventory and increased the foundry output to replenish component part shortages.  Inventory was relatively unchanged during the third quarter of 2007, declining only $0.4 million.  We expect inventory to continue to decline in the aggregate, but at a slower pace than in the past year; the remaining excess inventory is largely in component parts for slower moving products or in raw material.  The large excess of components in faster moving products and finished goods from one year ago has now been largely consumed. [Emphasis added].

98.    In addition, on or about October 24, 2007, Sturm Ruger filed its Form 10-Q for the third quarter of 2007, the period ended September 30, 2007.  The Q3 2007 10-Q revealed – for the first time – that inventories of unsold Sturm Ruger products held by the Company's independent

distributors had increased by more than 37% during the second quarter of 2007, indicating that Sturm Ruger's products were not selling through to end user retail customers. The Q3 2007 10-Q also revealed that firearm orders received in the third quarter had declined by more than 35% from the previous quarter and that the decline was due, in part, to "the Company's inability to produce and ship sufficient quantities of certain firearms already on order, which discouraged additional orders for those products" and "softening of demand." Sturm Ruger also noted that although some "product lines saw continued strong demand[,] . . . the Company was unable to produce these products in sufficient quantities to materially reduce their backlog." The Q3 2007 10-Q continued:

> In many cases the Company's rate of production for these products declined, principally because of a shortage of component parts. This unplanned decrease in the rate of production negatively impacted the results of the quarter ended September 30, 2007, and is expected to continue to depress operating results until improved. It is uncertain when higher levels of production will be achieved.

99. Following this news, the price of Sturm Ruger common stock fell by $6.45 per share, closing at $10.65 per share – a one-day decline of more than 37% on volume of 4.2 million shares.

100. The market for Sturm Ruger common stock was open, well-developed and efficient at all relevant times. As a result of these materially false and misleading statements and failures to disclose, Sturm Ruger securities traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired Sturm Ruger common stock relying upon the integrity of the market price of Sturm Ruger common stock and market information relating to Sturm Ruger, and have been damaged thereby.

101. During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Sturm Ruger common stock, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and misleading. Said statements and omissions were materially false and

misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations, as alleged herein.

102.    At all relevant times, the material misrepresentations and omissions particularized herein directly or proximately caused, or were a substantial contributing cause of, the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false or misleading statements about Sturm Ruger's business, prospects and operations. These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of Sturm Ruger and its business, prospects and operations, thus causing the Company's common stock to be overvalued and artificially inflated at all relevant times. Defendants' materially false and misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's common stock at artificially inflated prices, thus causing the damages complained of herein.

## ADDITIONAL SCIENTER ALLEGATIONS

103.    The Individual Defendants, by virtue of their high-level positions with Sturm Ruger, participated in the management of Sturm Ruger, were involved in the day-to-day operations of Sturm Ruger at the highest levels, and were privy to confidential proprietary information concerning Sturm Ruger and its business, operations and financial condition, and were aware of or deliberately disregarded that their false and misleading statements caused the Company's stock to trade at inflated prices. Because of their managerial positions with Sturm Ruger, each had access to the adverse undisclosed information about Sturm Ruger's business, financial condition and prospects, and knew or deliberately disregarded that the adverse facts alleged herein rendered their positive Class Period representations materially false and misleading.

104.    The Individual Defendants were personally familiar with Sturm Ruger's inventory and manufacturing requirements and distributor sell-through, because they closely monitored production and shipment schedules via reports from Sturm Ruger's operations, sales and finance departments, which were generated and provided to them on a regular basis.   These reports summarized the Company's purchase orders, production and manufacturing schedules, inventory levels and dealer inventories and sell-though.   As a result of their monitoring, each of the Individual Defendants knew or recklessly disregarded that Sturm Ruger would be unable to meet its production and shipping schedules because it was experiencing significant production problems and did not have enough inventory on hand following the reductions that took place during 2006 and the first half of 2007.   Defendants also knew or recklessly disregarded that some of the Company's dealers were likely to curtail future purchases from the Company due to a build-up of unsold products.

