## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| In re STURM, RUGER & COMPANY, INC. SECURITIES LITIGATION | ) ) ) | Master File No. 3:09-cv-01293-CFD |
| | ) | CLASS ACTION |
| This Document Relates To: | ) ) | |
| ALL ACTIONS | ) ) ) ) ) | |

## DEFENDANTS' MEMORANDUM IN SUPPORT OF MOTION TO DISMISS PLAINTIFFS' CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

Francis H. Morrison III (ct04200)
Denise V. Zamore (ct27549)
AXINN, VELTROP & HARKRIDER, LLP
90 State House Square
Hartford, CT 06103
Telephone: (860) 275-8100
Facsimile: (860) 275-8101

Michael Dockterman
W. Allen Woolley
Tracy A. Hannan
WILDMAN, HARROLD, ALLEN & DIXON LLP
225 West Wacker Drive
Chicago, Illinois 60606
Telephone: (312) 201-2000
Facsimile:  (312) 201-2555

*Attorneys for Defendants Sturm, Ruger & Company, Inc., Michael O. Fifer, and Thomas A. Dineen*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................ iii

I.      INTRODUCTION ................................................................................... 1

II.     STATEMENT OF FACTS ..................................................................... 4

      A.     Plaintiffs' Allegations ................................................................. 4

      B.     Sturm, Ruger's Alleged Misrepresentations ............................. 7

      C.     Cautionary Language Regarding Forward Looking Statements ............................ 9

      D.     Reasons Why Plaintiffs Say the Statements Were False or Misleading. .............. 10

      E.     The Alleged "Corrective Disclosures" ..................................... 11

      F.     Plaintiffs' Scienter Allegations ............................................... 12

III.    ARGUMENT ........................................................................................ 13

      A.     The Amended Complaint Fails To Allege Which Statements Were False or Misleading When Made and How They Were False or Misleading. ............... 14

      B.     Many of the Allegedly False or Misleading Statements Are Not Material or Actionable as a Matter of Law. ........................ 16

            1.    Many of the Statements Are Non-Actionable Statements of Corporate Optimism ............................... 16

                  a.    Statements About the Transition to Lean Manufacturing Are Mere Statements of Optimism. ................................ 17

                  b.    The Statements Concerning Product Demand Are General Expressions of Corporate Optimism. ............................ 19

            2.    Many of the Alleged Misrepresentations Are Statements of Historical Fact that Cannot Support a Securities Fraud Claim. .............. 19

                  a.    There Are No Allegations that Statements Regarding Shipments or Order Backlog Were Inaccurate. ............................ 20

                  b.    Plaintiffs Do Not Allege that Defendants' Statements Regarding Strong Demand Were Inaccurate. ............................ 21

                  c.    Plaintiffs Do Not Allege that Statements Regarding Inventory Reductions and Related LIFO Liquidations Were Inaccurate. ............................ 22

3.     Defendants' Forward-Looking Statements Fall Within the PSLRA Safe Harbor. ................................................................... 23

     a.     Forward-Looking Statements About Demand Were Qualified by Specific Warnings of the Uncertainties of Market Demand. ........................................................... 24

     b.     Statements Regarding the Expected Success of the Transition Were Qualified by Adequate Cautionary Language. ................................................................... 25

C.     Many of the Alleged Statements Lack an Adequate Connection to the Purported Corrective Disclosures To Establish Loss Causation. ......................... 26

     1.     Accounting Statements Regarding LIFO Liquidation Are Not Logically Related to the Alleged Corrective Disclosures. ........................ 27

     2.     Statements Regarding the Philosophy and Goals of the New System Could Not Have Caused the Alleged Loss as a Matter of Law. ................................................................... 28

     3.     Changes to Placement of Purchase Orders Have No Connection to Alleged Corrective Disclosures. ................................................................... 28

     4.     The Availability of "Raw Materials" Was Not Corrected by Alleged Corrective Disclosures. ................................................................... 29

D.     The Amended Complaint Does Not Create a Strong Inference of Scienter. ........ 29

     1.     Plaintiffs' Allegations Insufficiently Allege the Time When Defendants Acquired the Requisite Scienter. ........................................... 31

     2.     Plaintiffs' Allegations Fail To Give Rise to a Strong Inference that Defendants Ever Had the Requisite Scienter. ........................................... 32

     3.     Plaintiffs' Allegations Give Rise to a More Plausible Inference that Defendants Lacked Scienter. ........................................... 36

     4.     The Stock Transactions of Certain Employees Do Not Support a Strong Inference of Scienter. ................................................................... 37

E.     The Amended Complaint Fails To State a Section 20(a) Claim. .......................... 39

IV.     CONCLUSION. ................................................................... 40

# TABLE OF AUTHORITIES

**Cases**

*Albert Fadem Trust v. Citigroup, Inc.*,
    165 Fed. Appx. 928 (2d Cir. 2006) ...................................................................... 39

*Archdiocese of Milwaukee Supporting Fund, Inc. v. Halliburton Co.*,
    597 F.3d 330 (5th Cir. 2010) .......................................................................... 27

*Ashcroft v. Iqbal*,
    129 S. Ct. 1937 (2009) ................................................................................... 2

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ....................................................................................... 2

*Bloor v. Carro, Spanbock, Londin, Rodman & Fass*,
    754 F.2d 57 (2d Cir.1985) ............................................................................ 13

*Bovee v. Coopers & Lybrand C.P.A.*,
    272 F.3d 356 (6th Cir. 2001) ......................................................................... 5

*Campo v. Sears Holdings Corp.*,
    No. 09-3589-CV, 2010 WL 1292329 (2d Cir. Apr. 6, 2010) ............................ 31, 36

*Caspary v. Louisiana Land and Exploration Co.*,
    579 F.Supp. 1105 (D.C.N.Y. 1983) .............................................................. 21

*Dura Pharmaceuticals, Inc. v. Broudo*,
    544 U.S. 336 (2005) .................................................................................. 26, 27

*ECA & Local 134 IBEW Joint Pension Trust of Chicago. v. JP Morgan Chase Co.*,
    553 F.3d 187 (2d Cir. 2009) ......................................................................... 37

*Fadem v. Ford Motor Co.*,
    352 F. Supp. 2d 501 (S.D.N.Y. 2005) ........................................................... 37

*Fowlkes v. Rodriguez*,
    584 F. Supp. 2d 561 (E.D.N.Y. 2008) ........................................................... 38

*Galati v. Commerce Bancorp, Inc.*,
    220 Fed. Appx. 97 (3rd Cir. 2007) .............................................................. 19

*Ganino v. Citizens Utilities Co.*,
    228 F.3d 154 (2d Cir. 2000) ......................................................................... 30

*Higginbotham v. Baxter Int'l, Inc.*,
    495 F.3d 753 (7th Cir. 2007) ......................................................................... 30

*In re 2007 Novastar Fin. Inc.*,
   No. 08-2452, 2009 WL 2747281 (8th Cir. 2009) ................................................. 16

*In re Aspeon, Inc. Sec. Litig.*,
   168 Fed. Appx. 836 (9th Cir. 2006) ................................................................... 39

*In re Autodesk, Inc. Sec. Litig.*,
   132 F. Supp. 2d 833 (N.D. Cal. 2000) ................................................................ 16

*In re Boston Technology, Inc. Sec. Litig.*,
   8 F. Supp. 2d 43 (D. Mass. 1998) ................................................................. 18, 21

*In re Carter-Wallace, Inc., Sec. Litig.*,
   220 F.3d 36 (2d Cir. 2000) ........................................................................... 30, 32

*In re Downey Sec. Litig.*,
   No. CV, 08-3261-JFW, 2009 WL 2767670 (C.D. Cal. Aug. 21, 2009)................... 36

*In re Duane Reade Inc. Sec. Litig.*,
   No. 02 Civ. 6478, 2003 WL 22801416 (S.D.N.Y. Nov. 25, 2003) ......................... 19

*In re Federal-Mogul Corp. Sec. Litig.*,
   166 F. Supp. 2d 559 (E.D. Mich.2001)................................................................ 18

*In re Ford Motor Co. Sec. Litig.*,
   381 F.3d 563 (6th Cir. 2004) ...................................................................... 17, 20

*In re FX Energy Inc., Sec. Litig.*,
   No. 2:07-CV-874 CW, 2009 WL 1812828 (D. Utah 2009) ................................... 34

*In re Gilat Satellite Networks, Ltd.*,
   No. 02-1510, 2005 WL 2277476 (E.D.N.Y. Sept. 19, 2005) ................................ 24

*In re Int'l Bus. Machs. Corporate Sec. Litig.*,
   163 F.3d 102 (2d Cir. 1998) ...................................................................... 26, 31

*In re Merrill Lynch & Co. Research Reports Sec. Litig.*,
   272 F. Supp. 2d 243 (S.D.N.Y. 2003) ................................................................ 37

*In re N. Telecom Ltd. Sec. Litig.*,
   116 F. Supp. 2d 466 (S.D.N.Y. 2000) ................................................................ 18

*In re Peritus Software Servs., Inc. Sec. Litig.*,
   52 F. Supp. 2d 211 (D. Mass. 1999) ................................................................. 18

*In re SINA Corp. Sec. Litig.*,
   No. 05 Civ. 2154, 2006 WL 2742048 (S.D.N.Y. Sept. 26, 2006)..................... 15, 20

*In re Sofamor Danek Group*,
   123 F.3d 394 (6th Cir. 1997) ................................................................ 20

*In re Splash Tech. Holdings, Inc. Sec. Litig.*,
   160 F. Supp. 2d 1059 (N.D. Cal. 2001) ................................ 14, 16, 18, 19

*In re XM Satellite Radio Holdings Sec. Litig.*,
   479 F. Supp. 2d 165 (D.D.C. 2007) ........................................................ 18

*Konkol v. Diebold, Inc.*,
   590 F.3d 390 (6th Cir. 2009) ................................................................. 33

*Kramer v. Time Warner Inc.*,
   937 F.2d 767 (2d Cir. 1991) .................................................................... 5

*Lentell v. Merrill Lynch*,
   396 F.3d 161 (2d Cir. 2005) .................................................................. 26

*Ley v. Visteon Corp.*,
   543 F.3d 801 (6th Cir. 2008) ................................................................. 30

*Malin v. XL Capital Ltd.*,
   499 F. Supp. 2d 117 (D. Conn. 2007) .............................................. 33, 39

*Miller v. Champion Enterprises Inc.*,
   346 F.3d 660 (6th Cir. 2003) ........................................................... 24, 37

*Nadoff v. Duane Reade, Inc.*,
   107 Fed. Appx. 250 (2d Cir. 2004) ........................................................ 19

*Noble Asset Management v. Allos Therapeutics, Inc.*,
   No. CIVA-04CV-1030-RPM, 2005 WL 4161977 (D. Colo. 2005) ........................................ 34

*Raab v. General Physics Corp.*,
   4 F.3d 286 (4th Cir. 1993) .................................................................... 16

*Rombach v. Chang*,
   355 F.3d 164 (2d Cir. 2004) ........................................................... 13, 24

