UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| In re STURM, RUGER & COMPANY, INC. SECURITIES LITIGATION | ) ) ) | Master File No. 3:09-cv-01293-CFD |
| | ) | CLASS ACTION |
| This Document Relates To: | ) ) ) | MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION |
| ALL ACTIONS. | ) ) ) | TO DISMISS THE CONSOLIDATED AMENDED CLASS ACTION COMPLAINT |

# TABLE OF CONTENTS

**Page**

I. PRELIMINARY STATEMENT .................................................................................1

II. STATEMENT OF FACTS ....................................................................................3

    A. Defendant Fifer Establishes the Ruger Business System ......................................4

    B. Sturm Ruger Experiences Significant Undisclosed Problems Following its
        Implementation of Lean Manufacturing .........................................................5

    C. Defendants Mislead Investors About the Success of the Ruger Business
        System .......................................................................................................6

    D. The Truth is Disclosed ................................................................................7

III. ARGUMENT .....................................................................................................8

    A. Legal Standards on a Motion to Dismiss .........................................................8

    B. The Complaint Alleges Actionable Misrepresentations and Omissions................9

        1. The Complaint Specifically Alleges Defendants' Fraud in
            Accordance with Rule 9(b) and the PSLRA ...............................................9

        2. Defendants Were Required to Disclose Facts Necessary to Make
            Their Statements Complete and Accurate ................................................12

        3. Defendants' Misrepresentations and Omissions Are Material ................15

            a. Defendants' Statements Are Not Forward-Looking and Are
                Not Protected by the PSLRA's Safe Harbor Provision................17

            b. Misleading Statements of Historical Fact are Actionable............20

            c. Defendants' Statements Are Not "Puffery" ................................24

    C. The Complaint Sufficiently Alleges a Strong Inference of Scienter ...................26

    D. The Complaint Adequately Alleges Loss Causation ..........................................36

    E. The Complaint Adequately Alleges a Claim for Control Person Liability
        Under Section 20(a) ...................................................................................39

IV. CONCLUSION ................................................................................................40

# TABLE OF AUTHORITIES

**Page**

## CASES

*Alaska Elec. Pension Fund v. Flowserve Corp.*,
   572 F.3d 221 (5th Cir. 2009) ..............................................................38

*Ashcroft v. Iqbal*,
   129 S. Ct. 1937 (2009) ..........................................................................8

*Basic Inc. v. Levinson*,
   485 U.S. 224 (1988) ............................................................................16

*Bell Atl. Corp. v. Twombly*
    550 U.S. 544 (2007) ..........................................................................8, 9

*Berson v. Applied Signal Tech., Inc.*,
   527 F.3d 982 (9th Cir. 2008) .........................................................21, 23

*Billhofer v. Flamel Techs. SA.*,
   663 F. Supp. 2d 288 (S.D.N.Y. 2009) ..............................................24

*Caiola v. Citibank, N.A.*,
   295 F.3d 312 (2d Cir. 2002) ...............................................................13

*Citiline Holdings, Inc. v. iStar Fin., Inc.*,
   No. 08 Civ. 3612 (RJS), 2010 U.S. Dist. LEXIS 29706
   (S.D.N.Y. Mar. 26, 2010) ...................................................................30

*City of Sterling Heights Police & Fire Ret. Sys. v. Abbey Nat'l, PLC*,
   423 F. Supp. 2d 348 (S.D.N.Y. 2006) ..............................................25

*Cosmas v. Hassett*,
   886 F.2d 8 (2d Cir. 1989) ....................................................................29

*DeCicco v. United Rentals, Inc.*,
   602 F. Supp. 2d 325 (D. Conn. 2009) ...............................................15

*Dura Pharm., Inc. v. Broudo*,
   544 U.S. 336 (2005) .......................................................................36, 37

*Ellenburg v. JA Solar Holdings Co. Ltd.*,
   No. 08 Civ. 10475 (JGK), 2010 U.S. Dist. LEXIS 49220
   (S.D.N.Y. May 17, 2010) ....................................................................33

*Freudenberg v. E*Trade Fin. Corp.*,
   No. 07 Civ. 8538, 2010 U.S. Dist. LEXIS 46053
   (S.D.N.Y. May 11, 2010) ............................................................*passim*

**Page**

*Ganino v. Citizens Utils. Co.*,
  228 F.3d 154 (2d Cir. 2000) .............................................................. 8, 15, 26

*Graham v. Barriger*,
  No. 08 Civ. 9357 (PKC), 2009 U.S. Dist. LEXIS 107967
  (S.D.N.Y. Nov. 17, 2009) ..................................................................... 9

*Hall v. Children's Place Retail Stores, Inc.*,
  580 F. Supp. 2d 212 (S.D.N.Y. 2008) ........................................... 13, 16

*Higginbotham v. Baxter Int'l, Inc.*,
  495 F.3d 753 (7th Cir. 2007) .................................................................. 31

*In re Alstom SA Sec. Litig.*,
  406 F. Supp. 2d 433 (S.D.N.Y. 2005) ..................................................... 13

*In re APAC Teleservices, Inc. Sec. Litig.*,
  No. 97 Civ. 9145 (BSJ), 1999 U.S. Dist. LEXIS 17908
  (S.D.N.Y. Nov. 19, 1999) ...................................................................... 36

*In re Aspeon, Inc. Sec. Litig.*,
  168 Fed. Appx. 836 (9th Cir. 2006) ........................................................ 35

*In re Atlas Air Worldwide Holdings, Inc., Sec. Litig.*,
  324 F. Supp. 2d 474 (S.D.N.Y. 2001) ............................................... 22, 27

*In re Catalina Mktg. Corp. Sec. Litig.*,
  390 F. Supp. 2d 1110 (M.D. Fla. 2005) .................................................. 25

*In re Complete Mgmt. Inc. Sec. Litig.*,
  153 F. Supp. 2d 314 (S.D.N.Y 2001) ...................................................... 17

*In re Computer Assocs. Class Action Sec. Litig.*,
  75 F. Supp. 2d 68 (E.D.N.Y. 1999) ......................................................... 25

*In re Countrywide Fin. Corp. Derivative Litig.*,
  554 F. Supp. 2d 1044 (C.D. Cal. 2008) ................................................... 32

*In re Duane Reade Inc. Sec. Litig.*,
  No. 02 Civ. 6478(NRB), 2003 U.S. Dist. LEXIS 21319
  (S.D.N.Y. Nov. 25, 2003) ....................................................................... 21

*In re Dura Pharms., Inc. Sec. Litig.*,
  452 F. Supp. 2d 1005 (S.D. Cal. 2006) ................................... 25, 36, 37, 38

**Page**

*In re Dynex Capital, Inc.*,
No. 05 Civ. 1897 (HB), 2009 U.S. Dist. LEXIS 96527
(S.D.N.Y. Oct. 19, 2009) .................................................................................40

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
618 F. Supp. 2d 311 (S.D.N.Y. 2009) .............................................................20

*In re Ford Motor Co. Sec. Litig.*,
381 F.3d 563 (6th Cir. 2004) ...........................................................................21

*In re Geopharma, Inc. Sec. Litig.*,
399 F. Supp. 2d 432 (S.D.N.Y. 2006) ........................................................23, 37

*In re Globalstar Sec. Litig.*,
No. 01 Civ. 1748 (SHS), 2003 U.S. Dist. LEXIS 22496
(S.D.N.Y. Dec. 15, 2003) .................................................................................16

*In re Honeywell Int'l Sec. Litig.*,
182 F. Supp. 2d 414 (D.N.J. 2002) ..................................................................10

*In re IBM Corporate Sec. Litig.*,
163 F.3d 102 (2d Cir. 1998) .............................................................................20

*In re Indep. Energy Holdings Sec. Litig.*,
154 F. Supp. 2d 741 (S.D.N.Y. 2001) .............................................................20

*In re Initial Pub. Offering Sec. Litig.*,
544 F. Supp. 2d 277 (S.D.N.Y. 2008) .............................................................36

*In re KeySpan Corp. Sec. Litig.*,
No. 01 CV 5852 (ARR), 2003 U.S. Dist. LEXIS 26173
(E.D.N.Y. July 30, 2003) .................................................................................26

*In re MBIA, Inc. Sec. Litig.*,
No. 08-CV-264 (KMK), 2010 U.S. Dist. LEXIS 31430
(S.D.N.Y. Mar. 31, 2010) ..........................................................................12, 21

*In re Motorola Sec. Litig.*,
505 F. Supp. 2d 501 (N.D. Ill. 2007)................................................................38

*In re Nortel Networks Corp. Sec. Litig.*,
238 F. Supp. 2d 613 (S.D.N.Y. 2003) ................................................... 18, 19, 32

*In re NTL Inc. Sec. Litig.*,
347 F. Supp. 2d 15 (S.D.N.Y. 2004).......................................................... 11, 17

**Page**

*In re Oxford Health Plans, Inc. Sec. Litig.*,
   187 F.R.D. 133 (S.D.N.Y. 1999) ..................................................................34

*In re Pall Corp.*,
   No. 07-CV-3359 (JS)(ARL), 2009 U.S. Dist. LEXIS 88240
   (E.D.N.Y. Sept. 21, 2009) ..........................................................................30

*In re Parmalat Sec. Litig.*,
   375 F. Supp. 2d 278 (S.D.N.Y. 2005) ........................................................39

*In re Providian Fin. Corp. Sec. Litig.*,
   152 F. Supp. 2d 814 (E.D. Pa. 2001)..........................................................25

*In re Regeneron Pharms., Inc. Sec. Litig.*,
   No. 03 Civ. 3111 (RWS), 2005 U.S. Dist. LEXIS 1350
   (S.D.N.Y. Feb. 3, 2005)..............................................................................19

*In re Scholastic Corp. Sec. Litig.*,
   252 F.3d 63 (2d Cir. 2001) ............................................................... 9, 30, 34

*In re Smith & Wesson Holding Corp. Sec. Litig*,
   604 F. Supp. 2d 332 (D. Mass. 2009)..........................................................26

*In re Sotheby's Holding, Inc. Sec. Litig.*,
   No. 00 Civ. 1041 (DLC), 2000 U.S. Dist. LEXIS 12504
   (S.D.N.Y. Aug. 31, 2000)...........................................................................13

*In re Time Warner Inc. Sec. Litig.*,
   9 F.3d 259 (2d Cir. 1993) ...........................................................................20

*In re Top Tankers, Inc. Sec. Litig.*,
   528 F. Supp. 2d 408 (S.D.N.Y. 2007) ........................................................27

*In re Tower Auto. Sec. Litig.*,
   483 F. Supp. 2d 327 (S.D.N.Y. 2007) ........................................................40

*In re U.S. Interactive, Inc. Sec. Litig.*,
   No. 01-cv-522, 2002 U.S. Dist. LEXIS 16009
   (E.D. Pa. Aug. 23, 2002) ...........................................................................18

*In re Veeco Instruments, Inc. Sec. Litig.*,
   235 F.R.D. 220 (S.D.N.Y. 2006) ...............................................................31

*In re Vivendi Universal, S.A. Sec. Litig.*,
   381 F. Supp. 2d 158 (S.D.N.Y. 2003).............................................. 9, 18, 19, 24

**Page**

*In re Winstar Commc'ns,*
No. 01 CV 3014 (GBD), 2006 U.S. Dist. LEXIS 7618
(S.D.N.Y. Feb. 27, 2006)........................................................................29

*In re Xerox Corp. Sec. Litig.,*
165 F. Supp. 2d 208 (D. Conn. 2001) ................................................9, 34

*In re Xethanol Corp. Sec. Litig.,*
No. 06 Civ. 10234 (HB), 2007 U.S. Dist. LEXIS 65935
(S.D.N.Y. Sept. 7, 2007).........................................................................32

*Incase Inc. v. Timex Corp.,*
488 F.3d 46 (1st Cir. 2007)......................................................................11

*Institutional Investors Group v. Avaya, Inc.,*
564 F.3d 242 (3d Cir. 2009) ....................................................................33

*Lapin v. Goldman Sachs Group, Inc.,*
506 F. Supp. 2d 221 (S.D.N.Y. 2006) .....................................................24

*Lentell v. Merrill Lynch & Co.,*
396 F.3d 161 (2d Cir. 2005) ....................................................................38

*Lindelow v. Hill,*
No. 00-3727 (JFH), 2001 U.S. Dist. LEXIS 10301
(N.D. Ill. July 19, 2001)...........................................................................25