105.    Moreover, during the Class Period, certain of the Individual Defendants and other Company insiders sold thousands of shares of their personally-held common stock for aggregate proceeds of nearly $6.6 million.   These insiders occupied the following positions during the Class Period: (i) Defendant Dineen, Vice President, Treasurer and CFO; (ii) Leslie Gasper, Corporate Secretary; (iii) Stephen Sanetti, Vice Chairman of the Board, President, Chief Operating Officer ("COO") and General Counsel; and (iv) Robert Stutler, Vice President.   Their Class Period sales, which were suspicious and unusual in amount and timing, are depicted in the following chart:

| Last Name | First Name | Position | Date | Shares | Price | Proceeds |
|---|---|---|---|---|---|---|
| DINEEN | THOMAS | CFO, | 7/30/2007 | 27,089 | | $527,000 |
| | | various | | 27,089 | | $527,000 |
| | | | | | | |
| GASPER | LESLIE | Corporate | 8/7/2007 | 2,000 | $21.65 | $43,300 |
| | | Secretary | 8/7/2007 | 1,200 | $21.40 | $25,680 |
| | | | 8/7/2007 | 1,200 | $21.75 | $26,100 |
| | | | 8/7/2007 | 1,000 | $21.20 | $21,200 |
| | | | 8/7/2007 | 1,000 | $21.70 | $21,700 |
| | | | 8/7/2007 | 1,000 | $21.81 | $21,810 |
| | | | 8/7/2007 | 1,000 | $21.83 | $21,830 |

|  |  |  | 8/7/2007 | 1,000 | $21.85 | $21,850 |
|---|---|---|---|---|---|---|
|  |  |  | 8/7/2007 | 900 | $21.00 | $18,900 |
|  |  |  | 8/7/2007 | 800 | $21.10 | $16,880 |
|  |  |  | 8/7/2007 | 800 | $21.25 | $17,000 |
|  |  |  | 8/7/2007 | 100 | $21.87 | $2,187 |
|  |  |  | 8/7/2007 | 12,000 | $21.87 | $262,440 |
|  |  |  | 7/31/2007 | 37,827 |  | $773,000 |
|  |  |  |  | 61,827 |  | $1,293,877 |
| SANETTI | STEPHEN | COO, various | 7/31/2007 | 151,307 |  | $3,093,000 |
|  |  |  |  | 151,307 |  | $3,093,000 |
| STUTLER | ROBERT | Vice President | 8/24/2007 | 1,427 | $19.11 | $27,270 |
|  |  |  | 8/24/2007 | 473 | $19.07 | $9,020 |
|  |  |  | 8/24/2007 | 439 | $19.14 | $8,402 |
|  |  |  | 8/24/2007 | 300 | $19.13 | $5,739 |
|  |  |  | 8/24/2007 | 200 | $19.12 | $3,824 |
|  |  |  | 8/24/2007 | 200 | $19.08 | $3,816 |
|  |  |  | 8/24/2007 | 200 | $19.07 | $3,814 |
|  |  |  | 8/24/2007 | 100 | $19.10 | $1,910 |
|  |  |  | 7/31/2007 | 77,733 |  | $1,589,000 |
|  |  |  |  | 81,072 |  | $1,652,796 |
|  |  | **Total:** |  | **321,295** |  | **$6,566,673** |

106.    Defendants' insider trading was unusual and suspicious for at least the following reasons:

(a)    all insider trading took place within the span of one month – July 30, 2007 through August 24, 2007 – shortly after Sturm Ruger issued favorable results for the second quarter 2007 and just two months before the Company announced that its extreme reduction in inventory prevented it from meeting customer orders and led to the disappointing results announced in the third quarter of 2007;

(b)    the insider trading occurred at high prices (between $21.87 – $19.07 per share) relative to where the price of Sturm Ruger's stock fell at the end of the Class Period ($10.65 per share); and

(c)    none of the insiders made *any* sales before or after the Class Period.