*Rosner v. Star Gas Partners, L.P.*,
   344 Fed. Appx. 642 (2d Cir. 2000) .............................................. 16, 17, 18

*San Leandro Emergency Medical Group Profit Sharing Plan v. Philip Morris Cos.*,
   75 F.3d 801 (2d Cir. 1996) ............................................................. 18, 26

*Steinberg v. Ericsson LM Tel. Co.*,
   No. 07 CV. 9615, 2008 WL 5170640 (S.D.N.Y. Dec. 10, 2008) ............................ 34

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007) ..................................................................................................... 30, 35

*Waterford Township General Employees Retirement System v. BankUnited Financial Corp.*,
    No. 08-CIV-22572, 2010 WL 1332574 (S.D. Fla. Mar. 30, 2010) ......................................... 33

**Statutes**

15 U.S.C. § 78 ............................................................................................................... passim

Fed. R. Civ. P. 12(b) ........................................................................................................... 39

Fed. R. Civ. P. 9(b) ............................................................................................................. 15

## I.    INTRODUCTION

This case stems from a drop in the value of the stock of defendant, Sturm, Ruger & Co., Inc., in the fourth quarter of 2007.  Sturm, Ruger is the only remaining full-line manufacturer of American-made firearms.  Near the end of 2006, following several years of poor financial performance, Sturm, Ruger brought in new management to improve the company's performance. The company's goal was to modernize its manufacturing processes, reduce its excess inventory and institute an ordering system that was binding on the company's distributors rather than merely predictive.  These changes were introduced just as consumers began to buy heavily against the prospect of new restrictions on firearm ownership, causing an exuberant run-up in market value for the company and its competitors.  As the company began to implement common principles of lean manufacturing, however, there were setbacks and its efforts to "go lean" revealed underlying manufacturing problems.  After the fact, the company realized it had cut its inventories of component parts too far, stalling some of its manufacturing lines.  On October 24, 2007, Sturm, Ruger CEO Michael Fifer sent a public letter to shareholders announcing worse than expected financial results in the third quarter.  In his letter, which was included in the company's Form 10-Q, Mr. Fifer provided a *post-mortem* on the company's third quarter manufacturing problems, explaining that inventories of component parts had been cut too deeply and across too many product lines, exposing unexpected weaknesses in its manufacturing processes that harmed production.  Following Mr. Fifer's letter and the third quarter financial results, Sturm, Ruger's stock price dropped.

Plaintiffs in this consolidated securities action infer that Mr. Fifer and Thomas Dineen, both of whom have been named as individual defendants, must have known about the manufacturing bottlenecks and hidden them from the market so the stock price would remain high.  They claim that Mr. Fifer's October 24 letter and Sturm, Ruger's third quarter Form 10-Q

revealed "the truth" to the market, exposing the supposed fraud.  Plaintiffs are wrong; but even assuming they were correct, at this stage of the proceedings the questions are whether plaintiffs have alleged viable securities fraud claims with no allegations of *specific, material, false and misleading representations* by any of the defendants that *caused* stock price inflation at the beginning of the putative Class Period, ***and*** whether they have adequately alleged *facts giving rise to a strong inference* that defendants acted knowingly or recklessly at the time.

Plaintiffs' allegations do not make out a securities fraud claim under the governing law in this Circuit.  More specifically, because plaintiffs' allegations fall far short of *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) and *Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009), as well as the exacting requirements of the Private Securities Litigation Reform Act ("PSLRA"), the Amended Complaint should be dismissed for at least five reasons:

First, plaintiffs fail to identify any *specific false and misleading statements by defendants* and the *reasons why each is allegedly false and misleading*.  While plaintiffs have reprinted page after page from four of Sturm, Ruger's public filings, plaintiffs never say which specific statements in those four documents are the requisite misrepresentations of fact that *led* reasonable investors to buy Sturm, Ruger stock at an unlawfully inflated price.  Instead, plaintiffs follow the blocks of quotations with a single paragraph generally asserting, *en masse*, why the statements are false and misleading; this does not meet the pleading requirements of *Twombly*, *Iqbal*, or the PSLRA.

Second, the statements plaintiffs identify are *correct statements of historical fact* and/or general observations of *current or forward-looking optimism* for continued strong demand and for the prospects of the transition program.  General optimism, puffery and correct statements of historical fact are not material misstatements as a matter of law.  Forward-looking statements,

2

whether material or not, are protected by the PSLRA under a safe harbor provision when accompanied by appropriate cautionary language, as is the case here.

Third, to plead the necessary element of loss causation, plaintiffs must show a *connection between the alleged false statements and the alleged "corrective" disclosure*. Plaintiffs try to bridge this critical gap by starting with the "corrections" and telling their story backwards; but this conceit fails because plaintiffs have not alleged any purportedly false and misleading statements that were *corrected* by the "corrective" disclosures.

Fourth, to survive a motion to dismiss, plaintiffs must plead particular *facts giving rise to a strong inference that defendants acted knowingly or with reckless disregard for the truth*. Plaintiffs have pled with fanfare their reliance on three "confidential witnesses," but a close examination of plaintiffs' allegations makes clear that the confidential witnesses have nothing to add; they do not provide the sort of reliable, particularized factual allegations needed to meet the scienter requirement, and the leaps made from the witnesses' supposed "facts" to plaintiffs' inference of scienter are simply illogical. Plaintiffs also attempt to plead scienter by alleging that four corporate insiders sold their stock during the Class Period. But Sturm, Ruger's public filings show that only two of the insiders actually sold stock during the Class Period and the transactions resulted in the insiders *increasing* their net holdings, as anyone reading the company's disclosures clearly saw.

Fifth, because their Section 10(b) claims fail, plaintiffs cannot succeed on their claims against the individuals, Messrs. Fifer and Dineen, under Section 20(a) of the Exchange Act.

For these reasons, as set forth more fully below, defendants respectfully request that the Court dismiss plaintiffs' Amended Complaint with prejudice.

II.     STATEMENT OF FACTS

Named plaintiff Steamfitters Local 449 Pension Fund filed a class action complaint against defendants Sturm, Ruger & Company, Inc. and two of its officers, Michael Fifer and Thomas Dineen on August 13, 2009.  (Docket Entry 1.)  Plaintiff Alan Herrett filed a similar class action complaint on September 30, 2009.  The Court consolidated the *Steamfitters* and *Herrett* actions and appointed Steamfitters Local 449 Pension Fund as Lead Plaintiff on January 13, 2010.  (Docket Entry 18.)  The named plaintiffs jointly filed a consolidated class action complaint (the "Amended Complaint") on March 11, 2010.  (Docket Entry 37.)

The named plaintiffs claim to be purchasers of Sturm, Ruger stock and seek to represent a class of similarly situated purchasers who bought Sturm, Ruger common stock during the period beginning April 23, 2007, the date Sturm, Ruger filed its Form 10-Q for the first quarter of 2007, and ending on October 24, 2007, the date Sturm, Ruger filed its Form 10-Q for the third quarter of 2007 (the "Class Period").  (Am. Compl. ¶ 1.)  Defendant Sturm, Ruger is a manufacturer and seller of firearms.  (*Id*. ¶ 38.)  Individual defendant Michael Fifer joined Sturm, Ruger in September 2006 and served as CEO and a member of Sturm, Ruger's Board of Directors throughout the Class Period.  (*Id*. ¶ 21.)  Thomas Dineen, the other individual defendant, was Sturm, Ruger's Treasurer and CFO throughout the Class Period.  (*Id*. ¶ 22.)

Plaintiffs assert claims under Section 10(b) of the Exchange Act and Rule 10b-5 against all defendants, and under Section 20(a) of the Exchange Act against the individual defendants, alleged to be controlling persons of Sturm, Ruger.  (Am. Compl. Count II.)  All defendants have moved to dismiss the Amended Complaint.

A.     Plaintiffs' Allegations

Plaintiffs' allegations in the Amended Complaint—which defendants summarize here strictly for purposes of this motion—center around representations Sturm, Ruger allegedly made

(or omitted) in connection with its transition to new "lean" manufacturing and ordering processes in 2006 and 2007.  Plaintiffs allege that during fiscal years 2005 and 2006, Sturm, Ruger (then under prior management) faced numerous manufacturing challenges, including excess gun and component part inventory, congested factories, and an annual purchase order system that complicated production planning.  (Am. Compl. ¶ 42; *see also* October 24, 2007 Letter to Shareholders[1] at 1 (Ex. F).[2])  Sturm, Ruger reported financial losses in the third and fourth quarters of 2005 and declining year-over-year earnings for the first six months of 2006, and attributed its poor performance to its manufacturing challenges.  (Am. Compl. ¶¶ 44, 45.)

Upon becoming the company's CEO in September 2006, Mr. Fifer embarked on a program of improving manufacturing processes, eliminating waste, aggressively developing new products, potentially expanding the company through acquisition opportunities, and leveraging the company's brand through marketing and advertising initiatives.  (*Id*. ¶ 46, 48.)  The goals of the manufacturing process changes were to improve manufacturing efficiencies and to reduce excess inventory levels.  (*Id*. ¶ 49.)  To implement the new system, Sturm, Ruger began making significant reductions to inventory levels and changed its annual production cycle to better match production quantities to customer demand.  (*Id*. ¶¶ 51, 54.)  The company also changed the manner in which its customers—independent distributors—ordered firearms.  Under the old system, the distributors would place a single annual, *cancelable* order; under the new system, the distributors would submit smaller, *firm, non-cancelable* orders on a frequent basis.  (*Id*. ¶ 55.)

In April 2007, Sturm, Ruger announced positive net sales for the first quarter of 2007. (*Id*. ¶ 86.)  That month, its first quarter Form 10-Q and a letter to shareholders filed in

---

[1] The Court may consider the full text of SEC filings on a motion to dismiss a securities fraud claim.  *Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991); *Bovee v. Coopers & Lybrand C.P.A.*, 272 F.3d 356, 360-61 (6th Cir. 2001).
[2] All Exhibits referenced herein are annexed to the Declaration of Tracy Hannan, attached hereto as Exhibit 2.

conjunction with the 2006 Annual Report discussed the transition to the new system.  The letter described 2006 as a year of "significant transition" for the company, but stated that "the changes started during the year are beginning to yield real benefits for our shareholders, customers, and employees" and indicated that the company was optimistic about its opportunities.  (*Id.* ¶¶ 56, 83.)  The Form 10-Q for Q1 reported that Sturm, Ruger had successfully cut net inventory levels by $24 million at the end of 2006 and $16.5 million during the first quarter of 2007.  (*Id.* ¶ 51.)  It also discussed Sturm, Ruger's move from cancelable annual purchase orders to more frequent non-cancelable orders.  (*Id.* ¶ 87.)