*Makor Issues & Rights, Ltd. v. Tellabs, Inc.,*
513 F.3d 702 (7th Cir. 2008) .......................................................27, 31, 34

*Malin v. XL Capital Ltd.,*
499 F. Supp. 2d 117 (D. Conn. 2007) ......................................................35

*Manavazian v. ATEC Group, Inc.,*
160 F. Supp. 2d 468 (E.D.N.Y. 2001)......................................................16

*McMahan & Co. v. Wherehouse Entm't., Inc.,*
900 F.2d 576 (2d Cir. 1990) ....................................................................21

*Menkes v. Stolt-Nielsen S.A.,*
No. 3:03 CV 409 (DJS), 2005 U.S. Dist. LEXIS 28208
(D. Conn. Nov. 10, 2005) .........................................................................15

*Novak v. Kasaks,*
216 F.3d 300 (2d Cir. 2000) ................................................................9, 16

Page

*Patane v. Clark*,
  508 F.3d 106 (2d Cir. 2007) ...............................................................9

*Phelps v. Kapnolas*,
  308 F.3d 180 (2d Cir. 2002) ...............................................................8

*Plumbers & Pipefitters Local 572 Pension Fund v. Cisco Sys., Inc.*,
  411 F. Supp. 2d 1172 (N.D. Cal. 2005).............................................38

*Rothman v. Gregor*,
  220 F.3d 81 (2d Cir. 2000) ...............................................................28

*Shaw v. Digital Equip. Corp.*,
  82 F.3d 1194 (1st Cir. 1996)..............................................................33

*Silverman v. Motorola, Inc.*,
  No. 07 C 4507, 2008 U.S. Dist. LEXIS 76799
  (N.D. Ill. Sept. 23, 2008) ............................................................10, 16

*Takara Trust v. Molex Inc.*,
  429 F. Supp. 2d 960 (N.D. Ill. 2006)................................................17

*United States v. Forbes*,
  249 Fed. Appx. 233 (2d Cir. 2007) ...................................................23

*Whalen v. Hibernia Foods PLC*,
  No. 04 Civ. 3182, 2005 U.S. Dist. LEXIS 15489
  (S.D.N.Y. Aug. 1, 2005)....................................................................29

STATUTES, RULES AND REGULATIONS

15 U.S.C.
  §78j(b) ...............................................................................................40
  §78t(a)..........................................................................................39, 40
  §78u-4, *et seq*.....................................................................................9
  §78u-5(c)(1)(A)(i) ..............................................................................17

Federal Rules of Civil Procedure
  Rule 9(b) ....................................................................................2, 3, 9
  Rule 12(b)(6).......................................................................................8
  Rule 15(a) ..........................................................................................40

17 C.F.R.
  §240.10b-5 ..............................................................................12, 15, 40

Lead Plaintiff Steamfitters Local 449 Pension Fund ("Plaintiff") respectfully submits this memorandum of law in opposition to the motion to dismiss the Consolidated Amended Class Action Complaint (the "Complaint," cited herein as "¶__") filed by defendants Sturm, Ruger & Company, Inc. ("Sturm Ruger" or the "Company"), Michael O. Fifer ("Fifer") and Thomas A. Dineen ("Dineen")[1] (collectively, "Defendants").

## I.     PRELIMINARY STATEMENT

This case arises out of Defendants' fraudulent scheme to conceal problems Sturm Ruger faced as it transitioned into lean manufacturing.  Following almost two years of inefficient manufacturing processes and bloated firearm inventory, Sturm Ruger embarked on a complete transformation of the Company and hired a new Chief Executive Officer ("CEO"), Defendant Fifer, to remedy its ailing business.  Shortly after the transformation plan (known as the Ruger Business System) was put into effect, improvements in production and inventory seemed to be well underway as Defendants proclaimed that "demand and on-time order fulfillment [were] up" and they were starting to see "real benefits for [] shareholders, customers, and employees."  Defendants continued to publicize the success of the Ruger Business System throughout the Class Period,[2] reporting double-digit increases in sales and shipments during the first half of 2007.  The truth, however, was that Defendant Fifer's transformation plan was not as successful in remedying the Company's problems as Defendants had declared and, in fact, caused only more manufacturing and inventory issues that prevented Sturm Ruger from meeting production schedules and customer orders.

Instead of admitting to the problems, Defendants actively concealed the difficulties they experienced in implementing the Ruger Business System.  While Defendants were able to maintain the public appearance of production improvements and increased sales during the first half of 2007

---

[1]  Together, Fifer and Dineen are referred to herein as the "Individual Defendants."

[2]  The Class Period is April 23, 2007 to October 24, 2007.

by working through the stockpiles of firearm and component part inventory left over from previous years, Defendants knew that Sturm Ruger's production levels, sales and shipments to distributors could not be sustained because the Company was quickly running out of inventory and was having problems producing more.  Eventually, when Sturm Ruger's net sales for the third quarter fell more than 23%, Defendants were forced to reveal that the decrease in sales was due to production problems "brought to the forefront" and inventory reductions that cut "too deeply across too many product lines."  The result was a dramatic collapse in Sturm Ruger's stock price, which fell over 37% in just one day.

Faced with particularized allegations in the Complaint, Defendants respond by attacking the Complaint's use of "block quotations" and focus their motion on the materiality of the alleged false and misleading statements.  In attempting to make these arguments, however, Defendants' motion becomes a web of contradictions as Defendants first argue that they cannot identify the statements alleged to be false and misleading, then subsequently identify those very statements as immaterial.  Similarly, in arguing that the statements are not actionable, Defendants label the statements as "forward-looking" in one sentence, while labeling the same statements as accurate statements of historical fact in another.  While Defendants' motion argues many, often contradictory, issues, it is most telling in what it does not argue – the fact that Defendants had a duty to disclose the problems it was experiencing with production and inventory shortages, as well as a duty to speak truthfully and completely regarding demand, shipments and backlog.  Instead of addressing these issues, Defendants completely ignore the alleged omissions altogether.

In sum, Defendants' motion to dismiss should be denied in its entirety.  The Complaint more than adequately alleges that Defendants made material misrepresentations and omissions during the Class Period and satisfies the heightened pleading standards established by the Private Securities Litigation Reform Act ("PSLRA") and Federal Rule of Civil Procedure 9(b).  *See infra* §III.B.  The

Complaint also provides specific facts that, when viewed cumulatively, demonstrate Defendants' scienter in issuing materially false and misleading statements (*see infra* §III.C) and adequately pleads loss causation (*see infra* §III.D). Defendants' efforts to strike down these particularized allegations are unpersuasive and should be disregarded.

## II.    STATEMENT OF FACTS

Sturm Ruger is a Connecticut-based manufacturing company that primarily engages in the production and sale of firearms – including rifles, shotguns, pistols and revolvers – for the commercial sporting market. ¶¶2, 38. The Company sells its firearms directly to a small number of "independent" wholesale distributors, who resell the products to retail firearm dealers. ¶38. The retail dealers then sell the products to individual consumers. *Id.* In 2007, approximately 92% of the Company's sales were derived from the sale of firearms. *Id.* The remaining 8% of sales were derived from precision investment castings, which are used to produce many of the basic metal component parts of the firearms manufactured by the Company, including barrels and triggers. ¶39.

Beginning in 2005 and continuing into 2006, Sturm Ruger faced several manufacturing and marketing challenges, including problems with excess firearm and component part inventories. ¶42. An inventory count revealed that the amount of firearms produced by the Company severely exceeded any demand it was realizing from consumers and, as a result, the Company's profit margins declined by 350 basis points. ¶¶3, 43. In May 2006, Sturm Ruger reported disappointing 2005 financial results, citing inefficient manufacturing processes that caused delays in shipping products to consumers. ¶¶3, 44. The Company continued to report declining year-over-year earnings for the first six months of 2006 and, although Sturm Ruger had high levels of component part inventory, it was unable to shift manufacturing resources to meet orders for its products. ¶45. As a result of its manufacturing deficiencies, Sturm Ruger's stock floundered, trading at a low of $5.56 per share during the second quarter of 2006. *Id.*

### A.    Defendant Fifer Establishes the Ruger Business System

In late 2006, Sturm Ruger set out to remedy the manufacturing and excess inventory problems at the Company and, accordingly, hired Defendant Fifer to lead the Company's transformation to "lean manufacturing." ¶¶4-5. Defendant Fifer, who succeeded William B. Ruger, Jr. as CEO in September 2006, was viewed as a strong leader who was capable of transforming Sturm Ruger. ¶46.

Once Defendant Fifer became CEO, he employed a new management team and introduced an eight-component transformation plan based on lean manufacturing, known as the Ruger Business System. ¶¶47-49. The goal of the Ruger Business System was to mend the Company's ailing manufacturing methods and to cut bloated inventory levels. ¶49. As part of the transformation to lean manufacturing, Sturm Ruger made significant cuts to raw material, component part, work in progress and finished goods inventories. ¶51. The Company also changed the manner in which distributors ordered firearms – from one cancelable annual order, to a system which allowed distributors to place more frequent, non-cancelable purchase orders. ¶55. The market reacted positively to Defendant Fifer's turnaround efforts, and Sturm Ruger common shares began trading at $13 per share during March 2007, an increase of more than 80% from September 2006. ¶¶5, 57.

Surprisingly, however, the transformation plan placed an aura of secrecy around the Company, as Sturm Ruger halted all meetings with individual investors and analysts, discontinued the narrative portion of its quarterly financial press releases and ceased issuing financial forecasts or earnings guidance. ¶50. Additionally, on February 12, 2007, only two months prior to the Class Period, Sturm Ruger further limited communication with the market by announcing that it would no longer provide earnings releases on an annual or quarterly basis in advance of required Securities Exchange Act of 1934 (the "Exchange Act") filings with the Securities and Exchange Commission ("SEC"). *Id.*

**B.** **Sturm Ruger Experiences Significant Undisclosed Problems Following its Implementation of Lean Manufacturing**

Sturm Ruger's return to profitability *appeared* to be well underway during the first and second quarters of 2007, as the Company reported double-digit increases in firearm sales and shipments, and continued to reduce its inventory. ¶7. In reality, however, the Ruger Business System had failed to resolve the Company's problems and, in fact, led to only increased production and inventory issues. ¶¶6, 58.

Former Sturm Ruger employees explained that once the Company began implementing its transition to lean manufacturing, a host of production problems arose, including problems with machinery and tools, manufacturing problems, long machine changeover times and vendor supply issues. ¶59. These problems caused the Company to fall behind in production. *Id.* While, prior to the implementation of lean manufacturing, Sturm Ruger was able to produce 400 to 500 revolvers per day, under the Ruger Business System, the Company was only manufacturing between 50 to 100 units. ¶62. In terms of profitability, the Company fell short of producing the 1,700 to 1,800 firearms necessary to "break even" and was, therefore, operating inefficiently. ¶63. Eventually, the problems had become so severe that Sturm Ruger was unable to meet orders and shipping schedules. ¶¶8, 65.

Sturm Ruger's inability to satisfy orders was made worse by its policy of cutting inventory, which caused the Company to work through most of the firearm and component part inventories that had been piling up in 2005 and 2006. ¶67. As a result, the Company did not have the pieces and parts on hand to meet orders and target production volumes once the stockpile from previous years was sold. ¶70.

Defendants knew about the Company's dwindling inventory and poor production during the Class Period because they closely monitored the transformation to lean manufacturing and had access to daily production results and reports that summarized Sturm Ruger's purchase orders, production schedules and inventory levels. ¶¶77, 79-80, 104. Defendants also met regularly with

the Company's Executive Operations Committee, created specifically to oversee the Ruger Business System, and held daily production meetings during which the Company's inability to meet production goals was discussed. ¶¶78-79. Nevertheless, Defendants masked these problems during the first and second quarters of 2007, which they were able to do because the Company was selling off its old firearm inventory and working through its component part inventory to make new firearms. ¶65. Accordingly, the production and inventory problems were not evident in Sturm Ruger's earnings reports during the first half of 2007 because it appeared that the Company was producing sufficient quantities of firearms to meet orders. *Id.*

### C. Defendants Mislead Investors About the Success of the Ruger Business System

Despite Defendants' knowledge about the problems the Company was experiencing in its transition to lean manufacturing, Defendants misleadingly created the impression that Defendant Fifer, along with his Ruger Business System, had remedied past production and inventory issues and that the transformation plan had actually led to "improvements" at the Company. ¶83.