## LOSS CAUSATION/ECONOMIC HARM

107.    During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Sturm Ruger stock and operated as a fraud or deceit on Class Period purchasers of Sturm Ruger stock by misrepresenting the Company's operations and prospects.   When Defendants' falsehoods, misrepresentations and omissions were disclosed, the price of Sturm Ruger stock fell precipitously as the artificial inflation dissipated.  As a result of their purchases of Sturm Ruger stock during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

108.    By failing to disclose Sturm Ruger's production and inventory problems, among other things, Defendants presented a misleading picture of Sturm Ruger's business and prospects. Defendants' false and misleading statements and omissions had the intended effect and caused Sturm Ruger stock to trade at artificially inflated levels throughout the Class Period, reaching a Class Period high of $22.58 per share on August 7, 2007, before collapsing to $10.65 per share on October 25, 2007 – a 53% decline.

109.    The decline in the price of Sturm Ruger stock was a direct result of the nature and extent of Defendants' fraud being partially revealed to investors and the market.  The timing and magnitude of the decline in the price of Sturm Ruger stock negates any inference that the loss suffered by Plaintiff and other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to Defendants' fraudulent conduct.  The economic loss, *i.e.*, damages, suffered by Plaintiff and other members of the Class was a direct result of Defendants' fraudulent scheme to artificially inflate the price of Sturm Ruger stock and the subsequent significant decline in the value of Sturm Ruger stock when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

## APPLICABILITY OF PRESUMPTION OF RELIANCE:
## FRAUD ON THE MARKET DOCTRINE

110.    At all relevant times, the market for Sturm Ruger common stock was an efficient market for the following reasons, among others:

(a)    Sturm Ruger common stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b)    as a regulated issuer, Sturm Ruger filed periodic public reports with the SEC and the NYSE;

(c)    Sturm Ruger was followed by securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

111.    As a result of the foregoing, the market for Sturm Ruger common stock promptly digested current information regarding Sturm Ruger from all publicly available sources and reflected such information in the prices of the stock.  Under these circumstances, all purchasers of Sturm Ruger common stock during the Class Period suffered similar injury through their purchase of Sturm Ruger common stock at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

112.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are

liable for those false forward-looking statements because at the time each of those forward-looking statements were made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Sturm Ruger, who knew that those statements were false when made.

## COUNT I

### Violation of Section 10(b) of the Exchange Act and Rule 10b-5
### Against All Defendants

113.    Plaintiff repeats and realleges each and every allegation above as if set forth herein.

114.    During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

115.    Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they:

(a)    employed devices, schemes and artifices to defraud;

(b)    made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)    engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiff and others similarly situated in connection with their purchases of Sturm Ruger's publicly traded securities during the Class Period.

116.    Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Sturm Ruger stock.  Plaintiff and the Class would not have purchased Sturm Ruger stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

117.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of Sturm Ruger stock during the Class Period.

## COUNT II

### Violation of Section 20(a) of the Exchange Act
### Against the Individual Defendants

118.     Plaintiff repeats and realleges each and every allegation above as if set forth herein.

119.     The Individual Defendants acted as controlling persons of Sturm Ruger within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By reason of their positions as officers and/or directors of Sturm Ruger, and their ownership of Sturm Ruger stock, the Individual Defendants had the power and authority to cause Sturm Ruger to engage in the wrongful conduct complained of herein.

120.     By reason of such conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of itself and the Class, prays for judgment as follows:

A.     Determining that this action is a proper class action, certifying Plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Lead Counsel;

B.     Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.     Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.     Awarding such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMAND

Plaintiff hereby demands a trial by jury.

DATED: March 11, 2010

COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
SAMUEL H. RUDMAN
DAVID A. ROSENFELD
FAINNA KAGAN


_____/s/ David A. Rosenfeld_____
DAVID A. ROSENFELD

58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)

*Lead Counsel for Plaintiff*

DISERIO MARTIN O'CONNOR &
  CASTIGLIONI LLP
JONATHAN P. WHITCOMB (CT 15014)
One Atlantic Street
Stamford, CT 06901
Telephone:  203/358-0800
203/348-2321 (fax)

*Liaison Counsel*

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 11, 2010, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all counsel of record.

*s/ David A. Rosenfeld*
DAVID A. ROSENFELD

COUGHLIN STOIA GELLER
     RUDMAN & ROBBINS LLP
58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)
E-mail:Drosenfeld@csgrr.com