In July 2007, Sturm, Ruger filed its second quarter Form 10-Q, reporting that its net sales for the second quarter had increased $6.8 million as compared to the second quarter of 2006.  (*Id.* ¶ 92.)  The Form 10-Q for Q2 showed that the company had further reduced inventory by $10.1 million during the second quarter.  (*Id.* ¶ 51.)  The company stated that such reductions could result in an ongoing liquidation of LIFO inventory quantities and made clear that while this might potentially be material to the results of operations for the quarterly period it would not have a material impact on the financial position of the company.  (*Id.* ¶ 92.)

On October 24, 2007, Sturm, Ruger filed its Form 10-Q for the third quarter of 2007, reporting that net sales had decreased by approximately 23% in the third quarter, as compared to the third quarter of 2006.  (*Id.*  ¶ 96.)  In conjunction with the Form 10-Q, Mr. Fifer issued a letter to shareholders explaining that the component part inventory reductions had revealed problems with Sturm, Ruger's underlying production process, such as poor machine and tool reliability, manufacturing issues, long machine changeover times, and vendor supply issues. (Am. Compl. ¶ 97.)  The Form 10-Q also stated that customer demand had fallen in Q3. (September 30, 2007 Form 10-Q (Ex. E) at 19.)  Plaintiffs allege that Sturm, Ruger also learned

at this time that the amount of unsold product in the hands of its distributors had increased by over 37%, which, plaintiffs allege, indicated that the products were not being sold through to retailers and consumers.  (*Id*. ¶ 98.)  In other words, while product inventories were short at the factory, they were long in the hands of distributors at the same time demand had fallen sharply.

Following the third quarter Form 10-Q and shareholder letter, Sturm, Ruger's common stock fell by $6.45 per share to $10.65 per share.  (*Id*. ¶ 99.)  Plaintiffs contend that during the Class Period, defendants misled investors by publicly issuing the false and misleading statements and omissions detailed below.  (*Id*. ¶ 101.)  Plaintiffs allege that, as a result, Sturm, Ruger's stock traded at artificially high prices, causing damages to plaintiffs and putative class members who purchased during the Class Period.  (*Id*. ¶ 102.)

**B.      Sturm, Ruger's Alleged Misrepresentations**

Plaintiffs allege that all of the allegedly false and misleading statements appeared in four specific documents:

- The April 3, 2007 letter to shareholders submitted with Sturm, Ruger's 2006 Annual Report (Ex. A);

- The Form 10-Q for the first quarter of 2007 (Ex. B);

- Presentation materials for the April 24, 2007 Annual Meeting (Ex. C); and

- The Form 10-Q for the second quarter of 2007 (Ex. D).

The statements on which plaintiffs base their claims are quoted at length in paragraphs 83, 86, 87, 89, 90, 92 and 93 of the Amended Complaint.  Plaintiffs emphasize in bold certain passages from these statements but they do not indicate what the emphasis is supposed to mean.  A chart containing the text of each statement on which plaintiffs rely and the source of that statement is set forth as Exhibit 1 to this Memorandum, along with the reasons why the statement cannot support an actionable claim.  The statements can be characterized as follows:

     1.    <u>Statements Regarding the Transition</u>.  Plaintiffs allege that Sturm, Ruger made a number of purportedly misleading representations regarding the transition and new manufacturing process.  These include:

- Statements in the April 3, 2007 shareholder letter regarding the company's optimism with respect to the improvements "in many areas" it had made in 2006. For instance, changes started during 2006 were "beginning to yield real benefits for [the company's] shareholders, customers, and employees."  The changes had "generated a sense of excitement in the Company and amongst our customers that Ruger is moving in a very positive direction.  Morale is greatly improved. Demand and on-time order fulfillment are up.  Employees are fully engaged, and we see nothing but opportunities ahead of us."  (Am. Compl. ¶ 83.)

- Statements in the annual meeting presentation describing the philosophy and objectives of the new business system.  For instance, the new system "relentlessly pursues the elimination of all non-value-added activities from every business process with the ultimate goal of providing World-Class quality, delivery and service to its customers at the lowest possible cost." (*Id*. ¶ 89.)

- Examples from the annual meeting presentation of improvements in certain production processes, *e.g.*, improved scope ring production, enabling the company to produce more scope rings per day with fewer employees.  (*Id.*)

     2.    <u>Statements Regarding Inventory Reductions</u>.

Plaintiffs also contend that Sturm, Ruger made various false and misleading representations regarding reductions in inventory.  These include:

- Statements in the first and second quarter Form 10-Qs that (i) if LIFO liquidation of inventory continues, the impact may be material to results of operations for the period but will not have a material impact on the financial position of the company; and (ii) the impact of the LIFO liquidation was to reduce the cost of products sold.  (*Id*. ¶¶ 86, 92.)

- A statement in the first quarter Form 10-Q that cash provided by operating activities was $18.1 million for the three months ended March 31, 2007, compared to $4.7 million for the same quarter in 2006, principally as a result of decrease in inventory, improved net income, and fluctuations in the operating asset and liability accounts in 2007.  (*Id*. ¶ 86.)

- Statements in the annual meeting presentation that reductions in inventory had simplified the product line for trade customers and end users, eliminated low volume/low margin items, and ensured that profitable niche markets are still served.  (*Id*. ¶ 90.)

- A statement in the second quarter Form 10-Q that reduction of inventory would result in better cash flow.  (*Id*.)

- A statement in the second quarter Form 10-Q that the company believed it had adequate quantities of raw materials in inventory to provide ample time to locate and obtain additional items without interruption of manufacturing operations.  (*Id*. ¶ 92.)

3.   <u>Statements Regarding Demand, Shipments and Backlog</u>.   Plaintiffs allege that Sturm, Ruger made various false and misleading representations regarding demand, shipments and backlog.  These include:

- A statement in the April 2007 shareholders letter that "demand and on-time order fulfillment are up."  (*Id*. ¶ 83.)

- Statements in the first and second quarter Form 10-Qs that (i) the company had changed from annual cancelable purchase orders to more frequent non-cancelable orders; and (ii) order backlog had increased.  (*Id*. ¶¶ 87, 93.)

- Statements in the first and second quarter Form 10-Qs that (i) firearms unit shipments increased; (ii) rifle shipments increased due to strong demand and product availability; (iii) revolver shipments increased (at least when first quarter numbers were adjusted to account for discounted sale of a discontinued model); (iv) the increase in revolver sales in the first quarter reflected the greater availability and continued strong demand of revolver models; and (v) shotgun shipments increased and pistol shipments remained consistent in the first quarter and increased in the second.  (*Id*.)

**C.   Cautionary Language Regarding Forward Looking Statements**

Each of the four documents on which plaintiffs rely as the sources of the purportedly misleading statements contained cautionary language regarding forward-looking statements and projections concerning future expectations.   In each document, Sturm, Ruger specifically cautioned readers "not to place undue reliance on these forward-looking statements, which speak only as of the date made."  (Ex. A at 27, Ex. B at 22, Ex. C at 2, Ex. D at 24-25.)  The cautionary language specifically warned that any forward-looking statements were based on then-current expectations and were subject to risks and uncertainties:

> Such statements are based on current expectations and are subject
> to certain qualifying risks and uncertainties, such as market
> demand, sales levels of firearms, anticipated castings sales and
> earnings, the need for external financing for operations or capital
> expenditures, the results of pending litigation against the Company
> including lawsuits filed by mayors, state attorneys general and
> other governmental entities and membership organizations, and the
> impact of future firearms control and environmental legislation,
> any one or more of which could cause actual results to differ
> materially from those projected.

(*Id.*)  The cautionary language also made clear that any forward-looking statements were made only as of the date of the statement and explicitly disclaimed any responsibility to update:  "The Company undertakes no obligation to publish revised forward-looking statements to reflect events or circumstances after the date such forward-looking statements are made or to reflect the occurrence of subsequent unanticipated events."  (*Id.*)

### D.  Reasons Why Plaintiffs Say the Statements Were False or Misleading.

Plaintiffs allege two categories of securities violations.  Plaintiffs assert that the statements made in the April 4, 2007 shareholder letter regarding the transition were false and misleading because "production problems prevented Sturm, Ruger from fulfilling customer orders and meeting production schedules."  (*Id.* ¶ 84.)  These problems allegedly "intensified during the Class Period."  (*Id.*)  Plaintiffs therefore contend that defendants had a duty to correct and update their pre-Class Period representations.  (*Id.*)

Plaintiffs then explain in a single paragraph why all other alleged misrepresentations made during the Class Period were false and misleading.  (*Id.* ¶ 95.)  Plaintiffs do not allege in that paragraph that any of the representations were literally false.  Instead, plaintiffs say that they were "materially false and misleading because they failed to disclose" six supposed facts and one conclusion which plaintiffs claim were then known to, or were recklessly disregarded by, defendants:

- The cuts in inventory reduced parts and components below efficient levels, preventing the company from meeting production and shipping schedules and sustaining historical sales levels;

- Contrary to the statement that there were "adequate quantities of raw materials in its inventory," plaintiffs allege that inventory cuts left Sturm, Ruger with both insufficient component parts and raw materials to meet customer orders and target production volumes;

- The "backlog" of unfilled orders was inflated because the company could not meet production schedules due to inventory shortages and production problems;

- The increase in shipments were caused by the company selling through its inventory, not increased productivity;

- Orders from distributors were artificially boosted by the change to non-cancelable purchase orders, and did not reflect demand for products;

- Distributors were carrying large quantities of unsold products, increasing the risk that they would reduce future purchases; and

- Based on these facts, there was no reasonable basis for positive statements and opinions regarding the company's financial performance and condition.

(*Id.* ¶ 95.)

### E.     The Alleged "Corrective Disclosures"

According to plaintiffs, the "truth" was revealed on October 24, 2007, when the company announced that its net sales for the third quarter of 2007 fell by more than 23%, as compared to the third quarter of 2006, resulting in a net loss for the quarter.  (*Id.* ¶ 96.)  The Form 10-Q and a letter to shareholders issued the same day contained the following alleged corrective disclosures:

- The company's "transformation [to the new business system] will take time and progress will not always be smooth."  (*Id.* ¶ 97.)

- "Inventory masks problems in the production process.  ***By reducing inventory, challenges from poor machinery and tool reliability, manufacturing issues, long machine changeover times, and vendor supply issues are all brought to the forefront.  Because there is not spare inventory to draw upon, these challenges***

*need to be addressed in real time, with a focus on permanent corrective actions that address the root cause problems*." (*Id.* (emphasis in original[3]).)

- "We concluded during the third quarter that *we had reduced component part inventories too deeply across too many product lines simultaneously, which was a principal cause of our reduced production volume during the quarter*." (*Id.*)

- Inventory data that plaintiffs contend showed that distributors' inventories of unsold products had risen 37% during the second quarter. (*Id.* ¶ 98.)