Defendants' attempts at deceiving the public about the success of the Ruger Business System began approximately two weeks before the start of the Class Period, when the Company issued its 2006 Annual Report to Security Holders ("2006 Annual Report") and an accompanying letter to shareholders ("2006 Shareholder Letter"), highlighting the "changes" of the transformation plan, that were "beginning to yield real benefits for [] shareholders, customers, and employees." *Id.* The 2006 Shareholder Letter also stated that "[d]emand and on-time order fulfillment [were] up" and described Defendant Fifer as an "engineer of change." *Id.*

Defendants continued to mislead investors throughout the Class Period, issuing positive statements regarding "strong demand" for Sturm Ruger products and increases in firearm shipments, order backlog and productivity. ¶¶87, 89, 93. Defendants also positively described the Company's inventory reductions and made statements that it had "adequate quantities of raw materials in

inventory." ¶¶86, 90, 92.  While peppering their Form 10-Qs for the first and second quarter with encouraging statements, Defendants failed to disclose the truth about the Company's transformation plan, including, among other things, that Sturm Ruger was experiencing production problems and inventory shortages, preventing the Company from fulfilling customer orders and resulting in its inability to sustain current or historical sales levels.  ¶95.

The market responded positively to Sturm Ruger's representations of the Ruger Business System and the Company's financial statements during the first and second quarters of 2007.  For example, in response to the Company's first quarter results and statements made during an annual stockholder meeting, held on April 24, 2007 ("2007 Annual Meeting"), Sturm Ruger stock jumped from $12.05 to $13.39, an 11% increase, on heavy trading volume.  ¶91.  Sturm Ruger stock rose again after the announcement of the second quarter results, this time increasing 10% to close at $18.55.  ¶94.  While analysts were convinced that the Company was "making progress in manufacturing enough product to meet demand" (*id.*), Defendants knew otherwise.  Taking advantage of the artificially inflated market price, Defendant Dineen and other insiders sold over 321,000 shares of their personal holdings within the span of one month, receiving more than $6.6 million in gross proceeds just days after Sturm Ruger issued favorable second quarter results.  ¶106.

### D.    The Truth is Disclosed

On October 24, 2007, Sturm Ruger issued its financial results for the third quarter of 2007, revealing that net sales fell over 23%, resulting in a loss of $0.03 per share.  ¶96.  In a letter to Sturm Ruger's shareholders, Defendant Fifer admitted that the decline in sales was attributable to production problems and inventory reductions that had cut "too deeply."  ¶¶12, 97.  Defendant Fifer also admitted, that once the Company implemented its transformation to lean manufacturing and began "reducing inventory, challenges from poor machinery and tool reliability, manufacturing issues, long machine changeover times, and vendor supply issues [were] all brought to the forefront."  ¶97.

Moreover, Sturm Ruger's Form 10-Q for the third quarter of 2007, filed on or about October 24, 2007, revealed, for the first time, that the amount of unsold firearms in distributors' inventories had increased by more than 37% during the second quarter of 2007.  ¶¶75, 98.  The increase in unsold firearms indicated that the products were not selling through to end user retail customers and resulted in reduced firearm orders in the third quarter.  ¶¶76, 98.  Defendants attributed the decline in firearm orders to "the Company's inability to produce and ship sufficient quantities of certain firearms already on order, which discouraged additional orders for those products" and "softening of demand."  ¶98.

In response to the October 24, 2007 disclosures, Sturm Ruger stock fell by $7.21 per share, or more than 37%, to close at $10.65 per share on unusually high trading volume.  ¶99.

## III.    ARGUMENT[3]

### A.    Legal Standards on a Motion to Dismiss

In considering a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a court must accept all factual allegations as true and draw all reasonable inferences in plaintiffs' favor.  *See Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 161 (2d Cir. 2000).  "The fundamental issue . . . is not whether a plaintiff is likely to prevail ultimately, but whether the claimant is entitled to offer evidence to support the claims."  *Phelps v. Kapnolas*, 308 F.3d 180, 184-85 (2d Cir. 2002).  Accordingly, a complaint "attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations," but rather must simply provide the grounds of entitlement to relief and raise a right to relief above the speculative level.  *Bell Atl. Corp. v. Twombly* ("*Twombly*"), 550 U.S. 544, 555 (2007).

Reaffirming the pleading standard set out in *Twombly*, the United States Supreme Court held that, to survive a motion to dismiss, a complaint must simply "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 129 S. Ct.

---

[3]  Citations and internal quotations are omitted, and emphasis is added, unless otherwise noted.

1937, 1949 (2009) (quoting *Twombly*, 550 U.S. at 570). *Twombly* cautioned, however, that "[a]sking for plausible grounds . . . does not impose a probability requirement at the pleading stage;" it simply requires "enough fact[s] to raise a reasonable expectation that discovery will reveal evidence" to prove the claim. 550 U.S. at 556. Under this standard, "[o]nly a statement of facts so conclusory that it fails to give notice of the basic events and circumstances on which a plaintiff relies should be rejected as legally insufficient under [Rule] 12(b)(6)." *Patane v. Clark*, 508 F.3d 106, 116 (2d Cir. 2007).

### B.   The Complaint Alleges Actionable Misrepresentations and Omissions

#### 1.   The Complaint Specifically Alleges Defendants' Fraud in Accordance with Rule 9(b) and the PSLRA

Although Defendants claim to be confused as to which statements are alleged to be misleading (*see* Def. Mem. at 14-15),[4] the Complaint properly particularizes Defendants' materially false and misleading statements and omissions in accordance with Fed. R. Civ. P. 9(b) and the PSLRA, 15 U.S.C. §78u-4, *et seq.*[5] The Complaint specifically identifies "what" statements are alleged to be false and misleading (*see, e.g.*, ¶¶83, 86-87, 89-90, 92-93); "who" made the statements (*i.e.*, Sturm Ruger or Defendant Fifer); "when" they were made (*i.e.*, April 3, 2007, April 23, 2007, April 24, 2007 and July 24, 2007); and "where" they were made (*i.e.*, the 2006 Shareholder Letter, the Forms 10-Q for the first and second quarter of 2007 and the 2007 Annual Meeting). *See In re Vivendi Universal, S.A. Sec. Litig.*, 381 F. Supp. 2d 158, 165 (S.D.N.Y. 2003) (defining particularity

---

[4]  "Def. Mem. at __" refers to pages of Defendants' Memorandum in Support of Motion to Dismiss Plaintiffs' Consolidated Amended Class Action Complaint.

[5]  Fed. R. Civ. P. 9(b) and the PSLRA require plaintiffs to identify "with particularity" the circumstances constituting the alleged fraud. *Graham v. Barriger*, No. 08 Civ. 9357 (PKC), 2009 U.S. Dist. LEXIS 107967, at *16 (S.D.N.Y. Nov. 17, 2009). To satisfy the particularity requirement of Rule 9(b), the Complaint must specify the statements that Plaintiff contends were fraudulent, identify the speaker, state when and where the statements were made, and explain why the statements were fraudulent. *See Novak v. Kasaks*, 216 F.3d 300, 306 (2d Cir. 2000); *In re Xerox Corp. Sec. Litig.*, 165 F. Supp. 2d 208, 214 (D. Conn. 2001). "Even with the heightened pleading standard under Rule 9(b) and the Securities Reform Act," the Second Circuit "do[es] not require the pleading of detailed evidentiary matter in securities litigation." *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 72 (2d Cir. 2001). Accordingly, "[the PSLRA] does not require that plaintiffs plead with particularity every single fact upon which their beliefs concerning false or misleading statements are based. Rather, plaintiffs need only plead with particularity sufficient facts to support those beliefs." *Novak*, 216 F.3d at 313-14.

as the "who, what, when, where and how" of the fraud). The Complaint also alleges "why" the representations were materially false and misleading by identifying specific facts that were not disclosed, which rendered Defendants' Class Period statements materially false and misleading when made and caused Defendants' prior misleading statements to remain alive and uncorrected during the Class Period. *See, e.g.*, ¶¶84-85, 95(a)-(g).

Nevertheless, rather than focus their arguments on substantive grounds, Defendants clamor for a rule that would dismiss this case merely on form, arguing that the structure of the Complaint is improper. For example, Defendants attack the use of "block quotations" and claim that they "are left to guess which statements [P]laintiffs allege are actionable and why they were ostensibly false and misleading when made." Def. Mem. at 14-15. However, when it suits them, Defendants have no difficulty identifying the very statements they contend are not particular enough. *See, e.g.*, Def. Mem. at 7-9 (characterizing the false and misleading statements as "Statements Regarding the Transition," "Statements Regarding Inventory Reductions" and "Statements Regarding Demand, Shipments and Backlog"); Def. Mem. at 16-26 (disputing the materiality of the alleged false and misleading statements concerning the transition to lean manufacturing, product demand, shipments and order backlog, and inventory reductions). Defendants cannot seriously suggest that the Complaint fails to specify the statements at issue or articulate why they are false, on the one hand, while disputing the falsity and materiality of those very statements, on the other.[6] *See In re Honeywell Int'l Sec. Litig.*, 182 F. Supp. 2d 414, 426 (D.N.J. 2002) (rejecting similar language).

Contrary to Defendants' assertions, the actionable statements alleged in the Complaint are emphasized in bold and italicized text and, thus, are readily identifiable. *See Silverman v. Motorola, Inc.*, No. 07 C 4507, 2008 U.S. Dist. LEXIS 76799, at *24 (N.D. Ill. Sept. 23, 2008) ("As we

---

[6] It goes without saying that if Defendants were unable to identify the statements alleged to be false and misleading, they would not have spent over 10 pages arguing that those very same supposedly unidentifiable false and misleading statements were immaterial. *See* Def. Mem. at 16-26.

understand the complaint, plaintiffs are not alleging that the entire paragraphs are false, but only the highlighted statements. . . ."); *see also In re NTL Inc. Sec. Litig.*, 347 F. Supp. 2d 15, 22 (S.D.N.Y. 2004) (rejecting defendants' argument that plaintiffs failed to plead with particularity and reproduced "blocks of text from allegedly deceptive NTL statements without specifying which portions are misleading," finding that it was enough that the complaint specifically identified "the date, publication and speaker of each of the alleged misstatements or omissions").

In particular, the Complaint alleges that Defendants consistently portrayed the Company's implementation of its Ruger Business System in a positive light, while downplaying and misrepresenting material information concerning Sturm Ruger's production problems and inventory cuts. *See, e.g.*, ¶83 (noting "improvements" in the Company "are beginning to yield real benefits for our shareholders" and projecting "nothing but opportunities ahead of us"); ¶¶86, 92 (claiming that reduction in inventory "will not have a material impact on the financial position of the Company";)[7] ¶89 (claiming to "implement a business system . . . with the ultimate goal of providing World-Class quality, delivery and service to its customers"); ¶¶89-90 (boasting about improvements in productivity and effects of inventory reductions); ¶92 (stating that the Company "has adequate quantities of raw materials in inventory to provide ample time to locate and obtain additional items . . . without interruption of its manufacturing operations"). These statements were materially false and misleading because they created the false impression that the Ruger Business System was remedying the manufacturing and inventory problems that the Company had experienced in 2005 and 2006. *See* ¶¶42-45. In truth, Defendants knew that Sturm Ruger's implementation of its transformation

---

[7] While Defendants accuse Plaintiff of paraphrasing language from the 2007 Annual Meeting (*see* Def. Mem. at 15), the quotes referenced in the Complaint were taken directly from the April 24, 2007 Annual Meeting Presentation, filed with the SEC on or about April 24, 2007 and attached as Exhibit C to the Declaration of Tracy Hannan in Support of Defendants' Motion to Dismiss Plaintiffs' Consolidated Amended Class Action Complaint ("Hannan Decl."). The fact that the Complaint refers to "stock keeping units" as "inventory" does not alter the alleged false and misleading statements. *See Incase Inc. v. Timex Corp.*, 488 F.3d 46, 50 (1st Cir. 2007) (defining "Stock Keeping Unit" as "an identifying code used in inventory management").

plan was not running as smoothly as Defendants had represented and caused the Company to experience additional production problems and inventory shortages that prevented it from fulfilling customer orders and meeting production schedules in a timely manner.  ¶¶58, 95(a)-(b).[8]

### 2. Defendants Were Required to Disclose Facts Necessary to Make Their Statements Complete and Accurate

Focusing *only* on the alleged false and misleading statements, Defendants completely ignore the alleged omissions outlined in the Complaint.  An omission is actionable under the federal securities laws "when the [defendant] is subject to a duty to disclose the omitted facts." *In re MBIA, Inc. Sec. Litig.*, No. 08-CV-264 (KMK), 2010 U.S. Dist. LEXIS 31430, at *28 (S.D.N.Y. Mar. 31, 2010).  Although Rule 10b-5 does not create an affirmative duty to disclose all nonpublic material information in a company's possession, "[s]uch a duty arises whenever secret information renders prior public statements materially misleading, not merely when that information completely negates the public statements." *Id.*

Throughout the Class Period, Defendants issued a series of fraudulent material misrepresentations regarding Sturm Ruger's then current financial condition and the benefits that the Company was experiencing, and would continue to experience, as Defendants implemented the Ruger Business System.  For example, Defendants made positive statements about the Company's new business model, stating, *inter alia*, that Sturm Ruger was "implementing a business system . . . with the ultimate goal of providing World-Class quality, delivery and service to its customers" and bragged about increases in productivity and other production improvements achieved since

---

[8] Defendants also made misleading statements regarding "strong demand" for its products, increased shipments, and increased purchase order backlog.  ¶¶87, 93.  These statements were each materially false and misleading because they failed to disclose that:  (i) Sturm Ruger's "backlog" of unfilled purchase orders was materially inflated because of the Company's inability to meet current production and shipping schedules; (ii) the increase in product shipments during the first and second quarters of 2007 were caused by the Company selling through its inventory and not as a result of increased productivity; (iii) orders received from Sturm Ruger's independent distributors were artificially boosted by the Company's switch to non-cancelable purchase orders and was not reflective of actual demand; and (iv) the Company's independent distributors were carrying large quantities of unsold products, increasing the risk that demand would decline.  ¶¶95(c)-(f).

implementing the Ruger Business System. ¶89. With respect to inventory, Defendants represented

that the Company had "adequate quantities of raw materials in inventory to provide ample time to

obtain . . . additional items . . . without interruption of its manufacturing operations." ¶92.