- Order data that plaintiffs contend showed that third quarter orders had declined by more than 35% from the previous quarter due, in part, to "the Company's inability to produce and ship sufficient quantities of certain firearms already on order, which discouraged additional orders for those products" and to "softening of demand." (*Id.*)

- Although some product lines still had strong demand, "the Company was unable to produce these products in sufficient quantities to materially reduce their backlog." (*Id.*)

- "This unplanned decrease in the rate of production negatively impacted the results … and is expected to continue to depress operating results until improved.  It is uncertain when higher levels of production will be achieved." (*Id.*)

### F.    Plaintiffs' Scienter Allegations

Plaintiffs allege that the company had a number of mechanisms in place to monitor orders, production and inventory, including an Executive Operations Committee that met with management to discuss transition issues (*id.* ¶ 78); daily production meetings in the New Hampshire facility at which company vice presidents were apprised of the previous day's production results (*id.* ¶ 79); and an inventory tracking system (*id.* ¶ 80).  Plaintiffs also allege that upper management, including the individual defendants, received reports from the operations, sales and finance departments which summarized purchase orders, production schedules and inventory.  (*Id.* ¶ 104.)  Plaintiffs therefore contend that Sturm, Ruger's senior management knew or recklessly disregarded that inventory reduction and production problems would cause the company to be unable to meet production and shipping schedules in the third

---

[3] Unless otherwise stated, emphasis is in the Amended Complaint.

quarter.  (*Id.*)  Plaintiffs do not specifically allege when defendants supposedly learned this information.

Plaintiffs allege that the individual defendants and other insiders demonstrated their knowledge of Sturm, Ruger's problems during the Class Period by selling thousands of shares of company stock.  (*Id.* ¶ 105.)  According to plaintiffs, this trading activity was unusual and suspicious because it all took place in a single month, while prices were high, and there were no sales before the Class Period.  (*Id.* ¶ 106.)  The Amended Complaint is silent on the public filings describing these sales.

## III.   ARGUMENT

Plaintiffs' claims should be dismissed because plaintiffs have failed to meet the basic pleading requirements of *Twombly* and *Iqbal*, as well as the special pleading requirements of the PSLRA and Fed. R. Civ. P. 9(b).  To state a claim for fraud under Section 10(b) of the Exchange Act and Rule 10b-5 thereunder, "a plaintiff must allege (1) a misleading statement or omission of a material fact; (2) made in connection with the purchase or sale of securities; (3) with intent to defraud or recklessness; (4) reliance; and (5) damages."  *Bloor v. Carro, Spanbock, Londin, Rodman & Fass,* 754 F.2d 57, 61 (2d Cir.1985).  Rule 9(b) requires that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity."  *Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir. 2004) (*quoting* Fed. R. Civ. P. 9(b) (the particularity requirement of Rule 9(b) applies to securities fraud claims brought under Section 10(b) and Rule 10b-5).  The Amended Complaint is so prolix and disjointed that it is sometimes difficult to sort out exactly what plaintiffs intend to allege—perhaps that is their way of trying to evade the heightened pleading standards they must meet—and even more difficult to address all of plaintiffs' allegations in a concise narrative.  In order to sort out plaintiffs' claims, and to demonstrate systematically that ***none*** of the purported misstatements in plaintiffs' laundry

list of quotations from Sturm, Ruger's public filings can be the basis for an actionable securities fraud claim, defendants have prepared the chart attached to this Memorandum as Exhibit 1.  The chart lists *all* of the allegedly actionable statements in the Amended Complaint together with the reasons why each particular statement cannot support a claim.  Those reasons fall into one or more of the following categories:  (1) Inadequate allegations of why the statement was misleading when made; (2) immaterial and/or not actionable under Rule 10b-5 because they were accurate historical statements, vague statements of optimism on which no reasonable investor would rely, or forward-looking statements protected by the PSLRA; (3) insufficient allegations of loss causation; and (4) lack of strong inference of scienter.  The remainder of this Memorandum explains the legal principles underlying these defenses, cites pertinent legal authority, and shows that plaintiffs have not stated any viable securities fraud claims.

> ### A.   The Amended Complaint Fails To Allege Which Statements Were False or Misleading When Made and How They Were False or Misleading.

As a threshold matter, the PSLRA requires a Rule 10b-5 complaint to "*specify each statement* alleged to have been misleading, [and] the reason or *reasons why the statement is misleading*."  15 U.S.C. § 78u-4(b)(1) (emphasis added).  Here, under sections labeled "Pre-Class Period Materially False and Misleading Statements" and "Materially False and Misleading Statements Made During the Class Period," the Amended Complaint lists page after page of long, selective quotations from Sturm, Ruger's public filings.  (Am. Compl. ¶¶ 83-95.)  Some of the text from the long block quotations is highlighted in bold, but there is *no* indication why plaintiffs have put some of the language in bold typeface; and plaintiffs make *no* allegations *specifying* which statements are alleged to be false or misleading, as the PSLRA requires.  *See, e.g., In re Splash Tech. Holdings, Inc. Sec. Litig.*, 160 F. Supp. 2d 1059, 1074 (N.D. Cal. 2001) (highlighting certain sections of quoted passages from defendants public filings is "not a reliable

guide to determining which statements are alleged to be false").  In several cases, plaintiffs do not even quote the language of Sturm, Ruger's statements, but instead make their own misleading paraphrases of the language.[4]

Plaintiffs follow their laundry list of block quotations with a single paragraph purporting to describe why all of them, *en masse*, are false and misleading.  But that paragraph says only that the statements "set forth above ¶¶ 86-87, 89-90, 92-93 were materially false or misleading because they failed to disclose, *inter alia*, the following facts which were then existing, known or recklessly disregarded by defendants...."  (Am. Compl. ¶ 95.)  None of the subparagraphs, setting out the six "facts" that defendants supposedly "disregarded," specifies the particular statements in the company's public filings that were supposedly false as a result of these "disregarded" facts, let alone whether the "facts" were known in the Class Period or first learned after the Class Period had ended.  (*Id.* ¶ 95(a)-(f).)  Nor is the seventh subparagraph, making the conclusory allegation that there was "no reasonable basis for positive statements and opinions regarding the company's financial performance and condition," any more specific.  (*Id.* ¶ 95(g).)  Defendants and the Court are left to guess which statements plaintiffs allege are actionable and why they were ostensibly false and misleading when made.  This approach simply does not satisfy *Twombly* and *Iqbal*, let alone the Rule 9(b) and PSLRA pleading requirements.  *See, e.g., In re SINA Corp. Sec. Litig.*, No. 05 Civ. 2154 (NRB), 2006 WL 2742048, at *6 (S.D.N.Y. Sept. 26, 2006) ("large block quotes taken from public statements made by the individual defendants and from SEC filings, followed by generalized explanations of why the statements collectively

---

[4] For instance, plaintiffs allege that Sturm, Ruger stated in its annual meeting presentation that its "*reduction in inventory* 'simplified product line for trade customers and end users,' '[e]liminated low volume/low margin items,' and [e]nsured that profitable niche markets are still served.'"  (Am. Compl. ¶ 90, emphasis added.)  The actual text plaintiffs purport to paraphrase attributed these results to *reduction in SKUs* (stock keeping units), not reduction in inventory.  (Ex. C at 15.)  Similarly, plaintiffs cobble together the statement that a "[s]ignificant reduction in inventory *would* 'result in better cash flow.'"  (Am. Compl. ¶ 90, emphasis added.)  The actual statement discussed the outcome of the first 180 days of the transition—it was not a future prediction, as plaintiffs' paraphrase suggests.  (Ex. C at 16.)

misled the plaintiffs" failed to "satisfy the pleading requirements of Rule 9(b) and of the PSLRA"); *In re Autodesk, Inc. Sec. Litig.*, 132 F. Supp. 2d 833, 841 (N.D. Cal. 2000) (complaint impermissibly "left it up to defendants and the court to try to figure out exactly what the misleading statements are, and to match the statements up with the reasons they are false or misleading").[5]

### B. Many of the Allegedly False or Misleading Statements Are Not Material or Actionable as a Matter of Law.

Even if plaintiffs were more specific, many of the alleged misstatements cannot constitute a securities violation because they are not ***material*** as a matter of law.

#### 1. Many of the Statements Are Non-Actionable Statements of Corporate Optimism.

It is well established that generalized statements of optimism are immaterial as a matter of law because they are not the type of statements upon which a reasonable investor would rely. *See, e.g., Rosner v. Star Gas Partners, L.P.*, 344 Fed. Appx. 642, 644 (2d Cir. 2000); *Rombach*, 355 F.3d at 174 ("expressions of puffery and corporate optimism do not give rise to securities violations"). The market relies on ***facts***, not optimistic statements predicting growth. *Raab v. General Physics Corp.*, 4 F.3d 286, 289-90 (4th Cir. 1993) ("[T]he market price of a share is not inflated by vague statements predicting growth. … Analysts and arbitrageurs rely on facts in determining the value of a security, not mere expressions of optimism from company spokesmen"). Many of the statements which are the subjects of plaintiffs' claims are vague statements of corporate optimism or puffery, and not the sort of factual representations on which a claim can be stated.

---

[5] *Cf. In re Splash Tech. Holdings, Inc. Sec. Litig.*, 160 F. Supp. 2d at 1073-1074 (complaint not sufficiently pled because, in part, it simply listed "reasons" statements were false without identifying which alleged false statements were belied by the facts stated in each reason); *In re 2007 Novastar Financial Inc.*, No. 08-2485, 2009 WL 2747281, *3-4 (8th Cir. 2009) (thirty-six page section entitled "Defendants' False and Misleading Statements Issued During the Class Period" lacked "any indication as to what specific statements" were "alleged to be false or misleading").

### a.    Statements About the Transition to Lean Manufacturing Are Mere Statements of Optimism.

The vast majority of Sturm, Ruger's statements in the April 3, 2007 shareholder letter and April 2007 Annual Meeting presentation regarding the transition to a more modern approach to manufacturing and inventory are nothing more than statements of optimism or puffery, rather than objectively verifiable statements of fact on which a reasonable investor would rely.  For instance, the shareholder letter stated that "we are pleased to tell you that the company ended the year with improvements in many areas.  The changes started during the year are beginning to yield real benefits for our shareholders, customers, and employees."  It characterized CEO Michael Fifer as "an outstanding engineer of change," noting that "[t]hese changes have generated a sense of excitement in the company and amongst our customers that Ruger is moving in a very positive direction," and concluded that "we see nothing but opportunities ahead of us."  (Am. Compl. ¶ 83.)  Likewise, the presentation made by management for the annual meeting characterized the new system as one that "relentlessly pursues the elimination of all non-value-added activities from every business process with the ultimate goal of providing World-Class quality, delivery and service to its customers at the lowest possible cost."  (*Id*. ¶ 89.)  These are exactly the sort of statements of corporate optimism that courts routinely deem immaterial and non-actionable as a matter of law.  *See, e.g., Rosner*, 344 Fed. Appx. at 644 (positive statements about business improvement plan, such as that "we are beginning to *see* many of the operational and customer satisfaction benefits originally anticipated" were non-actionable as "sufficiently vague and generalized"); *In re Ford Motor Co. Sec. Litig., Class Action*, 381 F.3d 563, 571 (6th Cir. 2004) (statements such as "We want to ensure that all our vehicles have world-class quality …" constituted mere puffing); *San Leandro Emergency Medical Group Profit Sharing Plan v. Philip Morris Companies*, 75 F.3d 801, 807, 811 (2d Cir. 1996)

(statement that "[w]e expect 1993 to mark another year of strong growth in earnings per share" is "puffery" that "cannot have misled a reasonable investor ...").[6]

Additional information known to the market at the time these statements were made further reinforces that they were not material. Plaintiffs acknowledge, for example, that the market was well aware that Sturm, Ruger was undergoing a rapid and radical transition to a new business system. (*See, e.g.*, Am. Compl. ¶ 58 (noting Sturm, Ruger's "aggressive transformation plan").) Courts recognize that reasonable investors understand the possibility that problems may arise during a period of significant change. *See, e.g., In re Boston Technology, Inc. Sec. Litig.*, 8 F. Supp. 2d 43, 69 (D. Mass. 1998) ("Reasonable investors would understand the phrase "product transition" to encompass the various problems typically faced by corporations as they change product lines-R & D, marketing, and customer problems"). In light of the total mix of information described in the Amended Complaint, no reasonable investor could have relied upon the company's vague statements of corporate optimism to purchase Sturm, Ruger shares. *See, e.g., Rosner*, 344 Fed.Appx. at 644 (positive statements about the company's present stability were sufficiently vague and generalized that no reasonable investor would have relied upon them). These statements cannot support a claim of securities fraud.