Defendants also made positive representations regarding the Company's inventory reductions,

stating, among other things, that the Company's reduction in inventory "simplified product line for

trade customers and end users" and "[e]nsured that profitable niche markets are still served." ¶90.

Further, Defendants boasted increases in backlog of unfilled purchase orders and that shipment of

firearms was increasing due to "strong demand" and "product availability" during the first and

second quarters of 2007. ¶¶87, 93.

Once Defendants made these statements, they undertook a duty "to speak truthfully and to

make such additional disclosures as . . . necessary to avoid rendering the statements misleading."

*Hall v. Children's Place Retail Stores, Inc.*, 580 F. Supp. 2d 212, 226 (S.D.N.Y. 2008); *see also*

*Caiola v. Citibank, N.A.*, 295 F.3d 312, 331 (2d Cir. 2002) ("[U]pon choosing to speak, one must

speak truthfully about material issues."). "Thus, when a corporation does make a disclosure –

whether it be voluntary or required – there is a duty to make it complete and accurate." *In re*

*Sotheby's Holding, Inc. Sec. Litig.*, No. 00 Civ. 1041 (DLC), 2000 U.S. Dist. LEXIS 12504, at *13

(S.D.N.Y. Aug. 31, 2000). Defendants nevertheless concealed information regarding the true extent

of the Company's issues. "This alleged deception, in itself, gave rise to the duty to disclose." *In re*

*Alstom SA Sec. Litig.*, 406 F. Supp. 2d 433, 454 (S.D.N.Y. 2005).[9]

Specifically, while Defendants spoke extensively about the benefits the Company was

already experiencing as a result of the Ruger Business System, they failed to inform investors of the

significant problems relating to the implementation of the transformation plan. In fact, despite

Defendants' positive statements, Sturm Ruger was experiencing a host of production problems that

---

[9] Notably, Defendants do not dispute their duty to disclose the alleged omissions.

Defendants knew prevented the Company from meeting customer orders and, consequently, from "providing World-Class quality, delivery and service to its customers."  In particular, during the Class Period, the Company experienced problems with its machinery and tools, manufacturing problems, long changeover times and vendor supply problems. *See* ¶¶59-66.  These problems were exacerbated by Sturm Ruger's severe inventory cuts, which prevented the Company from having the materials on hand to meet customer orders and target production volumes.  ¶¶68, 70.  Moreover, Sturm Ruger's new order policy, which permitted distributors to make non-cancelable purchase orders on a more frequent basis, caused orders to significantly increase.  ¶71.  The increase in orders, combined with the production problems and lack of inventory, made it impossible for the Company to manufacture firearms quickly enough to meet the orders.  ¶72.  Nevertheless, Defendants led investors and analysts to believe that "the company [wa]s making progress in manufacturing enough product to meet demand."  ¶94.

Defendants also failed to inform investors that the amount of unsold products in Sturm Ruger's distributors' inventories had significantly increased during the first and second quarters of 2007 – by approximately 37% – and that the products were not selling through to retail customers, which created a risk that distributors would reduce future firearm purchases from the Company in the near term.  ¶¶75-76.  Nor did Defendants disclose that the backlog of Sturm Ruger's unfilled purchase orders was materially inflated because of the Company's inability to meet production and shipment schedules or that the number of sales made to Sturm Ruger's independent distributors was artificially increased as a result of the Company's change in its ordering policy, which permitted distributors to make several non-cancelable orders throughout the year and was not reflective of actual demand.  ¶¶74, 95.

Despite the fact that the Company was unable to fulfill orders on time and did not have the capacity to catch up with demand, Defendants continued to represent that the transformation plan

was improving the Company's production and that Sturm Ruger had adequate quantities of raw materials for its firearms.  ¶¶89, 92.  Defendants highlighted the increase in product shipments, which they attributed to "strong demand" and "product availability," and made positive statements regarding the effect of inventory cuts on the Company's business operations and finances without mentioning that Sturm Ruger's production of firearms could not keep up with the inventory cuts or customer demand.  ¶¶87, 90, 93.  In light of the problems Sturm Ruger was experiencing as a result of its implementation of the Ruger Business System, Defendants lacked a reasonable basis for the positive statements about production improvements, inventory reductions and increased sales.  Thus, their failure to disclose those problems rendered their affirmative representations misleading.

### 3.   Defendants' Misrepresentations and Omissions Are Material

As a general standard, "[i]n order for an omission to be actionable, the omission must be material."  *Menkes v. Stolt-Nielsen S.A.,* No. 3:03 CV 409 (DJS), 2005 U.S. Dist. LEXIS 28208, at *17 (D. Conn. Nov. 10, 2005).  "At the pleading stage, a plaintiff satisfies the materiality requirement of Rule 10b-5 by alleging a statement or omission that a reasonable investor would have considered significant in making investment decisions."  *Ganino*, 228 F.3d at 161.  "The materiality inquiry is fact-specific" and, accordingly, "a complaint may only be dismissed on the grounds of a lack of materiality if the alleged misstatements or omissions are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance."  *DeCicco v. United Rentals, Inc.*, 602 F. Supp. 2d 325, 337 (D. Conn. 2009).  This is not one of those rare situations in which the determination of materiality should be made on the basis of the pleadings alone.

As alleged in the Complaint, Defendants' false and misleading statements omitted and downplayed the very significant problems that Sturm Ruger was experiencing with production and inventory (¶¶59-73) and which were likely to (and did, in fact) prevent the Company from meeting customers' orders and shipment schedules.  These false statements and omissions precluded

- 15 -

investors from obtaining a clear understanding of the Company's business operations and reported results and, accordingly, were precisely the type of information that an investor would have deemed material. *See, e.g., Hall*, 580 F. Supp. 2d at 229 (defendants' failure to disclose breaches of an agreement was material); *In re Globalstar Sec. Litig.*, No. 01 Civ. 1748 (SHS), 2003 U.S. Dist. LEXIS 22496, at *29 (S.D.N.Y. Dec. 15, 2003) (failure to disclose a delay in the Company's rollout of its gateways was material); *Silverman*, 2008 U.S. Dist. LEXIS 76799, at *29 (holding that defendants' omissions of extensive problems and delays plaguing the rollout of a product were material). By refusing to provide material information to shareholders concerning Sturm Ruger's production and inventory problems, Defendants significantly altered the "total mix" of information available to potential investors. *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988).

The materiality of Defendants' statements and omissions is further established by a more than 11% rise in Sturm Ruger stock in response to positive statements about the Ruger Business System made during the 2007 Annual Meeting and the 10% increase in response to the second quarter financial results. ¶¶91, 94. Once Defendants disclosed that the Company was experiencing production problems and had cut its inventory "too deeply" as a result of its attempt to implement the transformation plan, however, Sturm Ruger's stock dropped over 37%. ¶99. *See Manavazian v. ATEC Group, Inc.*, 160 F. Supp. 2d 468, 483 (E.D.N.Y. 2001) ("A dramatic change in the value of a company's stock following a company announcement . . . supports the materiality of the announcement."). Defendants' statements and omissions not only misled investors, but also analysts, who noted that "it appears the company is making progress in manufacturing enough product to meet demand." ¶94; *see Novak*, 216 F.3d at 314 (intentionally fostering a false belief among analysts of a material fact is actionable).

Thus, there is no set of facts under which Defendants could establish that their misleading statements and omissions were "obviously unimportant" to investors. Accordingly, Defendants

ignore the alleged omissions and, instead, argue that their statements were immaterial – because they were either:  (i) forward-looking in nature and accompanied by cautionary language; (ii) accurate statements of historical fact; or (iii) non actionable "puffery" or expressions of optimism. Defendants' arguments are without merit and fail to mitigate the harm caused by Defendants' materially misleading statements and *omissions* during the Class Period.

> **a.      Defendants' Statements Are Not Forward-Looking and Are Not Protected by the PSLRA's Safe Harbor Provision**

Defendants argue that some of their statements are protected by the PSLRA's "safe harbor" provision.[10]  Def. Mem. at 23-26.  To qualify as a forward-looking statement entitled to safe-harbor protection, however, a forward looking statement must be identified as such, and "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement."  15 U.S.C. §78u-5(c)(1)(A)(i); *see also Freudenberg v. E*Trade Fin. Corp.*, No. 07 Civ. 8538, 2010 U.S. Dist. LEXIS 46053, at *55 (S.D.N.Y. May 11, 2010).  The safe harbor "appl[ies] to forward-looking statements *only*, and not to material omissions or misstatements of historical fact."  *In re Complete Mgmt. Inc. Sec. Litig.*, 153 F. Supp. 2d 314, 340 (S.D.N.Y 2001) (emphasis in original).

Here, many of the statements that Defendants have identified are not forward-looking at all, but, rather, are statements of past or present fact that are not entitled to protection under the safe harbor provision.  For example, the alleged false and misleading statements regarding demand – *e.g.*, "demand **remained** strong;" there was "**continued** strong demand of revolver models;" and "[r]ifle shipments increased . . . **due to strong demand and product availability**" (¶¶87, 93) – are clearly

---

[10]  While Defendants argue only that statements regarding demand and success of the transition to lean manufacturing are protected by the safe harbor provision, the basis of the Complaint lies in Defendants' *failure to disclose* material adverse facts, which are not protected by the safe-harbor provision of the PSLRA.  *See In re NTL*, 347 F. Supp. 2d at 35 (noting that the safe-harbor provision of the PSLRA applies "to forward-looking statements only and not to material omissions"); *Takara Trust v. Molex Inc.*, 429 F. Supp. 2d 960, 974 (N.D. Ill. 2006) (holding that "it is axiomatic that the failure to make a statement cannot be forward-looking").

statements of present or historical fact, not future projections. Similarly, Defendants' statements regarding improvements in productivity; inventory cuts that "[s]implified product line for trade customers and end users;" and the Company's "adequate quantities of raw materials in inventory" (¶¶89-90, 92) also concern past or present facts. In fact, most of the statements that Defendants contend are forward-looking, are the same statements that Defendants assert are "Accurate Statement[s] of Historical Fact." *See* Def. Ex. 1., pp. 2-3, 5-8.[11] A statement protected under the safe harbor provision cannot be ***both*** a forward-looking statement and a misstatement of historical fact. *See In re Nortel Networks Corp. Sec. Litig.*, 238 F. Supp. 2d 613, 629 (S.D.N.Y. 2003) (noting that "it is well recognized that even when an allegedly false statement has both a forward-looking aspect and an aspect that encompasses a representation of present fact, the safe harbor provision of the PSLRA does not apply").