---

[6] *See also In re Peritus Software Servs., Inc. Sec. Litig.*, 52 F. Supp. 2d 211, 227, 229 (D. Mass. 1999) (statement that "[t]he acquisition and integration [of the target] had been a success" was not actionable because the "'success' comment seems exactly the type of 'rosy affirmation' frequently held non-actionable under the corporate puffery doctrine"); *In re Splash Technology Holdings, Inc. Sec. Litig.*, 160 F. Supp. 2d at 1077 (statement that company's growth strategy "was unfolding as planned" mere puffery); *In re N. Telecom Ltd. Sec. Litig.*, 116 F. Supp. 2d 466, 458, 466 (S.D.N.Y. 2000) (statement that "we will continue to deliver the best of new technologies" was not sufficiently "concrete" or "specific" to be material); *In re Federal-Mogul Corp. Sec. Litig.*, 166 F. Supp. 2d 559, 563 (E.D. Mich. 2001) (dismissing claims based on statements about the "viability" of company's "growth strategy," "synergies," and "cost savings"); *In re XM Satellite Radio Holdings Sec. Litig.*, 479 F. Supp. 2d 165 (D.D.C. 2007) (generalized positive statements about "cost effective," "smart," "sound" and "efficient" growth are vague and not the type of statement upon which a reasonable investor would rely "in considering the 'total mix' of facts available) (internal citation omitted); *In re Baan Co. Sec. Litig.*, 103 F.Supp.2d 1, 13 (D.D.C. 2000) (company's statements that it saw "no constraints on growth," and "[d]uring the past several quarters, we have put in place a number of global initiatives which will enable Baan to sustain its continued growth" were mere puffery and vague statements of optimism not actionable under Rule 10b).

              **b.**     **The Statements Concerning Product Demand Are General Expressions of Corporate Optimism.**

Plaintiffs also allege that Sturm, Ruger made false and misleading representations about demand for its products.  For instance, the April 2007 shareholder letter stated comparatively that "demand and on-time order fulfillment are up."  (Am. Compl. ¶ 83.)  Likewise, the Form 10-Qs for Q1 and Q2 stated that "demand remained strong" for certain firearms and that shipments of certain firearms increased "due to strong demand."  (*Id.* ¶¶ 87, 93.)  As addressed in section B.2.b., *infra*, plaintiffs never say that demand was ***not***, in fact, strong during Q1 and Q2, and true statements of historical fact are not actionable.  But even if demand were not strong, such statements regarding demand constitute, at worst, puffery and not a Rule 10(b)-5 violation.  *See, e.g.*, *In re Splash Technology Holdings, Inc. Sec. Litig.*, 160 F. Supp. 2d at 1077 (statements about "strong" product demand and that financial results were "better than expected" or "robust" constituted puffery); *Galati v. Commerce Bancorp, Inc.*, 220 Fed. Appx. 97, 102 (3rd Cir. 2007) (statements concerning the company's "dramatic deposit growth," "strong performance," and "unique business model," constitute nothing more than mere puffery and are not actionable under Rule 10(b)-5).  The chart at Exhibit 1 correctly puts all such statements into the immaterial category, and they must be disregarded when considering whether plaintiffs have stated a claim.

              **2.**     **Many of the Alleged Misrepresentations Are Statements of Historical Fact that Cannot Support a Securities Fraud Claim.**

The law is well settled that statements of historical facts or historical financial data are not actionable, even if future results are not as favorable.  *In re Duane Reade Inc. Sec. Litig.*, No. 02 Civ. 6478, 2003 WL 22801416, *6 (S.D.N.Y. Nov. 25, 2003) (disclosure of accurate historical data does not become misleading even if less favorable results might be predictable by the company in the future) (internal citation omitted), *aff'd sub nom. Nadoff v. Duane Reade, Inc.*, 107 Fed. Appx. 250 (2d Cir. 2004); *In re SINA Corp. Sec. Litig.*, No. 05 Civ. 2154 (NRB),

2006 WL 2742048, at * 6 (S.D.N.Y. Sept. 26, 2006) (company's statements that it experienced a "'record-setting quarter' due to 'a better than expected revenue contribution from mobile value-added service'" were accurate statements of historical fact and, thus, not actionable, even if such revenues were not sustainable); *In re Ford Motor Co. Sec. Litig.*, 381 F.3d at 570.  For instance, in *Ford Motor Co.*, the plaintiffs alleged that statements about Ford's positive and improved earnings, and specifically the Explorer model having set various sales records, were misleading because Ford knew that these profits were due to its sale of a defective product and that the eventual public revelation of the defect would affect adversely Ford's financial status.  The Court of Appeals noted that accurate historical data does not become misleading even if less favorable results in the future might be predictable by the company.  *In re Ford Motor Co.*, 381 F.3d at 570 (*citing In re Sofamor Danek Group*, 123 F.3d 394, 401 n.3 (6th Cir. 1997)).   The analogue to plaintiffs' allegations here is obvious:   "Because plaintiffs have not alleged the historical inaccuracy of Ford's [analogous Sturm, Ruger's] financial and earnings' statements, such statements are not misrepresentations."  *Id.*

> **a.** **There Are No Allegations that Statements Regarding Shipments or Order Backlog Were Inaccurate.**

Plaintiffs point to the following statements from Sturm, Ruger's Form 10-Qs for Q1 and Q2 quantifying orders received, shipments, and/or backlog:

> *… firearms orders received totaled $58.9 million, and order backlog increased $11.6 million from $16.2 million on December 31, 2006 to $27.8 million on March 31, 2007*
>
> *            *       *       **
>
> *Firearms unit shipments increased 31.8% for the three months ended June 30, 2007 when compared to the second quarter of 2006.  Rifle shipments increased 49.3% from the comparable prior year period due to strong demand and product availability. Revolver shipments increased 19.8% from the comparable prior year period.   Pistol shipments increased 18.8% from the*

20

*comparable prior year period.   Shotgun shipments increased*
*35.8% from the comparable prior year period.*

(Am. Compl. ¶¶ 87, 93.)

Yet plaintiffs do not allege that any of these statements were wrong, thereby conceding that these statements are non-actionable, accurate statements of historical fact.   Plaintiffs' contention that these accurate statements were misleading because they gave the impression that the positive results were due to high end-user demand, when, in truth, they were due to inflated purchase orders from distributors, which could not be sustained in future quarters, do not render them actionable.   (Am. Compl. ¶ 95(e), (f).)  First, the alleged "corrective" disclosures do not make the earlier statements false because these "corrective" disclosures do not attribute the Q1 and Q2 results to inflated purchase orders.  *See* C.3., *infra.*  Second, Sturm, Ruger *did not predict* what the future might hold based upon these results, and the fact that it stopped short of making predictions protects these accurate historical statements from a 10b-5 claim.  *See, e.g., Caspary v. Louisiana Land and Exploration Co.*, 579 F.Supp. 1105, 1109 (D.C.N.Y. 1983) ("Defendants were under no obligation to release their internal projections regarding oil recovery rates or exploration costs to disabuse those shareholders who, of their own accord, might think that successful first quarter results necessarily would result in similar success during the remainder of the year."); *In re Boston Technology, Inc. Sec. Litig.*, 8 F. Supp. 2d at 68 ("The issuer of an accurate report of earnings and revenue figures is not required to discuss current or prospective financial conditions").

> **b.    Plaintiffs Do Not Allege that Defendants' Statements**
> **Regarding Strong Demand Were Inaccurate.**

The April 3, 2007 shareholder letter stated generally that at that time demand was "up." (*Id*. ¶ 83.)  The Form 10-Q for Q1 stated that "*demand remained strong for the Ruger 10/22 rimfire rifles and Mini-14 centerfire rifles*" and that there was "*continued strong demand of*

*revolver models, particularly the Ruger New Vaquero.*" (*Id.* ¶ 87.)  The Form 10-Q for Q2 noted that rifle shipments had increased in part "*due to strong demand*" for rifle models.  (*Id.* ¶ 93.)  Plaintiffs do not suggest that defendants' statements about current demand, whether made before and during the Class Period, were in any way inaccurate or in need of correction.  There is no suggestion that demand was not "up" as of April 3, 2007, and there is nothing indicating that demand was not strong at the time of the Form 10-Qs for the particular models of firearms cited.  To the contrary, the company said in its Form 10-Q for Q3 that demand had *decreased* in the third quarter, confirming that demand had been stronger during Q2 and Q1.  (Ex. E at 19.)  The comparative statements about demand simply are not a basis for stating a securities claim.

**c.    Plaintiffs Do Not Allege that Statements Regarding Inventory Reductions and Related LIFO Liquidations Were Inaccurate.**

Plaintiffs curiously recite statements, appearing in the Form 10-Qs for both Q1 and Q2, that the reductions in inventory had resulted in liquidations of LIFO inventory quantities carried on the company's books at the lower costs prevailing in prior years.  (Am. Compl. ¶¶ 86, 92.)  Plaintiffs' recitation is curious because the Form 10-Q for Q2 stated retrospectively that "*[t]he Company estimates that the impact of this liquidation on the results of operations for the three and six month periods ended June 30, 2007 was to reduce cost of products sold by $6.5 and $16.2 million, respectively*."  (*Id.* ¶ 92.)  A similar retrospective statement appears in the Form 10-Q for Q1.  (*Id.* ¶ 86.)  These historical statements relate strictly to the *accounting impact* of LIFO liquidations on the cost of products.  Plaintiffs make *no* allegations, and nothing in the purported corrective disclosures suggests, that the numbers were wrong, that the company did not decrease inventory in the amounts disclosed, that LIFO liquidations did not occur, or that the estimates were misleading.  These statements fall squarely within the category of accurate historical facts that cannot support a securities claim.