While Defendants expressly ***admit*** that the alleged false and misleading statements regarding demand "include several statements directly commenting on past and current levels of demand" (Def. Mem. at 24), they nevertheless argue that these statements are protected by the safe harbor provision. Defendants cannot have it both ways. "By definition, the safe-harbor provision applies to protect only 'forward-looking' statements, and not to misrepresentations of historical or current facts." *In re Vivendi Universal*, 381 F. Supp. 2d at 183. Simply mixing a present statement with a future projection will not insulate the entire statement. *See In re Nortel Networks Corp.*, 238 F. Supp. 2d at 628 ("Linking future success to present and past performance does not render statements immune from liability"); *In re U.S. Interactive, Inc. Sec. Litig.*, No. 01-cv-522, 2002 U.S. Dist. LEXIS 16009, at *56 n.11 (E.D. Pa. Aug. 23, 2002) ("Defendants cannot convert a larger statement

---

[11] References to "Def. Ex. __" are to the exhibits attached to Defendants' Memorandum in Support of Motion to Dismiss Plaintiffs' Consolidated Amended Class Action Complaint.

containing a series of misstatements about current factual conditions into one forward-looking statement simply by including one statement that is clearly forward-looking").

Even assuming that certain statements are forward-looking, the cautionary language upon which Defendants rely is insufficient to invoke the protection of the safe harbor. Cautionary language accompanying forward-looking statements must "precisely address the substance of the specific statement or omission that is challenged." *In re Nortel Networks Corp.*, 238 F. Supp. 2d at 628. The purportedly cautionary statements in question, however, refer to general risks and uncertainties that "could cause actual results to differ materially from those projected" (Hannan Ex. A at 27, Ex. C at 2)[12] and do nothing to warn of the production and inventory problems that had already come to pass. *See In re Vivendi Universal*, 381 F. Supp. 2d at 183 ("The generic warning that 'actual results may differ,' . . . does not come close to the cautionary language [needed] to render reliance on the misrepresentation unreasonable."). For example, Defendants point to language in Sturm Ruger's first and second quarter 2007 Forms 10-Q, as well as the Company's 2006 Annual Report and 2007 Annual Meeting presentation, which all contain exactly the same boilerplate language that "[t]he Company may, from time to time, make forward-looking statements and projections concerning future expectations" and that "[s]uch statements . . . are subject to certain qualifying risks and uncertainties, such as market demand . . . ." Def. Mem. at 25 (citing Hannan Ex. A at 27, Ex. B at 22, Ex. C at 2, Ex. D at 24-25). Not only does this purported "cautionary statement" fail to even mention production problems or inventory cuts, but it does nothing to warn about the impact of what Defendants already knew, namely, that the increase in orders and shipments during the first and second quarters of 2007 were a result of the Company's change to non-cancelable purchase orders and the Company's selling through its old inventory, not (as Defendants suggested) a consequence of increased demand and productivity. *See In re Regeneron*

---

[12] References to "Hannan Ex. __" are to the exhibits of the Hannan Decl.

*Pharms., Inc. Sec. Litig.*, No. 03 Civ. 3111 (RWS), 2005 U.S. Dist. LEXIS 1350, at *54 (S.D.N.Y. Feb. 3, 2005) ("[a] warning that fails to disclose specific known facts is insufficiently precise").[13]

Finally, to the extent that any of Defendants' challenged statements are forward-looking, Plaintiff has alleged sufficient facts demonstrating that Defendants made the statements with actual knowledge that they were false or misleading. *See infra* §III.C. Accordingly, the PSLRA provides no safe harbor protection with respect to any of those statements. *See Freudenberg*, 2010 U.S. Dist. LEXIS 46053, at *55 (noting "[d]efendants cannot be immunized for knowingly false statements even if they include some warnings"); *In re Indep. Energy Holdings Sec. Litig.*, 154 F. Supp. 2d 741, 756 (S.D.N.Y. 2001) (finding "[n]o degree of cautionary language will protect material misrepresentations or omissions where defendants knew their statements were false when made").

### b.    Misleading Statements of Historical Fact are Actionable

While arguing that their statements were forward-looking, Defendants contradictorily contend that some of the alleged misrepresentations are not actionable because they are "accurate statements of historical fact." Def. Mem. at 21. In particular, Defendants argue that the Complaint fails to allege that the challenged statements regarding order backlog, demand and inventory reductions were inaccurate. Def. Mem. at 19-23. Notwithstanding the fact that a statement cannot simultaneously be forward-looking and based on historical fact, whether Defendants' statements were accurate or inaccurate is not the question the federal securities laws address. Rather, they ask whether the statements would mislead a reasonable investor, regardless of whether the statements are technically true. *See In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 618 F. Supp. 2d 311, 323

---

[13]  Despite Defendants' arguments to the contrary, Defendants had a duty to update their pre-class period statements regarding the positive improvements made by the Ruger Business System once they became cognizant of the production and inventory problems at the Company. *See In re IBM Corporate Sec. Litig.*, 163 F.3d 102, 110 (2d Cir. 1998) ("A duty to update may exist when a statement, reasonable at the time it is made, becomes misleading because of a subsequent event."); *see also In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 267 (2d Cir. 1993) ("[A] duty to update opinions and projections may arise if the original opinions or projections have become misleading as a result of intervening events.").

(S.D.N.Y. 2009) (denying summary judgment motion and holding: "[t]he touchstone of the inquiry is not whether isolated statements within a document were true, but whether defendants' representations or omission . . . [would] mislead a reasonable investor").  In fact, misleading statements may be technically accurate but still knowingly fraudulent and actionable.  *See McMahan & Co. v. Wherehouse Entm't., Inc.*, 900 F.2d 576, 579 (2d Cir. 1990) ("[s]ome statements, although literally accurate, can become, through their context and manner of presentation, devices which mislead investors.  For that reason, the disclosure required by the securities laws is measured not by literal truth, but by the ability of the material to accurately inform rather than mislead prospective buyers").

Defendants' argument also misconstrues the allegations outlined in the Complaint.  Contrary to Defendants' assertions, the Complaint does not allege that Sturm Ruger's specific quantifications of past revenue are false.  Rather, it alleges that these statements were misleading in light of undisclosed information regarding the reasons behind the increases in firearm orders and shipments, and did not reflect the problems that the Company was then currently experiencing.[14]  For example, Defendants' statements that "order backlog increased $11.6 million from $16.2 million" was misleading because Defendants failed to disclose that the number was materially inflated as a result of Sturm Ruger's inability to meet production and shipping schedules, which led to unfilled purchase orders.  *See Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 987 (9th Cir. 2008) ("[O]nce defendants chose to tout the company's backlog, they were bound to do so in a manner that wouldn't

---

[14] Defendants' reliance on *In re Duane Reade Inc. Sec. Litig.*, No. 02 Civ. 6478(NRB), 2003 U.S. Dist. LEXIS 21319 (S.D.N.Y. Nov. 25, 2003), and *In re Ford Motor Co. Sec. Litig.*, 381 F.3d 563 (6th Cir. 2004), is misplaced because, in those cases, the plaintiffs alleged that accurate financial results imposed upon defendants a duty to disclose that those results were unlikely to be duplicated because of some potential future event.  In this case, by contrast, the Complaint alleges that Defendants' historical statements regarding shipments, backlog and demand were materially and falsely overstated because they were "half-truths" that failed to disclose information regarding the production and inventory problems that were then occurring and substantially certain to affect Sturm Ruger's financial results.  *See In re MBIA*, 2010 U.S. Dist. LEXIS 31430, at *28 ("A statement can [] be misleading, though not technically false, if it amounts to a half-truth by omitting some material fact.").

mislead investors as to what the backlog consisted of."). Similarly, Defendants' statements regarding the increase in firearm orders were misleading because they failed to disclose that the orders received were artificially boosted by Sturm Ruger's change in its order policies, and did not reflect actual demand. Likewise, Defendants' statements regarding increases in firearm shipments were misleading because they were not the result of "strong demand" as Defendants suggested, but, rather were caused by the Company selling through its old inventory during the first and second quarters of 2007. These statements instilled confidence in the market that the Company's productivity would continue to improve and that Sturm Ruger would experience similar increases in orders and shipments in the third quarter of 2007.[15]

Defendants' other statements regarding Sturm Ruger's reductions in inventory and corresponding impact on the Company's financial position were also rendered false and misleading by the omission of the critical fact that Sturm Ruger's inventory was cut so severely that the Company would be unable to meet its production and shipment schedules, thereby preventing the Company from sustaining its sales levels. Accordingly, Defendants' statements that reduction in inventory levels and LIFO liquidation "will not have a material impact on the financial position of the Company" (¶92) was misleading because Defendants knew that the inventory reductions would, in fact, **have** a material impact on the Company's financial position.

One need only compare the reaction of Sturm Ruger's stock price following the issuance of the Company's Forms 10-Q for the first and second quarter of 2007 (when Defendants announced increases in firearm shipments, orders and backlog and advertized "strong demand" of Sturm Ruger products) with the reaction on October 24, 2007 (when Defendants were finally forced to reveal that

---

[15] Defendants are correct in noting that they were not required to "predict what the future might hold." Def. Mem. at 21. However, that is not what the Complaint alleges. Instead, the Complaint alleges that by failing to make the necessary disclosures, Defendants ignored or failed to take into account information that was then available to them when they made their statements, which removes this case from the realm of fraud-by-hindsight. *See In re Atlas Air Worldwide Holdings, Inc., Sec. Litig.*, 324 F. Supp. 2d 474, 494 (S.D.N.Y. 2001) (plaintiffs offered more than hindsight where they alleged that the "company failed to take into account information that was available to it").

the Company was experiencing production problems and had reduced inventory "too deeply") to see that investors had been misled by the financial statements issued during the first two quarters of 2007. On April 24, 2007, for example, after Defendants issued their positive first quarter results and made additional positive statements during the 2007 Annual Meeting, Sturm Ruger's stock closed at $13.39 per share, an 11% increase from the previous day. ¶91. Based on the Company's seemingly strong first quarter results, market analysts raised their estimate from $.40 to $.50 per share. ¶88. Then, after the Company filed its second quarter Form 10-Q on July 24, 2007, the Company's stock closed at $18.55 per share, a 10% increase from the previous day. ¶94. Industry analysts commented that the second quarter "results were outstanding" and that "it appears the company is making progress in manufacturing enough product to meet demand." *Id.* As the market's reaction makes clear, investors and analysts understood Defendants' statements to be conveying favorable news. Indeed, Sturm Ruger's stock price continued to rise, closing as high as $22.58 per share on August 7, 2007. ¶108. By contrast, after the production and inventory problems at Sturm Ruger were communicated on October 24, 2007, the reaction was very different. The following day – on October 25, 2007 – the price of Sturm Ruger stock fell by $6.45 per share to close at $10.65 (down 37% from the prior day's close of $17.10), on volume of 4.2 million shares. ¶99.

The positive reaction to the publication of Defendants' flattering version of the Company's operations, and the opposite, negative reaction to the full disclosure of problems at Sturm Ruger, demonstrates that the market was misled. *See United States v. Forbes*, 249 Fed. Appx. 233, 236 (2d Cir. 2007) (holding that the "District Court correctly ruled that references to the decline in Cendant's stock price or investor losses were probative on the issue of materiality"). Thus, the Court cannot rule, as a matter of law, that the Company's Forms 10-Q were not misleading. *See In re Geopharma, Inc. Sec. Litig.*, 399 F. Supp. 2d 432, 441 (S.D.N.Y. 2006) ("a statement or omission is

actionably misleading when a reasonable investor would have been misled.  This determination is fact-specific, rarely amendable to disposition as a matter of law").

### c.     Defendants' Statements Are Not "Puffery"

Defendants' argument that some of their false and misleading statements are mere puffery or "generalized statements of optimism" (Def. Mem. at 16-19) also fails.  As shown above, at the time they were made, Defendants did not have a reasonable basis for their positive statements about the transformation to the Ruger Business System, production improvements and inventory cuts, which takes them out of the realm of "puffery."  *See Lapin v. Goldman Sachs Group, Inc.*, 506 F. Supp. 2d 221, 239 (S.D.N.Y. 2006) ("[O]ptimistic statements may be actionable upon a showing that the defendants did not genuinely or reasonably believe the positive opinions they touted . . . or that the opinions imply certainty."); *see also Billhofer v. Flamel Techs. SA.*, 663 F. Supp. 2d 288, 299 (S.D.N.Y. 2009) (representations that program was a "success" and that interest in the company's technologies "has never been higher" were not mere puffery where defendants had no reasonable basis for making those "categorical claims"); *In re Vivendi Universal*, 381 F. Supp. 2d at 182 (statements that company was "financially solid" were actionable where lacking in reasonable basis).