22

To the extent plaintiffs contend that these LIFO liquidation passages wrongly implied that the company lowered its cost of goods sold—and thereby increased profits—by enhancing productivity or otherwise producing goods more cheaply, the **text** of the Form 10-Qs which plaintiffs include in the Amended Complaint contradicts their claim.  (*See, e.g.,* Am. Compl. ¶ 65.)  The Form 10-Qs for both quarters expressly attribute the lower cost of goods sold to the LIFO liquidation, stating that the reduction in inventory would "result in a liquidation of LIFO inventory quantities carried at lower costs prevailing in prior years as compared with the current cost of purchases."  (*Id.* ¶¶ 86, 92.)[7]  It was thus clear to the market that the reductions in cost, and commensurate increases in profits, were due to the **accounting** effects of liquidating LIFO inventory carried at lower cost, and not due to improvements in productivity.

### 3.    Defendants' Forward-Looking Statements Fall Within the PSLRA Safe Harbor.

Forward-looking statements are statements projecting revenue, management's plans or objectives, or future economic performance.  *See* 15 U.S.C. § 78u-5(i).  In an effort to encourage the disclosure of forward-looking information, *see* H.R. Conf. Rep. No. 104-369 at 32, 43 (1995), *reprinted in* 1995 U.S.C.C.A.N. 730, 731, 742, the PSLRA insulates forward-looking

---

[7] In a portion of the Form 10-Q for Q2 that plaintiffs do not quote, Sturm, Ruger even more clearly explained this point, noting that the decreased cost of goods sold—and resulting effect on earnings—was essentially attributable to inflation and the effect of heavy inventory reduction on LIFO inventory:

> Inflation's effect on the Company's operations is most immediately felt in cost of products sold because the Company values inventory on the LIFO basis. Generally under this method, the cost of products sold reported in the financial statements approximates current costs and, thus, reduces distortion in reported income that would result from the slower recognition of increased costs when other methods are used. In the three and six months ended June 30, 2007, however, a significant reduction in inventories resulted in a liquidation of LIFO inventory quantities carried at lower costs prevailing in prior years as compared with the current cost of purchases. This resulted in LIFO income and decreased cost of products sold of $6.5 million and $16.2 million for the three and six months ended June 30, 2007, respectively.

(Ex. D at 24.)

statements from civil liability under the federal securities laws where the statement (1) is accompanied by meaningful cautionary language or (2) is immaterial.  15 U.S.C. § 78u-5(c)(1)(A); *see also Rombach*, 355 F.3d at 173.  If a forward-looking statement is accompanied by the requisite cautionary language or is immaterial, it is protected by the PSLRA safe harbor regardless of the defendant's state of mind.  *In re Gilat Satellite Networks, Ltd.*, No. 02-1510, 2005 WL 2277476, * 12 (E.D.N.Y. Sept. 19, 2005); *Miller v. Champion Enterprises Inc.*, 346 F.3d 660, 672 (6th Cir. 2003).  If a forward-looking statement is not accompanied by sufficient cautionary language (and is material), then the plaintiff must show that the defendant made the statement with "actual knowledge" of its false or misleading nature. 15 U.S.C. § 78u-5(c)(1)(B)(i).  Recklessness will not suffice. *See* 15 U.S.C. § 78u-5(c)(1)(B).

Here, the Court need not reach the second factor.  The company included detailed cautionary statements in each of the public filings on which plaintiffs rely.  (Ex. A at 27, Ex. B at 22, Ex. C at 2, Ex. D at 24-25.)  Plaintiffs seek to challenge two categories of forward-looking statements as actionable, inaccurate projections:  (a) certain statements concerning demand and (b) statements about the anticipated effects of the transition.  But both of these categories of statements—along with any other conceivably forward-looking statement made by defendants—fall within and are protected by the safe harbor.

a.    **Forward-Looking Statements About Demand Were Qualified by Specific Warnings of the Uncertainties of Market Demand.**

Plaintiffs highlight a number of statements that they apparently contend misrepresented demand.  These include several statements directly commenting on past and current levels of demand.  (Am. Compl. ¶ 87 ("demand remained strong" for certain of its rifles and there was "continued strong demand of revolver models"); ¶ 93 (rifle shipments increased "due to strong demand and product availability").)  These also include data regarding orders received from

24

distributors as well as information on the quantities of products distributors were carrying. (*Id.* ¶ 87.) Plaintiffs broadly imply that these statements and this information were misleading because they reflected prospects for future purchases by distributors. (*Id.* ¶ 95(e), (f).)

But defendants' statements regarding demand, orders and distributor stock—to the extent they projected ***future*** demand or prospects for distributor orders, as plaintiffs interpret them— cannot be actionable in light of the accompanying cautionary language which explicitly warned that market demand is uncertain:

> The Company may, from time to time, make forward-looking statements and projections concerning future expectations. Such statements are based on current expectations ***and are subject to certain qualifying risks and uncertainties, such as market demand*** . . . Readers are cautioned not to place undue reliance on these forward-looking statements, which speak only as of the date made.

(Ex. A at 27, Ex. B at 22, Ex. C at 2, Ex. D at 24-25.)[8]   These statements are absolutely protected under the PSLRA's safe harbor, regardless of defendants' knowledge, and cannot form a basis for plaintiffs' claims.

### b.    Statements Regarding the Expected Success of the Transition Were Qualified by Adequate Cautionary Language.

For the same reason, when plaintiffs allege that defendants misled the market through statements in the April 2007 shareholder letter and annual meeting presentation about positive changes expected as a result of the transition, their allegations fail in the face of the company's explicit cautions to the market. For instance, the shareholder letter stated "the Company is moving in a very positive direction … we see nothing but opportunities ahead of us." (Am. Compl. ¶ 83.) Setting aside that these statements are examples of non-actionable corporate optimism, if plaintiffs contend that the market viewed these as forward-looking statements, the

---

[8] The Form 10-Q for Q2 also warned specifically that demand for firearms is generally lower in the third quarter of the year. (Ex. D at 16.)

cautionary language eliminates any claim based upon them.  The April 2007 shareholder letter and annual meeting presentation, like the Form 10-Qs, contained language warning investors, in clear and unambiguous terms, that these statements "are based on current expectations and are subject to certain qualifying risks and uncertainties," and cautions the readers "not to place undue reliance on these forward-looking statements, which speak only as of the date made." (Ex. A at 27, Ex. C at 2.)  These statements fall squarely within the PSLRA safe harbor.

The company also had no duty to update any of these statements, to the extent they allegedly became false or misleading at some later date.  The company expressly disclaimed any obligation to publish revised forward-looking statements should circumstances change.  (Ex. A at 27, Ex. B at 22, Ex. C at 2, Ex. D at 24-25.)  And the law imposes no duty to update forward-looking statements.  15 U.S.C. § 78u-5(d); *see also In re Int'l Bus. Machs. Corporate Sec. Litig.*, 163 F.3d 102, 110 (2d Cir. 1998) (as forward-looking predictions for the next quarter, the statements of which plaintiffs complain constitute immaterial opinions and thus, cannot form the basis of a duty to update); *San Leandro*, 75 F.3d at 811 (there is no duty to update expressions of opinion or vague statements of corporate optimism).  Plaintiffs' selection of alleged forward-looking statements fails to make out a claim for securities fraud.

### C.  Many of the Alleged Statements Lack an Adequate Connection to the Purported Corrective Disclosures To Establish Loss Causation.

In addition to materiality, plaintiffs must adequately allege loss causation.  To do so, the allegations of the Amended Complaint must establish a ***causal relationship*** between the statements alleged to be false and misleading and the corrective disclosure that allegedly reveals the false and misleading nature of these statements.  *Lentell v. Merrill Lynch*, 396 F.3d 161, 175 (2d Cir. 2005) (plaintiff must allege that the subject of the fraudulent statement or omission was the cause of the actual loss suffered); *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 342

(2005) (must be a causal connection between the material misrepresentation and the loss); *Archdiocese of Milwaukee Supporting Fund, Inc. v. Halliburton Co.*, 597 F.3d 330, 336 (5th Cir. 2010) (corrective disclosure must reveal something about the deceptive nature of the original false statement).  Without this explicit causal link, the alleged misstatements lack the required connection to the "corrective" disclosures to plead a securities claim.

### 1.     Accounting Statements Regarding LIFO Liquidation Are Not Logically Related to the Alleged Corrective Disclosures.

The Amended Complaint cites several passages from Sturm, Ruger's Form 10-Qs regarding the ***accounting*** effects of LIFO liquidation of inventory on its financial results.  (Am. Compl. ¶¶ 86, 92.)  But accounting treatment and financial performance are not the same thing. The Form 10-Qs for Q1 and Q2 state that LIFO liquidation of inventory reduced the cost of products sold in the first two quarters due to the liquidation of inventory that was being *carried* at lower cost on the company's books.  The Form 10-Qs make clear that ***if*** LIFO liquidation continued in 2007, the ***accounting impact*** may be material to results of operations but will not have a material impact on the company's financial position.  (*Id*. ¶¶ 86, 92.)  These statements regarding the accounting effects of LIFO liquidation have no logical relation to the alleged "corrective" disclosures about new production and inventory issues in Mr. Fifer's letter or the company's Form 10-Q for Q3.

Mr. Fifer's October 24, 2007 letter says that Sturm, Ruger had reduced component part inventory too deeply, across too many product lines.  (*Id*. ¶ 97.)  This misjudgment exposed weaknesses in the company's manufacturing processes and caused reductions in productivity that prevented the company from meeting third quarter demand.  (*Id*.)  This was not an accounting matter driven by LIFO reductions on the company's books, and nothing in Mr. Fifer's letter or

the Form 10-Q for Q3 suggests that there was anything false or misleading about the company's earlier analysis of the *accounting* impact of LIFO liquidation.

### 2. Statements Regarding the Philosophy and Goals of the New System Could Not Have Caused the Alleged Loss as a Matter of Law.

Plaintiffs also say that several general statements regarding the philosophy and goals of lean manufacturing and the company's new manufacturing processes are actionable.  For instance, the April 2007 annual meeting presentation discussed implementation of "a business system that relentlessly pursues the elimination of all non-value added activities from every business process with the ultimate goal of providing World-Class quality, delivery and service to its customers at the lowest possible cost."  (*Id.* ¶ 89.)  Similarly, it discussed the company's plan to simplify product lines for trade customers and end users, eliminate low volume margin items, and ensure that profitable niche markets were served.  (*Id.* ¶ 90.)  These statements of general philosophy and goals are, again, quite different from the *post-mortem* analysis of what caused the disappointing third quarter results—*i.e.*, that component part inventory had been cut "too deeply across too many product lines simultaneously, which was a principal cause of our reduced production volume during the quarter."  (*Id.* ¶ 97.)  *See Archdiocese of Milwaukee Supporting Fund, Inc.*, 597 F.3d at 336 ("A subsequent disclosure that does not correct and reveal the truth of the previously misleading statement is insufficient to establish loss causation.")