For example, the Complaint alleges that Defendants had no reasonable basis for their positive representations about the Company's transformation to lean manufacturing – including statements that the Company was experiencing "improvements in many areas" that lean manufacturing was "beginning to yield real benefits for [] shareholders" and that Sturm Ruger was "moving in a very positive direction."  ¶83.  At the same time that these statements were made, Sturm Ruger was experiencing production and inventory problems that prevented the Company from meeting customer orders.  Nevertheless, Defendants continued to make optimistic statements about the improvements made by Sturm Ruger's transition to lean manufacturing and their "goal of providing World-Class quality, delivery and service to its customers" (¶89), while failing to disclose adverse information that would have exposed the Company's difficulties and permitted investors to make an

independent determination of whether Sturm Ruger's goals were in fact attainable.  It is for this reason that Defendants' statements expressing confidence in the future performance of the Ruger Business System and the Company's increase in shipments as a result of strong demand do not constitute harmless puffery.  *See City of Sterling Heights Police & Fire Ret. Sys. v. Abbey Nat'l, PLC*, 423 F. Supp. 2d 348, 356-57 (S.D.N.Y. 2006) ("While mere puffery is insufficient to state a claim of securities fraud, public statements must be consistent with reasonably available data and should not misrepresent existing facts.").[16]

Defendants also mischaracterize their statements about demand for Sturm Ruger products as puffery.  Def. Mem. at 19.  However, Defendants' statements that "demand remained strong" and that shipments of firearms increased "due to strong demand" failed to disclose that Sturm Ruger's shipments and orders had not increased as a result of stronger demand, but, rather, because the Company changed its order policy from one cancelable order per year to several non-cancelable purchase orders.  The statements also neglected to inform investors that independent distributors were carrying large quantities of unsold Sturm Ruger products in their inventories and would likely reduce future purchases.  Where, as here, statements regarding strong demand failed to disclose, or masked, material concerns, courts have found such statements to be actionable and not mere puffery.  *See, e.g., In re Dura Pharms., Inc. Sec. Litig.*, 452 F. Supp. 2d 1005, 1033 (S.D. Cal. 2006) (statements that sales and demand were strong were not puffery because sales were achieved by overloading wholesalers with the product and did not reflect actual demand); *In re Computer Assocs. Class Action Sec. Litig.*, 75 F. Supp. 2d 68, 73 (E.D.N.Y. 1999) (statements of "strong worldwide

---

[16]  *See also Lindelow v. Hill*, No. 00-3727 (JFH), 2001 U.S. Dist. LEXIS 10301, at *20 (N.D. Ill. July 19, 2001) (statements of "strategy" and "goals" were actionable where "the stated goals were not obtainable"); *In re Providian Fin. Corp. Sec. Litig.*, 152 F. Supp. 2d 814, 825 (E.D. Pa. 2001) (where company touted its "customer focused approach," court found that the failure to disclose a series of fraudulent business practices that were responsible for inflating revenue, profit and customer base, was a material omission); *In re Catalina Mktg. Corp. Sec. Litig.*, 390 F. Supp. 2d 1110, 1113 (M.D. Fla. 2005) (statements that "publicly touted new operations as a continuing source of rapid growth with knowledge that these operations would not yield revenue increases for some time, if ever," were actionable).

demand" for products were actionable because they failed to disclose "materially misleading adverse business trends"); *see also In re Smith & Wesson Holding Corp. Sec. Litig,* 604 F. Supp. 2d 332, 342 (D. Mass. 2009) (holding that "[d]efendants' statements regarding the strength of past demand and 'backlog' orders" were not puffery because they "are definite and important to a potential investor" and "only purely forward-looking statements are entitled to protection as 'mere puffery'").

Similarly unavailing is Defendants' argument that because investors were aware of the Company's transition to the Ruger Business System, they should have anticipated "that problems may arise during a period of significant change."[17] Def. Mem. at 18. Defendants cannot reasonably expect investors to infer that Sturm Ruger was experiencing problems associated with its transition to lean manufacturing rendering the Company unable to fulfill customer orders, simply by disclosing that the Company was undergoing a transition to lean manufacturing. This is especially true because the misleading financial results during the first and second quarters of 2007 led investors to believe that Sturm Ruger's transformation plan was running smoothly. *See In re KeySpan Corp. Sec. Litig.*, No. 01 CV 5852 (ARR), 2003 U.S. Dist. LEXIS 26173, at *25 (E.D.N.Y. July 30, 2003) (defendants announcement of their transition plan failed to disclose problems at their subsidiary and, accordingly, "falsely suggested that the transition was proceeding according to plan and without material problems").

### C.     The Complaint Sufficiently Alleges a Strong Inference of Scienter

In the Second Circuit, a strong inference of scienter is established either: (i) by alleging facts that constitute evidence of conscious misbehavior or recklessness; or (ii) by alleging facts which demonstrate that defendants had motive and opportunity to commit fraud. *See Ganino*, 228 F.3d at 168-69. A court must consider "whether *all* of the facts alleged, taken collectively, give rise to a

---

[17] To the extent Defendants are arguing a "truth-on-the-market" defense, they have failed to show that any corrective information was "conveyed to the public with a degree of intensity and credibility sufficient to counter-balance effectively any misleading information created by the alleged misstatements." *Ganino*, 228 F.3d at 167.

strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs*, 127 S. Ct. at 2509 (emphasis in original). The inference must merely be "*at least as likely* as any plausible opposing inference." *Id*. at 2513 (emphasis in original). In other words, a tie between facts that give rise to an inference of scienter and plausible opposing inferences is sufficient to avoid dismissal. *In re Top Tankers, Inc. Sec. Litig.*, 528 F. Supp. 2d 408, 413 (S.D.N.Y. 2007).

Here, the Complaint's allegations, taken as a whole, paint a picture of a strong and compelling inference of scienter that is *at least as likely* as any opposing inference of non-culpable intent. As detailed in the Complaint, Defendant Fifer was appointed as CEO of Sturm Ruger to transform the Company and remedy the manufacturing and inventory problems it was experiencing throughout 2005 and 2006. ¶¶5, 46. Defendant Fifer's transformation plan, however, only led to increased manufacturing and inventory concerns. ¶¶6, 58. Rather than admit to the difficulties the Company was experiencing, Defendants chose to conceal the fact that the Ruger Business System had failed to reform the Company as investors had expected. Specifically, Defendants made several positive statements regarding the Company's transformation to lean manufacturing, while failing to disclose material information that undermined the truth and accuracy of their statements. *See* ¶¶83-95. These statements were contradicted by available facts that production problems at the Company were so severe that Defendants were unable to meet customer orders and the problems were only worsened by Sturm Ruger's reduction in inventory, giving rise to an inference that Defendants "had intimate knowledge of those facts or should have known them." *In re Atlas Air*, 324 F. Supp. 2d at 489. Indeed, in an effort to hide the problems that the Company was experiencing, Defendants went as far as changing Sturm Ruger's communication policy and ceased holding meetings with individual investors or analysts, discontinued the narrative portion of its quarterly financial press releases, stopped issuing financial forecasts or earnings guidance and decided that the Company

would no longer provide an earnings release in advance of filing its annual and quarterly financial reports. ¶50. While Defendants' scheme had its intended effect of deceiving investors during the first two quarters of 2007, as the Company's financial results seemed to improve, Defendants knew that the Company's production levels, shipments to distributors and sales levels could not be sustained and the only reason that Sturm Ruger was able to report double-digit increases in firearm sales and shipments was because it was selling through its old firearm inventory and working through its component part inventory. ¶¶8, 65. By October 24, 2007, the charade had come to a halt when the Company announced that its net sales for the third quarter fell over 23% and Defendants were forced to reveal, for the first time, that once inventory reductions took place, production problems were "all brought to the forefront" and that Defendants had reduced "inventories too deeply across too many product lines simultaneously." ¶97.

While Defendants assert that they did not "realize their problems until the cumulative effects of the reduction in inventory throughout the first and second quarters, combined with the production problems that surfaced in the third quarter, revealed the true extent of the difficulties" (Def. Mem. at 36), neither the production problems, nor the effects of Sturm Ruger's inventory reductions, came as a surprise to them.  It is disingenuous for Defendants to now argue that they did not know of these problems until the third quarter, when Defendant Fifer *admitted* that, "[b]y reducing inventory, challenges from poor machinery and tool reliability, manufacturing issues, long machine changeover times, and vendor supply issues are all brought to the forefront." ¶97. Defendants do not dispute that they started reducing Sturm Ruger's inventory at the end of 2006 and, as a result, by the start of the Class Period on April 23, 2007 (almost six months later) would have already known about the production problems that, in Defendant Fifer's words, were "brought to the forefront."[18]  Even if

----

[18]  Defendants' demand for the exact time that "something was known within [the] six month" Class Period (Def. Mem. at 32) is simply not supported by case law. *See Rothman v. Gregor*, 220 F.3d 81, 91 (2d Cir. 2000) (noting that plaintiffs "do not have to fix the exact date and time" that defendants became aware of information contrary to their statements);

Defendants' assertions that they did not know about Sturm Ruger's inventory and production problems until the third quarter (which began July 1, 2007) were true, Defendants essentially admit that by July 24, 2007 (approximately one month into the third quarter), when Sturm Ruger filed its second quarter Form 10-Q, Defendants knew that the statements contained therein were false and misleading.[19]

Given the importance of the Ruger Business System, which was intended to completely transform the Company's prior manufacturing method, it is incredible to suggest that Defendants did not know of the continuing production and inventory issues facing Sturm Ruger. Courts routinely hold that a strong inference of scienter is imputed to senior executives where the subject of the alleged fraud affects the company's core business.[20] *See, e.g., Cosmas v. Hassett*, 886 F.2d 8, 13 (2d Cir. 1989) (holding that directors are imputed with knowledge of the removal of a "potentially significant source of income for the company"); *Freudenberg*, 2010 U.S. Dist. LEXIS 46053, at *72-*73 (scienter was established where misstatements concerned a core operation upon which defendants depended for much of its financial results); *In re Winstar Commc'ns*, No. 01 CV 3014 (GBD), 2006 U.S. Dist. LEXIS 7618, at *22 (S.D.N.Y. Feb. 27, 2006) (imputing knowledge to "key

---

*Whalen v. Hibernia Foods PLC,* No. 04 Civ. 3182, 2005 U.S. Dist. LEXIS 15489, at *7 (S.D.N.Y. Aug. 1, 2005) ("To plead with particularity does not require at this stage that Plaintiff spell out the very moment [defendant] should have known about the alleged fraud or that [defendant] had actual knowledge of the scope or particulars of the scheme."). In any event, the Complaint clearly alleges that Defendants knew or recklessly disregarded the production and inventory problems "***by the start of the Class Period***." ¶8.

[19] Defendants argue that the more plausible inference is that Defendants did not know that inventory reductions would render the Company unable to meet demand until the third quarter because they continued to make inventory reductions through the end of the second quarter and would not have done so had they known the consequences. *See* Def. Mem. at 36-37. However, as alleged in the Complaint, the manner in which Sturm Ruger reduced its inventory was by selling it and working through the old component part inventory to make new firearms during the first and second quarters of 2007. ¶65. While this worked to mask the Company's production problems during the first half of 2007, Defendants were fully aware throughout the Class Period, that they would run out of inventory sooner rather than later.

[20] The Individual Defendants signed SEC filings (¶¶21-22), which gave rise to a duty to familiarize themselves with Sturm Ruger's core business operations. *See In re Winstar*, 2006 U.S. Dist. LEXIS 7618, *22-*23.

officers who should have known of facts relating to the core operations of their company that would have led them to the realization that the company's [ ] statements were false when issued").