### 3. Changes to Placement of Purchase Orders Have No Connection to Alleged Corrective Disclosures.

Plaintiffs allege that the company failed to disclose that the changes in its distribution system—from distributors placing one annual, cancelable order to frequent, non-cancelable orders—resulted in artificially inflated purchase orders that were not reflective of actual demand. (Am. Compl. ¶¶ 95 (e).)  This theory is a stretch, if only because it is obvious that a switch from a single annual order to more frequent non-cancelable orders would bring orders in line with

actual demand.  Yet, even if these allegations are assumed true for purposes of this motion to dismiss, they do not correlate to any correction made by the company in its Q3 Form 10-Q or Mr. Fifer's letter to the shareholders.  Neither of these documents suggests, let alone states, that the change in purchase orders contributed to the third quarter loss.  Again, these alleged corrective disclosures attributed the third quarter decline to problems with manufacturing, too deep an inventory reduction, and decreased demand for certain products.  (*Id*. ¶¶ 97, 98.) Plaintiffs' allegations concerning the company's changed ordering system simply have no causal relationship to their alleged injury.

### 4. The Availability of "Raw Materials" Was Not Corrected by Alleged Corrective Disclosures.

Finally, the Amended Complaint points to statements in the second quarter that the company "believes that it has adequate quantities of *raw materials* in inventory."  (*Id*. ¶ 92.) Plaintiffs allege this was false or misleading because the company knew or recklessly disregarded that it had cut inventory supplies to too low of a level.  (*Id*. ¶ 95(b).)  But as the alleged "corrective" disclosures show, the problem was not *raw materials* but the inventory of *component parts*.  (*Id*. ¶ 97 ("we had reduced component part inventories too deeply").)  Indeed, plaintiffs even quote Mr. Fifer's October 24 statement that the company *continued to have excess inventory of raw materials*.  (*Id*. ¶ 97 ("remaining excess inventory is largely in component parts for slower moving products or *in raw material*") (emphasis added).)  Plaintiffs gloss over the distinction, but there is no causal link between the statements in Q1 and Q2 about *raw materials* and statements about *component parts* in Q3 to give rise to a securities claim.

### D. The Amended Complaint Does Not Create a Strong Inference of Scienter.

Under the PSLRA, plaintiffs must state with particularity "facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2).  The

state of mind required to support a Section 10(b) claim is "scienter," or an "intent to deceive, manipulate, or defraud." *Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 168 (2d Cir. 2000).  To plead scienter, a plaintiff must either allege facts establishing a motive to commit fraud and an opportunity to do so, or allege facts constituting circumstantial evidence of either reckless or conscious misbehavior. *In re Carter-Wallace, Inc., Sec. Litig.*, 220 F.3d 36, 40 (2d Cir. 2000) .

In determining whether the pleadings give rise to a strong inference of scienter, the Court "must take into account plausible opposing inferences," "rationally drawn from the facts alleged," and "must engage in a comparative evaluation" of those inferences. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314, 323 (2007).  "To qualify as 'strong'" within the intent of the PSLRA, "an inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of non-fraudulent intent." *Id*. at 314.  "A complaint will survive … only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id*. at 324.

Statements by confidential witnesses to prove scienter are generally afforded little weight.  Indeed, following the Supreme Court's decision in *Tellabs*, several circuits have steeply discounted confidential witness allegations in weighing inferences of scienter. *See Higginbotham v. Baxter Int'l, Inc.*, 495 F.3d 753, 756-57 (7th Cir. 2007) ("It is hard to see how information from anonymous sources could be deemed 'compelling' or how we could take account of plausible opposing inferences.  Perhaps these confidential sources have axes to grind.  Perhaps they are lying. Perhaps they don't even exist"); *see also Ley v. Visteon Corp.*, 543 F.3d 801, 811, 817 (6th Cir. 2008).  This Circuit has recognized that the anonymity of confidential witnesses to support allegations of scienter "frustrates the requirement, announced in *Tellabs,*

30

that a court weigh competing inferences to determine whether a complaint gives rise to an inference of scienter that is 'cogent and at least as compelling as any opposing inference of nonfraudulent intent.'"   *Campo v. Sears Holdings Corp.*, No. 09-3589-CV, 2010 WL 1292329, *3 (2d Cir. Apr. 6, 2010) (internal citation omitted).

Plaintiffs attempt to plead scienter in two wholly ineffective ways:  First, relying on confidential witnesses, they allege that upper management (including Messrs. Fifer and Dineen) must have known the statements were false and misleading because it was their job to monitor production, shipping and orders.  Second, they claim that stock sales by company insiders during the Class Period—which the public record shows did not occur as Plaintiffs allege—demonstrate that defendants must have known that the alleged misstatements were false and misleading. None of plaintiffs' allegations is sufficient as a matter of law to create the requisite "strong inference" of scienter.

### 1.      Plaintiffs' Allegations Insufficiently Allege the Time When Defendants Acquired the Requisite Scienter.

Plaintiffs allege that defendants knew "during the Class Period" that the company was missing daily production goals, and that they also knew during this period that component part inventory had been too drastically cut, which contributed to the missed production goals.  (Am. Compl. ¶ 64, 70.)  These allegations preclude any finding that defendants had the requisite scienter when it made the *pre*-Class Period statements in the company's 2006 Annual Report and accompanying letter to the shareholders, filed on April 3, 2007, concerning the transition and its intended success. (*Id.* ¶ 83.)  Plaintiffs also fail to allege any facts supporting a duty to update these statements should they become inaccurate at a later date.  As a matter of law, these statements were immaterial statements of corporate optimism and/or forward-looking projections—neither of which carries with it a duty to update.  *See, e.g.*, *In re Int'l Bus. Machs.*

*Corporate Sec. Litig.*, 163 F.3d at 110 (no duty, under securities laws, to update statements which were not material, such as vague statements of optimism or expressions of opinion); 15 U.S.C. § 78u-5(d) (imposing no duty to update forward-looking statements).  And plaintiffs do not allege that defendants acquired the requisite knowledge *prior to* issuance of the Form 10-Q for Q3 and accompanying letter to the shareholders such that a previous duty to update could have arisen.

Plaintiffs' allegations of scienter *during* the Class Period center on the company's failure to meet its production goals and its shortage of component part inventory.  (*See* Am. Compl. ¶¶ 77-82.)  The Class Period was six months long and covers the entirety of the second and third quarters, over which aspects of the transition continued to be rolled out.  Without putting a point on when something was known within those six months, plaintiffs cannot meet their obligation to allege which specific statements were false or misleading.  They must say defendants knew at a specific time that the company had gone from cutting *excess* inventory to cutting *needed* inventory and then hid that information from the investing public when they had a duty to reveal it.  *See, e.g.*, *In re Carter-Wallace, Inc., Sec. Litig.*, 220 F.3d at 42 (early medical reports may have indicated a potential problem, but until an actual connection between the drug and any illness could be made, defendants not required "to abandon its product on what, at the time, would have been speculation").  Plaintiffs simply do not make these allegations.

> ### 2.    Plaintiffs' Allegations Fail To Give Rise to a Strong Inference that Defendants Ever Had the Requisite Scienter.

Frankly, plaintiffs fail to allege that defendants *ever* had the requisite scienter at any point "during the Class Period."  Plaintiffs claim that upper management obtained information from three sources:  (1) Meetings of the Executive Operations Committee; (2) daily production meetings at the New Hampshire production facility; and (3) the company's Material

Requirements Planning ("MRP") system and inventory tracking reports. (Am. Compl. ¶¶ 77-81.) Plaintiffs' allegations regarding these three sources are based almost entirely on undisclosed, former employees of the company with nothing to add to the Amended Complaint.

Even with these confidential witnesses, plaintiffs fail to allege sufficiently what was known, when it was known, and how it was known. The witnesses have told plaintiffs that Sturm, Ruger had an Executive Operations Committee that met ten times during 2007, that also met with management to discuss the results of the company's transition, and met six times with members of the company's Board of Directors. (*Id*. ¶ 78.) But they do *not* specify when the meetings occurred, do *not* say what was actually discussed, and do *not* say what was actually known by defendants as a result of these meetings. Similar allegations in other cases have failed to create the strong inference of scienter required in this Circuit or elsewhere. *See, e.g., Malin v. XL Capital Ltd.*, 499 F. Supp. 2d 117, 141 (D. Conn. 2007) (confidential witness statements insufficient to create strong inference of scienter where witnesses failed to present any evidence that they communicated any of the alleged problems to the individual defendants or that the individual defendants otherwise knew about these issues); *Konkol v. Diebold, Inc.*, 590 F.3d 390, 398-99 (6th Cir. 2009) (investors' allegations that defendants attended weekly and monthly finance meetings not sufficient to support finding of scienter because complaint did not allege which specific matters, including the matter at issue, were discussed); *Waterford Township General Employees Retirement System v. BankUnited Financial Corp.*, No. 08-CIV-22572, 2010 WL 1332574, * 14 (S.D. Fla. Mar. 30, 2010) (allegations that defendants attended weekly executive committees where general subjects were discussed lacked particularity required to give rise to a strong inference of scienter).

According to Confidential Witnesses 1 and 2 ("CW 1" and "CW 2"), the company held daily meetings throughout the Class Period at its Newport, New Hampshire facility, during which the prior day's manufacturing results were "posted" and the participants discussed the company's inability to meet its production goals.  (Am. Compl. ¶ 79.)  But the Amended Complaint specifically says that the company did not miss its production targets *until the third quarter* and it was ***not until the third quarter that missing the targets "prevented the Company from keeping up with distributor demand***."  (*Id.* ¶ 65.)  This allegation defeats any claim that defendants had the requisite scienter at the time of the allegedly actionable statements in the first and second quarters.

Even if plaintiffs intended to allege that the company knew in the second quarter that it had missed production targets, there are no allegations about (1) what was discussed about these missed targets or (2) their impact going forward on the company's ability to satisfy demand. Indeed, plaintiffs do not allege that any of their confidential witnesses either were present at those meetings or had any discussions with members of management, let alone any discussions regarding missed production targets and their implications.  *See, e.g., Steinberg v. Ericsson LM Tel. Co.*, No. 07 CV. 9615, 2008 WL 5170640, at *13 (S.D.N.Y. Dec. 10, 2008) (plaintiffs failed to allege scienter where confidential sources did not identify any conversations in which executive defendants were provided information that was inconsistent with public statements); *Noble Asset Management v. Allos Therapeutics, Inc.*, No. CIVA-04CV-1030-RPM, 2005 WL 4161977, *13 (D. Colo. 2005) (information supplied by an unidentified witness "too unreliable to be useful to the scienter analysis" when "[t]he plaintiff has not alleged particular facts about conversations, documentary sources, or any other circumstances that would show how this source learned of the information he supposedly possessed"); *In re FX Energy Inc. Sec. Litig.,*

34

No. 2:07-CV-874 CW, 2009 WL 1812828, *10 (D. Utah 2009) (when complaint failed to allege facts as to whom confidential witnesses spoke to, when those conversations took place, or that confidential witnesses "made any assertions . . . that a reasonable person would not dispute", complaint merely alleged a difference of opinion between confidential witnesses and defendants that was insufficient under *Tellabs*).