Moreover, as alleged in the Complaint, the Individual Defendants closely monitored the transformation to lean manufacturing and held positions from which they would have been aware of the true facts and misleading disclosures.  ¶¶77-82; 103-104.  Indeed, Defendant Fifer was responsible for leading Sturm Ruger's transformation to lean manufacturing (¶¶5, 47) and, prior to the implementation of the Ruger Business System, Defendants promised to monitor Sturm Ruger's inventory and "conduct physical inventories at the end of 2006 and at the end of each quarter in 2007."  ¶53; *see Citiline Holdings, Inc. v. iStar Fin., Inc.*, No. 08 Civ. 3612 (RJS), 2010 U.S. Dist. LEXIS 29706, at *22 (S.D.N.Y. Mar. 26, 2010) (scienter was satisfied where Defendants were "alleged to have told the investing public that they monitored the value of their portfolio on a nearly real-time basis").  Both Defendants Fifer and Dineen met regularly with the Executive Operations Committee to discuss the Ruger Business System (¶78) and had access to daily production results and reports that summarized Sturm Ruger's purchase orders, production and manufacturing schedules, inventory levels and dealer inventories and sell-through.[21]  ¶¶79-80, 104; *see In Re Scholastic*, 252 F.3d at 76 (scienter was adequately pled where complaint alleged "that defendants knew facts or had access to non-public information contradicting their public statements"); *see also In re Pall Corp.*, No. 07-CV-3359 (JS)(ARL), 2009 U.S. Dist. LEXIS 88240, at *20 (E.D.N.Y. Sept. 21, 2009) (finding inference of scienter where defendants "knew or had access to information showing that the company was engaging in improper cash and tax practices, and consequently that the financial statements and press releases presented inaccurate and misleading information");

---

[21]   Defendants wrongly assert that the Complaint fails to allege "what was actually discussed" during the daily production meetings and meetings with the Executive Operations Committee.  Def. Mem. at 33.  The Complaint expressly states that during the production meetings, "Sturm Ruger's inability to meet its production goals was discussed" (¶79) and that Defendants met with the Executive Operations Committee "to review the plans and results of the company's operations and initiatives and to discuss Sturm Ruger's transformation plan."  ¶78.

*Freudenberg*, 2010 U.S. Dist. LEXIS 46053, at *70 (defendants had access to and actual knowledge of information regarding the company's investment in high risk loans where defendants worked closely with the capital markets division, attended meetings and visited the division).

According to a former document control manager at Sturm Ruger ("CW 1"), the Company issued internal reports that carefully outlined its manufacturing goals compared to the actual amount produced each day. ¶64. The Company used the reports to determine daily production rates that were necessary to meet customer orders and shipping schedules. For example, if a particular order needed to be delivered by a specific future date and Sturm Ruger was only able to produce a certain number of firearm units until that point, it would be determined how many firearm units would need to be manufactured each day to meet the deadline. *Id.* Accordingly, the Individual Defendants knew, or at the very least, by the nature of their positions, were reckless in not knowing, that the Company was experiencing significant production problems and did not have enough inventory on hand to meet its production and shipping schedules.

Further, detailed information from former Sturm Ruger employees establishes that Defendants knew, or were extremely reckless in ignoring, that the Ruger Business System was failing.[22] According to CW 1, the Company's production decreased from 400 to 500 revolvers per day to between 50 and 100 per day. ¶62. CW 1 also noted that, during the Class Period, Sturm Ruger did not have enough component part inventory to meet customer orders and target production

---

[22] Defendants' reliance on Seventh Circuit authority, *Higginbotham v. Baxter Int'l, Inc.*, 495 F.3d 753 (7th Cir. 2007), is misplaced. In fact, the Seventh Circuit has since distinguished *Higginbotham* and held that the use of confidential witnesses "does not invalidate the drawing of a strong inference from informants' assertions" and that confidential witnesses can be "important sources for the allegations not only of falsity but also of scienter." *Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 513 F.3d 702, 71-12 (7th Cir. 2008). Moreover, the allegations in this case are readily distinguishable from those in *Higginbotham*. In *Higginbotham*, "[t]here was no basis other than the confidential sources, described merely as three ex-employees of Baxter and two consultants, for a strong inference that the subsidiary had failed to conceal the fraud from its parent and thus that the management of the parent had been aware of the fraud during the period covered by the complaint." *Makor*, 513 F.3d at 712. Here, the confidential informants are identified with sufficient particularity to support the allegations relating to Defendants' awareness of production and inventory problems at Sturm Ruger (¶¶35-37) and each witness provided the type of information that someone in their position would likely know. *See In re Veeco Instruments, Inc. Sec. Litig.*, 235 F.R.D. 220, 230 (S.D.N.Y. 2006).

volumes.  ¶70.  A former product engineer at Sturm Ruger ("CW 2") confirmed that Sturm Ruger was behind in production during the Class Period.  *Id.*

Defendants were directly warned of these problems.  For example, when Defendant Fifer decided to modify the payment terms with the Company's vendors under the Ruger Business System, a former general manager of Sturm Ruger's Pine Castings division ("CW 3"), expressed concern to senior staff and Sturm Ruger's Board of Directors that pushing payment back to 90 days, as opposed to 10 days, would not guarantee deliveries and supplies when needed.  ¶66.  CW 3 also warned management that because it was necessary to keep a two month supply of castings inventory on hand to meet firearm orders, the new method of manufacturing only as much inventory as necessary for immediate orders under the Ruger Business System, would ensure that the Company would not have enough inventory to meet orders.  ¶68.[23]

At the very least, Defendants' failure to disclose Sturm Ruger's production and inventory problems amounted to "an extreme departure from the standards of ordinary care."  *In re Nortel Networks Corp.*, 238 F. Supp. 2d at 631.  The fact that Sturm Ruger was working through its remaining firearm and component part inventory and was experiencing production problems that prevented the Company from manufacturing additional products and parts to satisfy customer orders was "so obvious" that Defendants "must have been aware of it."  *Id.*  Given their close monitoring of inventory levels, production, orders and customer demand, Defendants either knew of, or recklessly

---

[23]   Ignoring the fact that Sturm Ruger management was directly warned about the Company's inability to satisfy customer orders, Defendants argue that the Complaint fails to allege that the confidential witnesses had "any discussions regarding missed production targets and their implications."  Def. Mem. at 34.  Even if this were true, evidence of discussions is not necessary here, especially since the information provided by the confidential witnesses relates to what was known about the Ruger Business System, something that Defendants would have knowledge of as well since it related to the Company's core business.  *See In re Xethanol Corp. Sec. Litig.*, No. 06 Civ. 10234 (HB), 2007 U.S. Dist. LEXIS 65935, at *9 (S.D.N.Y. Sept. 7, 2007) (rejecting defendants' argument that plaintiffs failed to identify reports or statements in which defendants were made aware of the alleged fraud and holding that letters and statements made by anonymous former employees were sufficient "to show that Defendants were told, knew or should have known that their statements . . . were false when made"); *see also In re Countrywide Fin. Corp. Derivative Litig.*, 554 F. Supp. 2d 1044, 1060 (C.D. Cal. 2008) (holding that information from confidential sources was adequate and rejecting defendants' argument that plaintiffs were required to allege that the sources "spoke[] [with] or had other contact with any of the seven non-management directors").

turned a blind eye to, the numerous signs indicating that it would be impossible for Sturm Ruger to meet its orders and shipping schedules.  However, rather than disclose these facts, Defendants led investors to believe that the Ruger Business System was creating positive changes in the Company, including double-digit increases in sales and shipments, increased productivity, on-time order fulfillment, and increased demand.  Indeed, while highlighting all the improvements resulting from the transformation plan, Defendants also falsely claimed that Sturm Ruger had "adequate quantities of raw materials in inventory to provide ample time to locate and obtain additional items at then-current market cost without interruption of its manufacturing operations."  ¶92.  These statements created a false impression about Sturm Ruger and its transformation plan that differed materially from the truth.  *Ellenburg v. JA Solar Holdings Co. Ltd.*, No. 08 Civ. 10475 (JGK), 2010 U.S. Dist. LEXIS 49220, *16 (S.D.N.Y. May 17, 2010) (finding a strong inference of scienter where defendants were aware of information that contradicted their statements).

The temporal proximity of Defendants' July 24, 2007 statements to the disclosure of the disappointing third quarter financial results further contributes to a strong inference of scienter.  *See Institutional Investors Group v. Avaya, Inc.,* 564 F.3d 242, 371 (3d Cir. 2009) (temporal proximity of false statements to end of quarter supported strong inference of scienter); *Shaw v. Digital Equip. Corp.*, 82 F.3d 1194, 1225 (1st Cir. 1996) (finding that proximity of misleading statements to date of eventual disclosure "provides some circumstantial factual support to be taken into account in determining whether the complaint pleads an adequate basis for inferring defendants' culpable knowledge").  The July 24, 2007 statements were issued approximately one month into the third quarter and, at that time, Defendants certainly would have known whether or not Sturm Ruger was meeting customer orders and shipping schedules.  Sturm Ruger cannot go from having no production problems and sufficient inventory, to (only two months later) experiencing countless issues with its Ruger Business System rendering it unable to satisfy orders, without being extremely reckless in

disregarding the problems at the Company.  There simply is no other, more compelling non-fraudulent inference.

Although Plaintiff has established a strong inference of scienter by alleging conscious misbehavior or recklessness, the fact that Defendant Dineen and other Sturm Ruger insiders acted to benefit from their possession of material non-public information by engaging in suspicious insider trading, further supports a strong inference of scienter.  *See, e.g., Tellabs*, 127 S. Ct. at 2511; *In re Scholastic*, 252 F.3d at 74.  Insider trading is unusual or suspicious where trading is timed to take advantage of the company's stock price as a result of undisclosed inside information or the trades are coordinated among insiders in a discernible pattern.  *See In re Oxford Health Plans, Inc. Sec. Litig.*, 187 F.R.D. 133, 139 (S.D.N.Y. 1999).

Here, the insider trading was both large in volume and timed to take advantage of the stock's favorable trading price before the disclosure of negative news.  ¶105.  In fact, ***all*** the sales took place between July 30, 2007 and August 24, 2007 – only days after Sturm Ruger issued positive results for the second quarter of 2007 and just two months before the Company announced that it was experiencing production problems and was unable to meet customer orders because of its inventory cuts.  ¶106(a); *see also In re Xerox*, 165 F. Supp. 2d at 222 (sales that took place shortly after false or misleading statements were indicative of scienter); *In re Oxford Health Plans*, 187 F.R.D. at 139 (timing was suspicious where trades were made two months before negative disclosure).  The sales significantly diverged from the insiders' previous trades, as none of the insiders made any sales either before or after the Class Period, and were executed near the highs for the stock during the Class Period.  ¶106(b)-(c).

While Defendants admit that the insiders disposed of the vast majority of their personally held Sturm Ruger shares during the Class Period, they claim that the transactions were "necessary to cover the exercise price of options and associated tax liability."  Def. Mem. at 38.  Notwithstanding

the fact that Defendants' argument raises a question of fact that is inappropriate at this stage, the nature of how the insiders used the proceeds of their stock sales is irrelevant to the issue of scienter. Even if the insiders made some sales to cover the exercise price and taxes, the transactions allowed them to exercise their options to purchase Sturm Ruger shares and subsequently sell the shares at inflated prices to lock in their profits before the stock price dropped below the exercise price and rendered the options worthless. As a result of the transactions, the insiders acquired the additional shares at **no cost**.[24] This precise type of stock sale was considered by the court in *Freudenberg*, 2010 U.S. Dist. LEXIS 46053, at *80. As here, the defendant in *Freudenberg* sold shares during the class period and used the proceeds to cover the exercise price and taxes for options. *Id.* The court held that the acquisition of additional shares did not demonstrate lack of scienter because the shares were acquired at no cost to the defendant. *Id.*[25]

Notably, the insiders were in control of when to exercise their options. According to the Form 4s, the options did not expire until December 31, 2008, yet all of the insiders chose to exercise the options on either July 30 or July 31 of 2007, more than a year prior to the expiration of the options and immediately after Defendants made positive statements about the Company's financial

---

[24] Defendants' citations to *Malin v. XL Capital Ltd.*, 499 F. Supp. 2d 117, 152 (D. Conn. 2007), and *In re Aspeon, Inc. Sec. Litig.*, 168 Fed. Appx. 836, 840 (9th Cir. 2006) (Def. Mem. at 39), for the proposition that acquisition of additional shares negates an inference of scienter are inapposite. Here, the insiders did not acquire the shares at market price, but rather exercised options at $11.9375, which was $8-9 per share below market value, and immediately sold the vast majority of shares they owned at the inflated price of approximately $20 per share. Such an acquisition and immediate sale can hardly be evidence of confidence in the Company.