Plaintiffs, through CW 1, point next to an internal inventory tracking system to allege defendants knew that inventory had been cut too deeply during the Class Period.  (Am. Compl. ¶ 80.)  Plaintiffs' own conclusion from their informant, however, is merely that these reports showed the company was "running out of inventory necessary to meet distributor's demands." (*Id.* ¶ 81.)  Plaintiffs concede that the lack of inventory did not prevent Sturm, Ruger from hitting its production targets or from keeping up with distributor demand *until the third quarter of 2007*, ***after*** the alleged false and misleading first and second quarter statements were made.  (*Id.* ¶ 65.) There are no facts showing a knowing or reckless disregard of material information that defendants had a duty to disclose *before* Mr. Fifer's letter or the company's Form 10-Q for Q3.

Finally, plaintiffs point to a meeting allegedly attended by Confidential Witness 3 ("CW 3")—a witness who had *left the company* in December 2006, ***prior to the start of the Class Period*** (*id.* ¶ 37)—with Sturm, Ruger senior staff and its Board.  (*Id.* ¶ 66.)  Plaintiffs allege that CW 3 expressed concern at this pre-Class Period meeting that a future decision to modify payment terms with its vendors and suppliers would not guarantee deliveries and supplies whenever needed and concludes that the modification "likely impacted Sturm, Ruger's ability to meet production demand."  (*Id.* ¶ 66.)  Not only does this alleged conversation have little to do with the allegations of the Amended Complaint, but CW 3's "conclusion" is speculation upon speculation, not a fact.  Without explaining CW 3's basis for, or expertise to opine on, the effect

that the modification in payment terms had, CW 3 can say only that the modification ***might*** affect the delivery of supplies and that problems with supply deliveries ***might***, in turn, affect production.  There is no allegation that the modification in payment terms actually ***did*** affect supply delivery or production.  These speculative "conclusions" from CW 3 have no relevance to defendants' scienter.  *In re Downey Sec. Litig.*, No. CV, 08-3261-JFW, 2009 WL 2767670 (C.D. Cal. Aug. 21, 2009) (disregarding statements of a confidential witness where based on speculation).

### 3.    Plaintiffs' Allegations Give Rise to a More Plausible Inference that Defendants Lacked Scienter.

The inference of scienter must be "at least as compelling as any opposing inference of nonfraudulent intent."  *Campo v. Sears Holdings Corp.*, No. 09-3589-CV, 2010 WL 1292329, *3 (2d Cir. Apr. 6, 2010). The most plausible inference from plaintiffs' allegations is that defendants did not realize their problems until the cumulative effects of the reduction in inventory throughout the first and second quarters, combined with the production problems that surfaced in the third quarter, revealed the true extent of the difficulties.  As plaintiffs concede, that is what Mr. Fifer's letter said.  (Am. Compl. ¶ 97.)  Plaintiffs also explicitly acknowledge the company did not miss its production targets or fail to meet demand ***until the third quarter***, (Am. Compl. ¶ 65), and they concede that the company's ***results did not suffer until the third quarter***.  (*Id.* ¶ 82.)  Plaintiffs also tellingly admit that the company's "aggressive transformation plan and inventory reductions were much more difficult to implement than defendants had originally anticipated."  (*Id.* ¶ 58.)

Furthermore, the inference that defendants did not become aware that component part inventory reductions would render the company unable to meet demand until the third quarter is the only economically sensible inference.  According to the Amended Complaint, the company

began cutting inventory at the end of 2006 and continued making substantial cuts throughout the first and second quarters of 2007. (*Id.* ¶ 51.) To conclude that defendants knew ***during*** the first and second quarters that the inventory cuts had already created an inability to meet production demands—something the informants never say—would mean that defendants intentionally sabotaged production by continuing to cut inventory through the end of the second quarter. That inference makes no sense, and as a matter of law, allegations of economically irrational behavior do not support an inference of scienter  *See ECA & Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 203 (2d Cir. 2009) (holding that when plaintiffs' view of the facts defies economic reason, such a view does not yield a reasonable inference of fraudulent intent); *In re Merrill Lynch & Co. Research Reports Sec. Litig.*, 272 F. Supp. 2d 243, 263 (S.D.N.Y. 2003) (that defendants would act counter to economic self interest "defie[d] economic reason"); *Fadem v. Ford Motor Co.*, 352 F. Supp. 2d 501, 504, 524-25 (S.D.N.Y. 2005) (holding that "a recipe for economic disaster, which in fact came to pass, . . . is inconsistent with" any inference of scienter), *aff'd*, *Fadem v. Ford Motor Co.*, 157 Fed. Appx. 398 (2d Cir. 2005); *Champion Enterprises Inc.*, 346 F.3d at 688 (finding allegations of scienter implausible because they would require a finding that defendants knowingly continued to advance *unsecured* loans of $2.25 million and $350,000 to an entity that they knew was going file a Chapter 11 petition). The only logical inference arising from plaintiffs' own allegations is that defendants lacked the requisite scienter when the alleged misrepresentations were made.

### 4.      The Stock Transactions of Certain Employees Do Not Support a Strong Inference of Scienter.

Plaintiffs' poor pleading practices are perhaps best exemplified by their allegations that Mr. Dineen and three other insiders "sold thousands of shares of their personally-held common stock" during the Class Period, (Am. Compl. ¶ 105), because the public record plainly shows that

plaintiffs have their facts wrong.  The insiders' stock transactions during the Class Period resulted in a ***net increase*** in shares because most of the "sales" to which plaintiffs refer were actually withholding of shares to cover the insiders' cost to exercise their options and increase their holdings.  These facts ***negate*** rather than support any inference of scienter.

The four insiders alleged to have sold stock are Thomas Dineen, Stephen Sanetti, Leslie Gasper, and Robert Stutler.  (*Id.* ¶ 105.)  A summary of the stock transactions, appropriately considered on this motion to dismiss,[9] which Sturm, Ruger disclosed in detail in Form 4s filed with the SEC, is set forth in the chart below:

| Participant | Share Ownership Prior to Transactions | Exercise Purchase Option[10] | Subsequent Stock Sales | Net Shares After Transactions |
|---|---|---|---|---|
| Dineen | 3,288 | 7,911 (7/30/07) | None | 11,199 |
| Sanetti | 33,654 | 48,693 (7/31/07) | None | 82,347 |
| Gasper | 677 | 12,173 (7/31/07) | 12,000 (8/24/07) | 850 |
| Stutler | 1,072 | 23,339 (7/31/07) | 3,339 (8/24/07) | 20,000 |

(*See* Exs. G-J.)  The Form 4s make clear that none of the insiders were net sellers, and the transactions, which plaintiffs characterize as selling "thousands of shares of personally-held common stock," were actually withholding of shares necessary to cover the exercise price of options and associated tax liability to ***increase*** their holdings.  These withholdings are denoted

---

[9] *See, e.g., Fowlkes v. Rodriguez*, 584 F. Supp. 2d 561, 574 (E.D.N.Y. 2008) ("On motion to dismiss, court is permitted to consider and take judicial notice of certain documents, such as matters of public record, and reject truthfulness of those allegations that are contradicted by documents.")

[10] The number of shares noted in this column reflects the number of shares acquired under the option *after* the requisite number of shares was withheld to cover the exercise price and associated tax liability.

on the Form 4 through the use of the code "F," which the instructions explain to mean "payment of exercise price or tax liability by delivering or withholding securities incident to receipt." www.sec.gov/about/forms/form4data.pdf.   The two who sold additional shares still ***increased*** their net holdings.

As for the individual defendants, there are no allegations that Mr. Fifer made *any* stock sales during the relevant period, and Mr. Dineen actually *increased* his holdings by over 240% during that time.   These facts negate, rather than support, any inference of scienter.  *See, e.g., Malin,* 499 F. Supp. 2d at 152 (fact that individual defendants and other members of management *increased* their total stock holdings during the class period was inconsistent with any alleged fraudulent intent); *In re Aspeon, Inc. Sec. Litig.*, 168 Fed. Appx. 836, 840 (9th Cir. 2006) (purchase of stock by company's CEO during period in which company allegedly inflated revenue "tends to negate the inference of scienter").  Plaintiffs therefore fail on this element, too.

### E.  The Amended Complaint Fails To State a Section 20(a) Claim.

Plaintiffs seek to hold the individual defendants liable as controlling persons of Sturm, Ruger under Section 20(a) of the Exchange Act.  (Am. Compl. Count II.)  Section 20(a) provides that any person who controls any person (such as a corporation) violating the Exchange Act is liable jointly and severally with the controlled person for that violation.  *See* 15 U.S.C. § 78t(a). As plaintiffs have failed to plead a primary violation of Section 10(b), the individual defendants cannot be held liable under Section 20(a).  *See Albert Fadem Trust v. Citigroup, Inc.*, 165 Fed. Appx. 928, 930 (2d Cir. 2006) ("If no primary violation of the securities laws has been shown, the individual defendants cannot be held liable under Section 20(a) control person liability as a matter of law.")

IV.     CONCLUSION

Sturm, Ruger stock dropped, but it did not drop because the securities laws were violated. The four public filings plaintiffs cite to support their supposed securities law claim contain no false and misleading statements; they were either accurate, contained immaterial or vague statements of optimism, or were protected by the safe harbor; and all lack the causal link and scienter required by the governing law.   For all of the foregoing reasons, the Amended Complaint fails to state the elements of a claim under Section 10(b) with the particularity necessary to survive a motion to dismiss under Fed. R. Civ. P. 9(b) and 12(b)(6).   Unable to state a claim for securities fraud, plaintiffs' claim against the individual defendants under Section 20(a) must likewise fail.   Plaintiffs' Amended Complaint should be dismissed with prejudice.

Dated:  April 26, 2010

Respectfully submitted,

/s/ Tracy A. Hannan_____
Francis H. Morrison III (ct04200)
Denise V. Zamore (ct27549)
AXINN, VELTROP & HARKRIDER, LLP
90 State House Square
Hartford, CT 06103
Telephone: (860) 275-8100
Facsimile: (860) 275-8101

Michael Dockterman
W. Allen Woolley
Tracy A. Hannan
WILDMAN, HARROLD, ALLEN & DIXON LLP
225 West Wacker Drive
Chicago, Illinois 60606
Telephone: (312) 201-2000
Facsimile:  (312) 201-2555

*Attorneys for Defendants Sturm, Ruger & Company, Inc., Michael O. Fifer, and Thomas A. Dineen*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned, an attorney, hereby certifies that a copy of the foregoing **Defendants' Motion to Dismiss Plaintiffs' Consolidated Amended Class Action Complaint and Memorandum in Support** were served via the CM/ECF electronic filing system on this 26th day of April, 2010, and thereby served upon counsel for all parties.

By: /s/ Tracy A. Hannan_____
One of the Attorneys for Defendants