[25] Defendants attempt to disguise the nature of the insider trading by setting forth a table that simply ignores their stock sales. Def. Mem. at 38. While Defendants' chart shows that the insiders' net holding increased, the transactions reflected in Form 4s show that the insiders acquired the additional shares at no cost and had shares remaining, essentially locking in profits from their insider trading sales. *See* Hannan Exs. G-J. For example, the documents establish that Defendant Dineen exercised options to acquire 35,000 shares and sold 27,089 shares on the same day. The amount of shares Defendant Dineen sold as a result of this transaction was over nine times the number of shares he owned prior to the transaction and two and a half times the number of shares he retained thereafter. Similarly, Stephen Sanetti, Chief Operating Officer of Sturm Ruger, exercised options to acquire 200,000 shares and immediately sold 151,307 shares. The number of shares Sanetti sold was five times the number of shares he owned prior to the transaction and nearly double the number of shares he retained after the sale. The same pattern applies to the other insiders. Had the insiders waited to sell the shares until after the problems with the Ruger Business System were revealed, the price of Sturm Ruger stock would have likely dropped below the exercise price and the options would have been worthless.

condition. Defendants fail to offer any explanation for the insiders' collective decision to dispose of the vast majority of their shares at the same time.[26]

### D.    The Complaint Adequately Alleges Loss Causation

Defendants also argue that the Complaint fails to plead loss causation (Def. Mem. at 26-29) – *i.e.,* "the causal connection between the material misrepresentation or omission and the economic loss suffered by the plaintiffs." *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 342 (2005). The Supreme Court's decision in *Dura* holds that, at the pleading stage, a plaintiff must simply "provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind." *Id.* at 347. In this regard, the alleged facts must support an inference that the "misstatements and omissions concealed the circumstances that bear upon the loss," and that all or a portion of the loss would not have occurred absent the fraud. *In re Initial Pub. Offering Sec. Litig.*, 544 F. Supp. 2d 277, 289 (S.D.N.Y. 2008). This standard is "not meant to impose a great burden on the plaintiff" and a securities fraud complaint is sufficient so long as it sets forth what the alleged loss and causal connection to the fraud "might be." *Dura*, 544 U.S. at 347.

Fully satisfying the minimal notice pleading burden, Plaintiff alleges that Defendants' fraudulent misrepresentations and omissions artificially inflated the price of Sturm Ruger's securities (*see* ¶¶91, 94), and that the inflation was removed with the revelation of the truth regarding the problems the Company was experiencing as a result of its transformation to lean manufacturing. *See* ¶99. The Complaint identifies Defendants' fraudulent statements that artificially inflated the price of Sturm Ruger stock (¶¶83, 86-87, 89-90, 92-93), details the undisclosed production and inventory problems (¶¶59-73) (as well as the fact that Sturm Ruger's distributors were carrying large quantities

---

[26] Moreover, the fact that Defendant Fifer did not trade Sturm Ruger stock during the Class Period (*see* Def. Mem. at 39) does not diminish the force of Plaintiff's scienter allegations. The scienter requirement may be satisfied even if some insiders sell little or none of their holdings. *See In re APAC Teleservices, Inc. Sec. Litig.*, No. 97 Civ. 9145 (BSJ), 1999 U.S. Dist. LEXIS 17908, at *21 (S.D.N.Y. Nov. 19, 1999) ("[t]he fact that not every one of the defendants may have sold stock does not defeat an inference of scienter"); *see also Freedman v. Value Health,* Inc., 958 F. Supp. 745, 755 (D. Conn. 1997) (holding that sales by only three of nine named defendants was sufficient to plead scienter).

of unsold firearms (¶¶74-76)), identifies the October 24, 2007 disclosures that removed some of the inflation of the misrepresentation from the stock price (¶¶96-98) and identifies the 37% decline in the price of Sturm Ruger stock as the artificial inflation came out of the stock.  ¶99.  Accordingly, Plaintiff has provided Defendants with more than "some indication of the loss and the causal connection that the plaintiff has in mind."  *Dura*, 544 U.S. at 347; *see also In re Geopharma*, 399 F. Supp. 2d at 453 (holding that, to adequately plead loss causation, "plaintiffs must only allege a false or misleading statement, which caused an artificial inflation of the stock, followed by a dissipation of that inflation after corrective disclosures were made").

While Defendants admit that the October 24, 2007 disclosures caused Sturm Ruger's stock to plummet (Def. Mem. at 1), they nevertheless contend that Plaintiff's loss causation allegations are inadequate because some of the alleged false and misleading statements do not correspond to a specific corrective disclosure.  Specifically, Defendants contend that the Complaint fails to plead loss causation because the Company did not explicitly admit in its October 24, 2007 disclosures that Sturm Ruger's third quarter decline was attributed to the Company's change in its distribution policy or to the reduction in inventory of raw materials, and did not specifically counter statements regarding LIFO inventory liquidation or goals of the Ruger Business System.  Def. Mem. at 27-29.[27] In effect, Defendants are arguing that in order to plead loss causation, the corrective disclosure has to be a mirror image of, or absolutely identical to, the alleged Class Period misrepresentations or omissions.  However, Defendants cannot point to a single sentence in *Dura* that imposes this rigid requirement, nor can they cite to any controlling authority that requires Plaintiff to identify a mirror

---

[27] Defendants' argument that statements made during the Class Period regarding LIFO liquidation are not related to the October 24, 2007 corrective disclosures because the disclosures did not reveal "that there was anything false or misleading about the company's earlier analysis of the accounting impact of LIFO liquidation" (Def. Mem. at 27-28), is an argument against falsity, not loss causation.  As such, the argument is, more appropriately, addressed in §III.B.3.b, *supra*.  Similarly, Defendants contention that "statements regarding the philosophy and goals of lean manufacturing and the company's new manufacturing processes" are not actionable (Def. Mem. at 28) is an argument against materiality and, therefore, addressed in §III.B.3.c, *supra*.

image disclosure.  To the contrary, nearly every post-*Dura* court to consider this contention has rejected it.  *See, e.g., Freudenberg,* 2010 U.S. Dist. LEXIS 46053, at *82 ("neither the Supreme Court in *Dura*, nor any other court addressing the loss causation pleading standard require a corrective disclosure to be a 'mirror image' tantamount to a confession of fraud"); *In re Motorola Sec. Litig.,* 505 F. Supp. 2d 501, 546 (N.D. Ill. 2007) (noting that "a corrective disclosure [need not], on its face, . . . explicitly correct a previous representation, or expressly disclose the particular fraudulent scheme plaintiff alleges"); *Plumbers & Pipefitters Local 572 Pension Fund v. Cisco Sys., Inc.*, 411 F. Supp. 2d 1172, 1176-77 (N.D. Cal. 2005) (rejecting defendants' argument that "*Dura* requires the corrective disclosure to directly relate to the putative misstatement").[28]

In *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161 (2d Cir. 2005), decided shortly prior to *Dura*, the Second Circuit addressed the requirements of loss causation.  The court wrote:

> [I]t cannot ordinarily be said that a drop in the value of a security is "caused" by the misstatements or omissions made about it, as opposed to the underlying circumstance that is concealed or misstated.  Put another way, a misstatement or omission is the "proximate cause" of an investment loss if the risk that caused the loss was within the zone of risk *concealed* by the misrepresentations and omissions alleged by a disappointed investor.

*Lentell*, 396 F.3d at 173 (emphasis in original).  "Thus, to establish loss causation, a plaintiff must allege . . . that the *subject* of the fraudulent statement or omission was the cause of the actual loss suffered, . . . *i.e.*, that the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security."  *Id.*  (emphasis in original).

Here, the "subject of the fraudulent statement or omission" was the production and inventory problems stemming from Defendant Fifer's transformation plan.  When Defendants revealed the truth – that its net sales for the third quarter of 2007 fell over 23% due to the previously undisclosed

---

[28]   A rule requiring the corrective disclosure to mirror the alleged misrepresentations and omissions, which is what Defendants urge the Court to accept here, would enable corporate executives to carefully tailor their disclosures so as to strip any potential securities laws claims of loss causation.  *See Alaska Elec. Pension Fund v. Flowserve Corp.*, 572 F.3d 221, 230 (5th Cir. 2009) ("If a fact-for-fact disclosure were required to establish loss causation, a defendant could defeat liability by refusing to admit the falsity of its prior misstatements.").

production and inventory problems the Company was experiencing – the price of Sturm Ruger's stock plummeted.  The fact that Defendants' October 24, 2007 disclosures did not *specifically* state that the decrease in net sales was due to the Company's changes in its purchase orders or inventory of the Company's raw materials, for example, does not alter the fact that Plaintiff was harmed by the revelation of information that Defendants had previously concealed – the failure of the transformation plan and the ensuing problems that caused the poor financial results in the third quarter.[29]

In any event, Defendants' disclosures at the end of the Class Period, did, in fact, reveal problems concerning critical aspects of Sturm Ruger's business that Plaintiffs alleged were concealed during the Class Period.  Indeed, Defendants recognize that Sturm Ruger "attributed the third quarter decline to problems with manufacturing, too deep an inventory reduction, and decreased demand for certain products."  Def. Mem. at 29.  Although these disclosures are not worded exactly as the alleged material adverse facts alleged in the Complaint, the substance is the same – problems with certain discrete aspects of Sturm Ruger's business which contributed to poor financial results.  Accordingly, Plaintiff has sufficiently alleged loss causation.

### E.      The Complaint Adequately Alleges a Claim for Control Person Liability Under Section 20(a)

The Complaint also adequately pleads that the Individual Defendants are liable as control persons pursuant to Section 20(a) of the Exchange Act.  To allege a claim under Section 20(a), a plaintiff must plead: "(1) a primary violation by a controlled person and (2) control of the primary violator by the defendant."  *In re Parmalat Sec. Litig.*, 375 F. Supp. 2d 278, 310 (S.D.N.Y. 2005).

Defendants Fifer and Dineen do not contest that they are "control persons" of Sturm Ruger and had primary responsibility for the dealings of the Company.  Instead, the only argument

---

[29] In the October 24, 2007 letter to shareholders, Defendant Fifer admits that *a* "principal cause of [Sturm Ruger's] reduced production volume during the [third] quarter" was the fact that the Company "reduced component part inventories too deeply across too many product lines simultaneously," but he does not state that this was the *only* cause.

Defendants assert for the dismissal of Plaintiff's Section 20(a) claim is that the Complaint does not allege an underlying primary violation of Section 10(b).  Def. Mem. at 39.  As demonstrated throughout this memorandum, Plaintiff has more than sufficiently pled violations of Section 10(b) and Rule 10b-5 of the Exchange Act against the Company and the Individual Defendants. Accordingly, because the Complaint adequately alleges underlying securities fraud violations, it also adequately alleges a control person claim against each of the Individual Defendants.  *See In re Dynex Capital, Inc.*, No. 05 Civ. 1897 (HB), 2009 U.S. Dist. LEXIS 96527, at *62 (S.D.N.Y. Oct. 19, 2009).  Further, to the extent that it must, the Complaint alleges that the Individual Defendants were "culpable participants" in the fraud with facts supporting an inference that they not only exerted control over Sturm Ruger, but also participated in the alleged improprieties with scienter.  *See In re Tower Auto. Sec. Litig.*, 483 F. Supp. 2d 327, 351 (S.D.N.Y. 2007).  Accordingly, the Section 20(a) claim should be sustained.

## IV.   CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court deny Defendants' motion to dismiss in its entirety.[30]

DATED:  June 18, 2010                      ROBBINS GELLER RUDMAN & DOWD LLP
                                           SAMUEL H. RUDMAN
                                           DAVID A. ROSENFELD
                                           FAINNA KAGAN


                                           _____
                                                   */s/ David A. Rosenfeld*
                                           DAVID A. ROSENFELD

                                           58 South Service Road, Suite 200
                                           Melville, NY  11747
                                           Telephone:  631/367-7100
                                           631/367-1173 (fax)

---

[30]  Although Plaintiff believes that it has more than adequately stated claims against all Defendants, in the event the Court determines the Complaint is deficient in any respect, Plaintiff respectfully requests an opportunity to move for leave to amend in accordance with Fed. R. Civ. P. 15(a) ("leave shall be freely given when justice so requires").  *See Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991) ("It is the usual practice upon granting a motion to dismiss to allow leave to replead.").

*Lead Counsel for Plaintiff*

DISERIO MARTIN O'CONNOR &
    CASTIGLIONI LLP
JONATHAN P. WHITCOMB (CT 15014)
One Atlantic Street
Stamford, CT 06901
Telephone:  203/358-0800
203/348-2321 (fax)

*Liaison Counsel for Plaintiff*

CERTIFICATE OF SERVICE

I hereby certify that on June 18, 2010, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all counsel of record.

*s/ David A. Rosenfeld*
DAVID A. ROSENFELD

ROBBINS GELLER RUDMAN & DOWD LLP
58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)
E-mail:Drosenfeld@rgrdlaw.com