# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

In re STURM, RUGER & COMPANY, INC.    )
SECURITIES LITIGATION    )    Master File No. 3:09-cv-01293-CFD
    )
―――――――――――――――――    )
    )    <u>CLASS ACTION</u>
This Document Relates To:    )
    )
    ALL ACTIONS    )
    )
    )
    )
―――――――――――――――――

## DEFENDANTS' REPLY TO PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

Francis H. Morrison III (ct04200)
Denise V. Zamore (ct27549)
AXINN, VELTROP & HARKRIDER, LLP
90 State House Square
Hartford, CT 06103
Telephone: (860) 275-8100
Facsimile: (860) 275-8101

Michael Dockterman
W. Allen Woolley
Tracy A. Hannan
WILDMAN, HARROLD, ALLEN & DIXON LLP
225 West Wacker Drive
Chicago, Illinois 60606
Telephone: (312) 201-2000
Facsimile:  (312) 201-2555

*Attorneys for Defendants Sturm, Ruger & Company, Inc., Michael O. Fifer, and Thomas A. Dineen*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................................ii

INTRODUCTION ..............................................................................................................1

ARGUMENT ....................................................................................................................1

I.      Plaintiffs Fail To Allege Material Misstatements or Actionable
        Omissions. ..........................................................................................................1

        A.      The "Actionable Statements" Were True and Required No
                Correction. ...............................................................................................2

        B.      Courts Faced With Factually Similar Claims Have Never
                Found a Disclosure Obligation To Support a Securities
                Claim. .......................................................................................................7

        C.      Defendants' Accurate Statements Did Not Leave a
                Misleading Impression Creating a New Duty To Disclose
                Further Information. ................................................................................10

                1.      Defendants' Accurate Statements of Historical Fact
                        Do Not Give Rise to a Duty of Further Disclosure. .....................10

                2.      Defendants' Forward-Looking Statements Are
                        Protected By the Safe Harbor of the PSLRA and Do
                        Not Create a Duty To Speak. .......................................................12

                3.      Vague Statements of Corporate Optimism Are
                        Immaterial and Cannot Support Plaintiffs'
                        Omissions Case. ..........................................................................14

        D.      Stock Price Reactions Do Not Make Statements
                Actionable. ..............................................................................................15

II.     Plaintiffs Have Not Pled a Strong Inference of Scienter.......................................15

III.    Plaintiffs' Loss Causation Arguments Mischaracterize the Law. ..........................19

IV.     The Court Should Dismiss Plaintiffs' Complaint With Prejudice. ........................20

CONCLUSION ................................................................................................................20

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Asher v. Baxter International, Inc.*,
   377 F.3d 727 (7th Cir. 2004) .................................................................. 13

*Basic, Incorporated v. Levinson*,
   485 U.S. 224 (1988) ............................................................................... 6

*Berson v. Applied Signal Technology, Inc.*,
   527 F.3d 982 (9th Cir. 2008) .................................................................. 11

*Billhofer v. Flamel Technologies, SA*,
   663 F. Supp. 2d 288 (S.D.N.Y. 2009) .................................................... 14

*Caiola v. Citibank, N.A.*,
   295 F.3d 312 (2d Cir. 2002) ................................................................... 12

*Caspary v. Louisiana Land and Exploration Co.*,
   579 F. Supp. 1105 (S.D.N.Y. 1983) ...................................................... 9

*Castillo v. Dean Witter Discover & Co.*,
   No. 97 Civ. 1272(RPP), 1998 WL 342050 (S.D.N.Y. June 25, 1998) ..................... 7

*Coyne v. General Electric Company*,
   No. 08-1135 (SRU), slip. op. (D. Conn. July 15, 2010) .......................... 2, 4, 8, 9, 17

*Davis v. SPSS, Inc.*,
   385 F. Supp. 2d 697 (N.D. Ill. 2005) .................................................... 13

*ECA & Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*,
   553 F.3d 187 (2d Cir. 2009) ................................................................... 7, 17

*Ernst & Ernst v. Hochfelder*,
   425 U.S. 185 (1976) ............................................................................... 16

*Fogarazzo v. Lehman Bros., Inc.*,
   341 F. Supp. 2d 274 (S.D.N.Y. 2004) .................................................... 19

*Fort Worth Employers' Retirement Fund v. Biovail Corp.*,
   615 F. Supp. 2d 218 (S.D.N.Y. 2009) .................................................... 20

*Ganino v. Citizens Utilities Company*,
   228 F.3d 154 (2d Cir. 2000) ................................................................... 6

*Geiger v. Solomon-Page Group, Ltd.*,
   933 F. Supp. 1180 (S.D.N.Y. 1996) ...................................................................... 15

*Hall v. Children's Place Retail Stores, Inc.*,
   580 F. Supp. 2d 212 (S.D.N.Y. 2008) .................................................................... 12

*Hillson Partners Ltd. Partnership v. Adage, Inc.*,
   42 F.3d 204 (4th Cir.1994) ....................................................................................... 9

*In re Atlas Air Worldwide Holdings, Inc. Securities Litigation*,
   324 F. Supp. 2d 474 (S.D.N.Y. 2001) .................................................................... 12

*In re Burlington Coat Factory Securities Litigation*,
   114 F.3d 1410 (3d Cir. 1997) .................................................................................. 10

*In re Convergent Technologies Securities Litigation*,
   948 F.2d 507 (9th Cir. 1991) ................................................................................... 10

*In re Duane Reade Inc. Securities Litigation*,
   No. 02 Civ. 6478 (NRB), 2003 WL 22801416 (S.D.N.Y. Nov. 25,
   2003) ........................................................................................................................ 10

*In re Flag Telecom Holdings, Ltd. Securities Litigation*,
   618 F. Supp. 2d 311 (S.D.N.Y. 2009) .................................................................... 11

*In re Ford Motor Co. Securities Litigation*,
   381 F.3d 563 (6th Cir. 2004) ..................................................................................... 9

*In re Gilat Satellite Networks, Ltd.*,
   No. CV-02-1510, 2005 WL 2277476 (E.D.N.Y. Sept. 19, 2005) ........................... 13

*In re Globalstar Securities Litigation*,
   No. 01 Civ. 1748 (SHS), 2003 U.S. Dist. LEXIS 22496 (S.D.N.Y. Dec.
   15, 2006) .................................................................................................................. 11

*In re Independent Energy Holdings PLC Securities Litigation*,
   154 F. Supp. 2d 741 (S.D.N.Y. 2001) .................................................................... 13

*In re Initial Public Offering Securities Litigation*,
   399 F. Supp. 2d 261 (S.D.N.Y. 2005) .................................................................... 19

*In re International Business Machines Corp. Securities Litigation*,
   163 F.3d 102 (2d Cir. 1998) ..................................................................................... 2

*In re Nortel Networks Corp. Securities Litigation*,
   238 F. Supp. 2d 613 (S.D.N.Y. 2003) .................................................................... 13

*In re Northern Telecom Ltd. Securities Litigation*,
    116 F. Supp. 2d 446 (S.D.N.Y. 2000) ........................................................ 9

*In re Sotheby's Holding, Inc. Securities Litigation*,
    No. 00 Civ. 1041 (DLC), 2000 WL 1234601 (S.D.N.Y. Aug. 31, 2000) ............... 12

*In re Star Gas Sec. Litig.*,
    No. 04-1766, slip op. (D. Conn. Aug. 21, 2006) ..................................... 7, 17

*In re Union Carbide Class Action Securities Litigation*,
    648 F. Supp. 1322 (S.D.N.Y. 1986) ........................................ 2, 7, 9, 10

*In re Verifone Securities Litigation*,
    784 F. Supp. 1471 (N.D. Cal. 1992) ....................................................... 8, 12

*In re Vivendi Universal, S.A. Securities Litigation*,
    381 F. Supp. 2d 158 (S.D.N.Y. 2003) .................................................... 15

*Kalnit v. Eichler*,
    264 F.3d 131 (2d Cir.2001) ............................................................... 17

*Lapin v. Goldman Sachs Group, Inc.*,
    506 F. Supp. 2d 221 (S.D.N.Y. 2006) .................................................. 14

*Lentell v. Merrill Lynch & Co., Inc.*,
    396 F.3d 161 (2d Cir. 2005) ............................................................... 19

*McMahan & Co. v. Wherehouse Entertainment, Inc.*,
    900 F.2d 576 (2d Cir. 1990) ............................................................... 11

*Miller v. Champion Enterprises, Inc.*,
    346 F.3d 660 (6th Cir. 2003) ........................................................ 8, 20

*Nadoff v. Duane Reade, Inc.*,
    107 Fed. Appx. 250 (2d Cir. 2004) ....................................................... 3

*Odyssey Healthcare, Inc. Securities Litigation*,
    424 F. Supp. 2d 880 (N.D. Tex. 2005) .................................................. 19

*Operating Local 649 Annuity Trust Fund v. Smith Barney Fund
    Management LLC*,
    595 F.3d 86 (2d Cir. 2010) .................................................................. 6

*Pollio v. MF Global, Ltd.*,
    608 F. Supp 2d 564 (S.D.N.Y. 2009) .................................................. 18

*Rombach v. Chang*,
    355 F.3d 164 (2d Cir. 2004) ................................................................ 4

*Rosner v. Star Gas Partners, L.P.*,
    344 Fed. Appx. 642 (2d Cir. 2009) .......................................................................... 6, 8

*Rothman v. Gregor*,
    220 F. 3d 81 (2d Cir. 1990) ...................................................................................... 18

*San Leandro Emergency Medical Group Profit Sharing Plan v. Philip*
    *Morris Companies, Inc.*,
    75 F.3d 801 (2d Cir. 1996) ........................................................................................ 17

*Silverman v. Motorola, Inc.*,
    No. 07 C 4507, 2008 WL 4360648 (N.D. Ill. Sept. 23, 2008) ..................................... 11, 13, 17

*Slayton v. American Express Co.*,
    604 F. 3d 758 (2d Cir. 2010) .................................................................................... 16, 18

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007) ............................................................................................ 1, 2, 16, 18

**Statutes**

H.R. Conf. Rep. 104-369 (1995) .................................................................................. 13

## INTRODUCTION

Plaintiffs were required to plead facts supporting the existence of material misrepresentations, scienter and loss causation in their Amended Class Action Complaint ("ACC"). While plaintiffs say that nine truthful statements and unspecified language in a presentation made at the Company's annual meeting on April 24, 2007 were actionable material representations, (Opp. at 10; ACC at ¶¶ 21-22), plaintiffs do not allege that the "actionable statements" were actually false. Instead, plaintiffs argue from their own impressions that undisclosed facts rendered defendants' truthful statements "misleading." (Opp. at 20.) Neither plaintiffs' hollow misstatement theory nor their re-crafted omission theory that Sturm Ruger should have said more about the pace of its implementation of a new system saves the ACC.

It is equally clear that plaintiffs have not shown a strong inference of scienter "at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007). Plaintiffs also have failed to show loss causation by a plausible link between the defendants' allegedly "actionable statements" and the purported "corrective disclosure." Whether based on the nine statements that plaintiffs now admit are true or on vague "omissions" of information that the defendants had no duty to supply, plaintiffs have not stated a claim upon which relief can be granted.

## ARGUMENT

**I.      Plaintiffs Fail To Allege Material Misstatements or Actionable Omissions.**

Plaintiffs say "the actionable statements alleged in the Complaint are emphasized in bold and italicized text and, thus, are readily identifiable." (Opp. at 10.) They then spend the rest of their brief arguing without reference to the "actionable statements" that defendants "consistently portrayed the Company's implementation of its Ruger Business System in a positive light, while

downplaying and misrepresenting material information concerning Sturm Ruger's production problems and inventory cuts." (Opp. at 11.)  When plaintiffs are taken at their word and the actual statements – as opposed to plaintiffs' characterization of those statements – are examined, plaintiffs fail the material misstatement hurdle because plaintiffs do not assert that any of the "actionable statements" were false when they were made.

Omissions claims fare no better because they are premised on a "duty to disclose" the omitted facts.  As Judge Underhill recently held:  there is "'no duty to update vague statements of optimism or expressions of opinion' and no need 'to update when the original statement was not forward looking and does not contain some factual representation that remains 'alive' in the minds of investors as a continuing representation, or if the original statements are not material.'" *Coyne v. General Elec. Co.*, No. 08-1135 (SRU), slip. op. at 12-13 (D. Conn. July 15, 2010) (attached as Ex. 1) (*citing In re Int'l Bus. Mach. Corp. Sec. Litig.*, 163 F.3d 102, 109 (2d Cir. 1998)).  Here, the nine "actionable statements" are **not** alleged to be false and where "plaintiffs have chosen to assert vaguely that a false and misleading impression was created" the Court should find "such a pleading to be insufficient."  *In re Union Carbide Class Action Sec. Litig.*, 648 F. Supp. 1322, 1326 (S.D.N.Y. 1986).

### A.     The "Actionable Statements" Were True and Required No Correction.

Plaintiffs now say their claim is premised on unspecified "concealed information regarding the true extent of the Company's issues."  (Opp. at 13.)  The Court must examine the nine "actionable statements" in light of the facts in the ACC "taken collectively" to determine whether "concealed information" made them misleading.  *Tellabs*, 551 U.S. at 324.  Plaintiffs set the context with the Company's 2006 Form 10-K, where Sturm Ruger explained its recent move to a new manufacturing, inventory and ordering system and warned that the financial impact of

the reduction in inventory may not be known until year-end.[1]   (ACC ¶¶ 54-56.)  In the third

quarter, the Company realized it had "reduced component part inventories too deeply" and told

this to its investors when it filed its Form 10-Q for Q3.  (ACC ¶ 97.)  Before then, the Company

never said – and plaintiffs do not allege it said – that the transition, including the announced

reduction in inventory, was going smoothly.

This is the background for plaintiffs' admission that "the Complaint does not allege that

Sturm Ruger's specific quantifications of past revenue are false."  (Opp. at 21.)  The Court need

only look at the "actionable statements" designated in the Opposition to see that plaintiffs have

failed to state a claim because "[a]ccurate statements of historical fact are not misleading and

thus are not actionable, *Nadoff v. Duane Reade, Inc.*, 107 Fed. Appx. 250, 252 (2d Cir. 2004),

---

[1] To put the plaintiffs' characterizations of the Company's Annual Report (ACC ¶¶ 53-56) into the correct framework, the Company's Form 10-K for the fiscal year ended December 31, 2006, included the following statements concerning the inventory and accounting changes the Company had implemented:

"Effective December 1, 2006 the Company changed the manner in which distributors order firearms, and began receiving firm, non-cancelable purchase orders on a frequent basis, with most orders for immediate delivery. In the past, the Company adjusted production schedules to consume on-hand raw material and WIP inventories, regardless of customer demand for the finished goods so produced. * * * Consistent with the change in the manner in which distributors order from the Company, the Company significantly changed its production scheduling philosophy from an annual production cycle to a customer-demand pull system in the fourth quarter of 2006. Under the Company's new system, production is driven solely by customer demand. The Company is committed to producing the firearms demanded by its customers and does not alter its production mix to achieve the short-sighted goal of producing finished goods in excess of customer requirements for the purpose of consuming excess or slow-moving raw material and WIP parts, components, or subassemblies, or absorbing overhead expense. This change to a customer-demand pull system should result in a better match between production and customer demand and is likely to result in further reductions in inventories. * * *

"In the fourth quarter of 2006, a $2.5 million non-cash inventory valuation adjustment, net of LIFO impact, was recorded to recognize inefficiencies in labor and overhead during a period of rapid inventory reduction as the Company converted to a manufacturing system that emphasizes continuous improvement in customer service, quality and productivity.

The accounting impact of this systemic change appears later in the Form 10-K:

"The Company believes the valuation of its inventory and the related excess and obsolescence reserve is also a critical accounting policy.  Inventories are carried at the lower of cost, principally determined by the last-in, first-out (LIFO) method, or market.  **An actual valuation of inventory under the LIFO method is made at the end of each year based on the inventory levels and prevailing inventory costs existing at that time.**"

(Ex. A to Hannan Declaration, attached as Ex. 1 to Memorandum in Support of Motion to Dismiss ("Hannan Dec."), at 18-19, 33 (emphasis supplied).)

and '[e]xpressions of puffery and corporate optimism do not give rise to securities violations.'"

*Coyne*, slip op. at 17 (*citing Rombach v. Chang*, 355 F.3d 164, 174 (2d Cir. 2004)).[2]  The first

four statements that plaintiffs have designated as "actionable" in the Form 10-Q for Q1 of 2007

are statements of uncontested facts:

> ***Cash provided by operating activities was $18.1 million and $4.7 million for the three months ended March 31, 2007 and 2006, respectively.  The increase in cash provided is principally a result of a decrease in inventory, improved net income and various fluctuations in operating asset and liability accounts during the first three months of 2007 compared to the first three months of 2006****. (ACC ¶ 86.)

> ***...firearms orders received totaled $58.9 million, and order backlog increased $11.6 million from $16.2 million on December 31, 2006 to $27.8 million on March 31, 2007****. (ACC ¶ 87.)

> ***Rifle shipments increased 9.5% as demand remained strong for the Ruger 10/22 rimfire rifles and Mini-14 centerfire rifles.*** (ACC ¶ 87.)

---

[2] Plaintiffs cite (although they do not highlight and make "actionable") general statements from the annual meeting about the Company's shift to "a business system that relentlessly pursues the elimination of all non-value-added activities from every business process with the ultimate goal of providing World-Class quality, delivery and service to its customers at the lowest possible cost," (ACC ¶ 89), and the Company's "inventory cuts."  (ACC ¶ 90.)  Once again, they do not allege that any of these statements were false; rather, they have an impression that these statements "promised that a '[s]ignificant reduction in inventory' would 'result[] in better cash flow.'"  *Id.*  The obvious reason that plaintiffs do not say the annual meeting statements were actionable is the caution appearing in a highlighted box on the page where this implicit "promise" supposedly appears:

> Favorable reduction in firearm WIP requires deliberate underutilization of the foundry, resulting in an ***expected, unfavorable impact on short-term earnings***.

(Ex. C to Hannan Dec. at 62) (emphasis supplied).  No reasonable investor would read an implicit promise of better short-term earnings into a presentation which carried this specific contrary warning about those same earnings.

Plaintiffs also italicize comments made prior to the Class Period, but those statements are equally innocuous:

> ***...the Company ended the year [2006] with improvements in many areas.  The changes started during the year are beginning to yield real benefits for our shareholders, customers, and employees.***

> ***Our CEO, Michael Fifer, who came on board in late September, has been an outstanding engineer of change.***

> ***These changes have generated a sense of excitement in the Company and amongst our customers that Ruger is moving in a very positive direction.  Morale is greatly improved.  Demand and on-time order fulfillment are up.  Employees are fully engaged, and we see nothing but opportunities ahead of us.***

For the reasons set out below, none of these statements is actionable in and of itself; none raised issues which required defendants to speak further; and none can legally be a basis for plaintiffs to recover.  *See* p. 14, *infra*.

*This comparison better reflects the greater availability and continued strong demand of revolver models, particularly the Ruger New Vaquero.*  (ACC ¶ 87.)

Plaintiffs also do not challenge the veracity of the fifth "actionable statement" in the Form 10-Q for Q1:

*Management believes that if a LIFO liquidation continues to occur in 2007, the impact may be material to the Company's results of operations for the period but will not have a material impact on the financial position of the Company.  The Company estimates that the impact of this liquidation on the results of operations for the period ended March 31, 2007 was to reduce cost of products sold by $4.4 million.*"[3]  (ACC ¶ 86)

This forward-looking fifth statement is preceded by the following specific cautionary language:[4]

> This reduction in inventory levels is expected to continue through year-end. This reduction will result in a liquidation of LIFO inventory quantities carried at lower costs prevailing in prior years as compared with the current cost of purchases.  Although the effect of such a liquidation cannot be precisely quantified at the present time...

(ACC ¶86.)

The same kind of forward-looking estimated adjustment – once again protected by predictive limitations that were not italicized by plaintiffs – was made for Q2:

*Management believes that if a LIFO liquidation continues to occur in 2007, the impact may be material to the Company's results of operations for the period but will not have a material impact on the financial position of the Company.  The Company estimates that the impact of this liquidation on the results of operations for the three and six month periods ended June 30, 2007 was to reduce cost of products sold by $6.5 and $16.2 million, respectively.*  (ACC ¶ 92.)

This was followed by a more specific statement of uncontested fact for Q2:

*The 2007 reduction resulted in LIFO income and decreased cost of products sold of $6.1 million and $10.6 million for the three and six months ended June 30, 2007, respectively.* (ACC ¶ 92.)

---

[3] Plaintiffs did not include the immediately preceding paragraph from the Forms 10-Q for Q1 or Q2, where the Company repeated the caution it had given in the preceding Form 10-K that "An actual valuation of inventory under the LIFO method can be made only at the end of each year based on the inventory levels and costs existing at that time. * * * Because these are subject to many forces beyond management's control, interim results are subject to the final year-end LIFO inventory valuation."  (Ex. B to Hannan Dec. at 8; Ex. D to Hannan Dec. at 8.)

[4] This forward-looking statement also is protected by the PSLRA Safe Harbor.  *See* pp. 12-13, *infra*.

The plaintiffs also italicized the following statement of uncontested fact for Q2:

> *Firearms unit shipments increased 31.8% for the three months ended June 30, 2007 when compared to the second quarter of 2006.  Rifle shipments increased 49.3% from the comparable prior year period due to strong demand and product availability.  Revolver shipments increased 19.8% from the comparable prior year period.  Pistol shipments increased 18.8% from the comparable prior year period.  Shotgun shipments increased 35.8% from the comparable prior year period.*  (ACC ¶ 93.)

None of these statements is alleged to be false.  None gives rise to a specific duty to state more about operational issues.  None supports a securities claim.

That leaves one forward-looking "actionable statement" in the Form 10-Q for Q2:

> *The Company believes that it has adequate quantities of raw materials in inventory to provide ample time to locate and obtain additional items at then-current market cost without interruption of its manufacturing operations.*  (ACC ¶ 92.)

Yet plaintiffs do not say that this was not true when it was said; they do not specify a single item of raw materials that was not on hand during the entire Class Period; and they do not demonstrate why the belief is material (in the legal, not the manufacturing, sense).  The so-called "corrective disclosure" does not suggest any problems concerning raw materials. (Mem. at 29.)  In light of the information supplied by the Company in the Form 10-K, *see* fn. 1, *supra*, and the caution given in the Forms 10-Q, *see* fn. 3, *supra*, there is no "'substantial likelihood' that a 'reasonable investor would have considered [the "actionable statements"] significant in making investment decisions.'"  *Rosner v. Star Gas Partners, L.P.*, 344 Fed. Appx. 642, *644 (2d Cir. 2009) (*citing Ganino v. Citizens Utils. Company*, 228 F.3d 154, 161-62 (2d Cir. 2000)); *see Basic, Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988); *Operating Local 649 Annuity Trust Fund v. Smith Barney Fund Mgmt. LLC*, 595 F.3d 86, 92 (2d Cir. 2010).

**B.      Courts Faced With Factually Similar Claims Have Never Found a Disclosure Obligation To Support a Securities Claim.**

Omissions are only actionable where they cause the statements that the company actually made to become misleading.  *ECA & Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 196 (2d Cir. 2009); *Union Carbide*, 648 F. Supp. at 1326; *Castillo v. Dean Witter Discover & Co.*, No. 97 Civ. 1272(RPP), 1998 WL 342050, *8 (S.D.N.Y. June 25, 1998).  Plaintiffs do not say how they can succeed here when they do not cite a single case imposing a duty on a company attempting a major overhaul of its manufacturing and business operations to reveal every negative operational development arising from that overhaul.

Rather, the cases go the other way.  In *In re Star Gas Sec. Litig.*, No. 04-1766, slip op. (D. Conn. Aug. 21, 2006), *aff'd*, 344 Fed. Appx. 642 (2d Cir. 2009) (attached as Ex. 2), Judge Arterton was faced with securities claims because Star Gas' Business Improvement Program ("BIP") was not as successful as quickly as originally hoped.  The Court considered allegations virtually identical to those made about the progress of Sturm Ruger's transition and found the "vast majority of the statements concerning the BIP were non-specific, optimistic statements such as that the Petro Division was making 'progress' and 'beginning to achieve very tangible benefits' and of 'grea[t] long-term significance'" and therefore not actionable.  *Id.* at 24.  The Court reached that conclusion despite allegations from confidential witnesses that Star Gas should have known the BIP was behind schedule, just as plaintiffs say Sturm Ruger should have known here.  *Id.*  The statements about "progress" and "significance" were deemed nothing more than corporate "puffery." *Id.* at 26.  The Court of Appeals affirmed, concluding that

> [P]ositive statements about the BIP's present stability were sufficiently vague and generalized that no reasonable investor would have relied upon them, particularly when coupled with [defendant's] concurrent disclosures

7

> about the BIP's problems to date.  As to [defendant's] forward-looking statements, the Complaint fails to allege facts supporting the conclusion that [defendant] made optimistic statements in bad faith or without a reasonable basis.

*Star Gas Partners, L.P.*, 344 Fed. Appx. at *644.

In *In re Verifone Sec. Litig.*, 784 F. Supp. 1471 (N.D. Cal. 1992), the plaintiffs alleged that defendants' accurate disclosure of positive first quarter financial results, along with general optimistic statements that it was "pleased" with the company's continued growth, was misleading because the financial results concealed facts that the company knew would negatively impact future revenue.  Like plaintiffs' allegation here that Sturm Ruger's "backlog" was inflated, the plaintiffs in *Verifone* argued that Verifone's statements gave rise to a duty to disclose that the first quarter results were atypically "boosted" by large one-time orders.  The *Verifone* plaintiffs also argued (like plaintiffs' allegations regarding production problems in this case) that Verifone was having difficulty marketing new products and product orders had slowed, such that the company "faced a brick wall." *Id.* at 1484-85.  The court dismissed the complaint with prejudice, holding that Verifone's accurate reporting of first quarter results did **not** give rise to a duty to disclose that problems in the first quarter could impact future quarters. *Id.* at 1485.  *See also Miller v. Champion Enterp., Inc.*, 346 F.3d 660, 682 (6th Cir. 2003) (complaint dismissed with prejudice because defendants' accurate discussion of the company's second quarter results did not mean "that they chose to speak on any situation that could possibly affect their financial condition").

Similarly, Judge Underhill dismissed securities claims against GE for saying it would "hit all of our financial goals" and that a 10% earnings increase was "in the bag." *Coyne*, No. 08-1135, slip op. at 10-12.  There, dealing with earnings, the Court found:

> Those statements of earnings projections for the quarter established goals at the start of the quarter and could not possibly mislead. Thus, GE was under no duty to correct them during the quarter. Holding otherwise would lead to an absurd result, effectively imposing on GE a duty to inform investors constantly about the Company's earnings throughout the quarter.

*Id.* at 13.

In *In re Ford Motor Co. Sec. Litig.*, 381 F.3d 563 (6th Cir. 2004), the plaintiffs alleged that positive statements about its earnings and sales of its Explorer model were misleading because Ford knew they were due to a defective product that eventually would limit Ford's positive earnings. The court held that accurate statements regarding earnings and sales did not give rise to a duty to disclose more.[5] *Id.* at 570. *See also Caspary v. Louisiana Land and Exploration Co.*, 579 F. Supp. 1105, 1109 (S.D.N.Y. 1983) (company's undisputedly accurate report of its current condition suggested no misimpression as to the company's future performance).

Even where internal operational problems are potentially significant, courts have regularly held that there is no duty to disclose. *See In re Northern Telecom Ltd. Sec. Litig.*, 116 F. Supp. 2d 446, 459 (S.D.N.Y. 2000) (no duty to disclose company's software and customer problems); *Union Carbide*, 648 F. Supp. at 1323, 1327-28 (failure to disclose numerous safety defects and risks associated with defendant's plant did not violate any duty to disclose despite the resulting "worst industrial accident in history"); *Hillson Partners Ltd. Partnership v. Adage, Inc.*, 42 F.3d 204, 213 (4th Cir.1994) (company had no duty to disclose problems in completing significant capital improvement projects). There is simply no legal basis for plaintiffs to say that these accurate statements triggered a duty to disclose more than what was said.

---

[5] Plaintiffs' attempt to distinguish *Ford* on the ground that *Ford* involved accurate statements while Sturm Ruger's statements here were "half-truths" that failed to disclose information regarding the production and inventory problems, (Opp. at 21, n.14), ignores what actually happened in *Ford*. There, as here, the plaintiffs contended Ford's accurate financial reports were misleading "half-truths" because they did not disclose that high earnings were the result of a defective product. The court rejected the argument that financial reports create a duty to speak.

**C.  Defendants' Accurate Statements Did Not Leave a Misleading Impression Creating a New Duty To Disclose Further Information.**

**1.  Defendants' Accurate Statements of Historical Fact Do Not Give Rise to a Duty of Further Disclosure.**

Having conceded the "actionable statements" are true, plaintiffs argue that the issue is not whether defendants' statements were accurate, but whether the statements were misleading. (Opp. at 21.)  The argument runs that, while defendants' statements were themselves accurate, the effect of defendants' true statements was to create a misleading positive impression that the transition was working, productivity was improving, and the Company would continue to have good results in the third quarter.  (Opp. at 11, 22.)  Misleading general "impressions" of "confidence," however, also do not create an affirmative duty to provide further disclosures.  *See Union Carbide*, 648 F. Supp. at 1326 (a threshold requirement is the presence of an affirmative statement that is made misleading by the material omission; general assertions that an omission created false and misleading impressions is insufficient to prove fraud).  This is true even if the company is aware of reasons those results might not be sustainable in the future.  *See, e.g.*, *In re Duane Reade Inc. Sec. Litig.*, No. 02 Civ. 6478 (NRB), 2003 WL 22801416, *6 (S.D.N.Y. Nov. 25, 2003) ("disclosure of accurate historical data does not become misleading even if less favorable results might be predictable by the company in the future") (internal citation omitted); *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1431-32 (3d Cir. 1997) (accurate report of past successes does not contain an implicit representation that the trend is going to continue); *In re Convergent Technologies Sec. Litig.*, 948 F.2d 507, 514 (9th Cir. 1991) (rejecting plaintiffs' contention that accurate reporting of past results "misled investors by implying that [the company] expected the upward first quarter trend to continue throughout the year").

While plaintiffs cite several cases for their proposition that a "literally true," but misleading, statement can be actionable, (Opp. at 20-22), in each of these cases the court found the statement potentially misleading because the omitted facts impacted the meaning of the content of the statement itself, not because a general impression might arise from the statement. *See In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 618 F. Supp. 2d 311, 323 (S.D.N.Y. 2009) (statements regarding presales and financing misleading because defendants did not disclose that presales included contributions from joint venture partner and misleadingly suggested there were three different sources of financing when the purported sources were actually interrelated); *McMahan & Co. v. Wherehouse Entertainment, Inc.*, 900 F.2d 576, 579 (2d Cir. 1990) (description of right to tender back debenture was misleading because meaning of specific statement could be interpreted differently by a reasonable investor); *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 987-88 (9th Cir. 2008) (alleging that company failed to inform public that it had changed its commonly understood definition of "backlog" to include stopped work that "in reality, had been halted and likely lost forever").  These cases do not support the impression claims in the ACC.

Plaintiffs' remaining cases all consider "misleading" statements that were actually alleged to be false on their faces.  *See Silverman v. Motorola, Inc.*, No. 07 C 4507, 2008 WL 4360648, *10 (N.D. Ill. Sept. 23, 2008) (Opp. at 16) (defendants represented that rollout of a new line of mobile phones was "on track" and "going to ship" despite knowing that design problems had delayed production and shipment); *In re Globalstar Sec. Litig.*, No. 01 Civ. 1748 (SHS), 2003 U.S. Dist. LEXIS 22496, *29 (S.D.N.Y. Dec. 15, 2006) (Opp. at 16) (defendants represented that "the management of the company feels that we are almost right on target for all the expectations and requirements to fulfill the expectation of the program. ... We are

experiencing no difficulties with the telephones, no difficulties with the software for the gateway and the phones, everything is working exactly right," when the company's planned rollout of key gateways was plagued with numerous delays); *Hall v. Children's Place Retail Stores, Inc.*, 580 F. Supp. 2d 212, 228 (S.D.N.Y. 2008) (Opp. at 15) (defendant represented that its relationship with Disney was positive and that it was working closely with Disney, when defendant was allegedly "butting heads" with Disney and had breached agreement, giving Disney the ability to terminate).[6]

Here, by contrast, there are no allegations (as in *Hall*) that defendants falsely stated past earnings or that (as in *Globalstar*) they falsely projected future earnings.  The securities laws presume that investors are aware that a corporation's performance with a new product or in a new market is unlikely to replicate past successes.  *See, e.g., Verifone*, 784 F. Supp. at 1484. Plaintiffs' contention that the alleged disclosures created a misleading impression that the transformation was proceeding without incident is unsupportable as a matter of law.

##### 2. Defendants' Forward-Looking Statements Are Protected By the Safe Harbor of the PSLRA and Do Not Create a Duty To Speak.

Plaintiffs argue that the Company's cautionary language is insufficient because it does not adequately address the specific risks that could cause actual results to differ.  (Opp. at 19.) But this argument, too, can be set aside:  The law does not require cautionary language to include

---

[6] *See also Caiola v. Citibank, N.A.*, 295 F.3d 312, 329 (2d Cir. 2002) (Opp. at 15) (bank falsely represented to investment customer that he could continue his particular investment strategy when, in fact, bank's merger with another company would prevent pursuit of this strategy); *In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d 474, 487 (S.D.N.Y. 2004) (Opp. at 22, n.15) (sustaining securities fraud claim based on allegations that defendants knowingly overstated past earnings); *In re Sotheby's Holding, Inc. Sec. Litig.*, No. 00 Civ. 1041 (DLC), 2000 WL 1234601, *3 (S.D.N.Y. Aug. 31, 2000) (Opp. at 15) (Sotheby's represented that the positive impact of its new commission structure and increased auction sales had led to improved revenues, when, in fact, a material portion of these revenues derived from an illegal antitrust conspiracy).

every possible risk factor that could cause differing actual results.[7]  *See In re Gilat Satellite Networks, Ltd.*, No. CV-02-1510, 2005 WL 2277476, *13 (E.D.N.Y. Sept. 19, 2005) ("PSLRA does not require defendants 'to reveal in detail what could go wrong'") (*quoting Asher v. Baxter Int'l, Inc.*, 377 F.3d 727, 734 (7th Cir. 2004)); *Silverman*, 2008 WL 4360648, at *12 (PSLRA does not require that "defendant list every factor" that could affect actual results).  Nor does the PSLRA's safe harbor require the cautionary language to include the specific factor ultimately causing actual results to differ.  *See Silverman*, 2008 WL 4360648, at *12 (*quoting* H.R. Conf. Rep. 104-369, at 44 (1995)) ("[f]ailure to include the particular factor that ultimately causes the forward-looking statement not to come true will not mean that the statement is not protected by the safe harbor.")).  Moreover, cautionary language similar to defendants' has been deemed adequately cautionary under the PSLRA because it contains those factors important to the Company.  *See, e.g., Id.* at *12; *Davis v. SPSS, Inc.*, 385 F. Supp. 2d 697, 711 (N.D. Ill. 2005) (cautionary language sufficient where warned that "variables as market conditions, changes in demand, competition, product release schedules and currency fluctuations" could cause actual results to differ).[8]  Further, both the Form 10-Qs and the annual meeting presentation included cautionary statements that warned readers "not to place undue reliance on these forward-looking

---

[7] Plaintiffs mis-cite *In re Nortel Networks Corp. Sec. Litig.*, 238 F. Supp. 2d 613, 628 (S.D.N.Y. 2003), for the proposition that forward-looking statements must "precisely address the substance of the specific statement or omission that is challenged."  (Opp. at 19.)  The cited language comes from Nortel's discussion of the "bespeaks caution" doctrine and does not reflect the PSLRA pleading standard.

[8] Plaintiffs also contend that defendants' forward-looking statements are actionable, regardless of any cautionary language, because defendants knew they were false or misleading by having knowingly omitting facts. (Opp. at 20.) This argument confuses the common law "bespeaks caution" doctrine with the PSLRA safe harbor.  *See, e.g., Gilat*, 2005 WL 2277476, at *12 ("Prior to the PSLRA, some courts held that the 'bespeaks caution' doctrine did not apply where the defendant knew that his forward-looking statement was false when made"); *In re Indep. Energy Holdings PLC Sec. Lit.*, 154 F. Supp. 2d 741, 755 (S.D.N.Y. 2001) (Opp. at 20) (evaluating forward-looking statement under the "bespeaks caution" doctrine, not the language of the PSLRA).  The PSLRA does not inquire into a defendant's state of mind if the statement is either accompanied by meaningful cautionary language or is immaterial.  *Gilat*, 2005 WL 2277476, at *12 ("Once a court determines that a forward-looking statement is accompanied by cautionary language sufficiently meaningful as to render it incapable of being reasonably relied upon, it is immaterial as a matter of law and the court need not consider the defendants' state of mind").  Regardless of defendants' alleged state of mind, each forward-looking statement on which plaintiffs rely is protected by the PSLRA safe harbor.

statements" and made clear that the "Company undertakes no obligation to publish revised forward-looking statements to reflect events or circumstances after the date such forward-looking statements are made or to reflect the occurrence of subsequent unanticipated events." (*See, e.g.*, Ex. B to Hannan Dec. at 22.)

### 3. Vague Statements of Corporate Optimism Are Immaterial and Cannot Support Plaintiffs' Omissions Case.

Plaintiffs also claim that even if the Company made vague statements of corporate optimism these statements become actionable if they were knowingly false or misleading. (Opp. at 24.)  For instance, plaintiffs assert that the Company's comments two weeks before the start of the Class Period (ACC ¶ 83) that it was "moving in a very positive direction," that it saw "nothing but opportunities ahead of us," or its general statements at the annual meeting about having the "ultimate goal of providing World-Class quality ...," (ACC ¶ 89), are actionable because the Company had no basis for making these "positive representations" in light of the production problems facing the Company.  (Opp. at 24.)  As the Court did in *Star Gas* and *Coyne*, this Court should also decline to read such corporate optimism as actionable.

In each case plaintiffs cite, the court expressly found that the statements in question were both verifiable and false.  *See, e.g.*, *Lapin v. Goldman Sachs Group, Inc.*, 506 F. Supp. 2d 221, 240 (S.D.N.Y. 2006) (Opp. at 24) (company made concrete, verifiable statements about its integrity being "at the heart" of its business and that it engaged in "truly independent investment research" even though it knew it was engaged in pervasive, undisclosed conflicts of interests that affected the independence of its reports and buy recommendations); *Billhofer v. Flamel Techs. SA*, 663 F. Supp. 2d 288, 299 (S.D.N.Y. 2009) (Opp. at 24) (company's statements that a new product was a "success," and that "[i]nterest in both technologies has never been higher" were not puffery, because the statements "were neither 'vague' nor 'non-specific' pronouncements

that were incapable of 'objective verification'"); *In re Vivendi Universal, S.A. Sec. Litig.*, 381 F. Supp. 2d 158, 182 (S.D.N.Y. 2003) (Opp. at 24) (statements that the company was "financially solid," that it would achieve its favorable projections for the coming year, and that its "balance sheet was clean" were actionable where the company was facing a liquidity crisis and on the verge of bankruptcy).  Here, by contrast, defendants' statements of general optimism and goals for the transformation to the new business system are not concrete, objectively verifiable, and false statements, and therefore are not actionable.

### D.   Stock Price Reactions Do Not Make Statements Actionable.

Plaintiffs ask this Court to ignore the actual content of the Company's statements and simply consider market reactions to find fraud.  (Opp. at 22-23.)  The market's reaction in itself does not make a statement material or actionable, particularly when that statement is part of a Form 10-Q that includes numerous statements and financial results.  *See, e.g.*, *Geiger v. Solomon-Page Group, Ltd.*, 933 F. Supp. 1180, 1188 (S.D.N.Y. 1996) (market reaction to the publication of the omitted fact did not demonstrate the omission's materiality, especially in light of the plain unimportance of that specific information).

## II.   Plaintiffs Have Not Pled a Strong Inference of Scienter.

Plaintiffs say that defendants should have known that the transition to lean manufacturing was not going as smoothly as anticipated and therefore, the argument goes, defendants should have told investors about each problem long before their cumulative effect surfaced in the third quarter.  But that accusation, broadly directed at both the accurate "actionable statements" of fact and general statements of corporate optimism, both overstates the law governing disclosure, *see* pp. 12-14, *supra*, and does not satisfy the obligation to plead facts showing scienter: "a mental state embracing intent to deceive, manipulate, or defraud."  *Ernst & Ernst v. Hochfelder*, 425

U.S. 185, 193, n. 12 (1976).  To meet this heightened pleading standard, plaintiffs' allegation of scienter "must be more than merely 'reasonable' or 'permissible' it must be cogent and compelling, thus strong in light of other explanations." *Tellabs*, 551 U.S. at 324.  A "complaint will survive only if ... a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.*

In their Opposition, plaintiffs simply ignore their burden to establish that the more plausible inference drawn from the ACC must be that "defendants (1) did not genuinely believe the [actionable] statement, (2) actually knew that they had no reasonable basis for making the statement, or (3) were aware of undisclosed facts tending to seriously undermine the accuracy of the statement, 'cogent and at least as compelling as any opposing inference.'" *Slayton v. American Express Co.*, 604 F. 3d 758, 775 (2d Cir. 2010) (*citing Tellabs*, 551 U.S. at 323) (no scienter fond even though loss from investments was twice as much as defendants' stated expectations).  Plaintiffs posit that defendants had knowledge of inventory issues "by the start of the Class Period" that made all of their subsequent statements misleading.  (Opp. at 28 n.18.)[9] But when plaintiffs' impression is read in light of the Company's specific caution in April 2007 that it would not know its actual inventory until year-end 2007, see fn. 1, *supra*, and that the inventory reduction would have an "expected, unfavorable impact on short-term earnings," *see* fn. 2, *supra*, the ACC simply does not support a strong inference of intent to "deceive, manipulate, or defraud."[10]  As Judge Arterton has observed, "Statements that a program was making progress or beginning to achieve results are not promises of specific current

_____

[9] As shown in defendants' initial brief, plaintiffs imply that defendants had the requisite knowledge by the start of the Class Period, but they only allege that the Company's manufacturing inefficiencies and lack of on-hand inventory caused the company "**in the third quarter of 2007** ... to miss its targets and prevented the Company from keeping up with distributor demand."  (ACC ¶ 65, emphasis supplied.)

[10] The Court's gatekeeping obligation to make a comparative assessment of plausible competing inferences of scienter at the pleading stage and determine which are more compelling and cogent "does not impinge on the Seventh Amendment right to a jury trial." *Tellabs*, 551 U.S. at 327.

performance, but optimistic statements that the program is under way and is hoped to yield good results in the future." *Star Gas*, No. 04-1766, slip op. at 25.

Scienter also requires motive.  Plaintiffs initially pleaded that defendants were motivated by greed because they allegedly sold stock during a trading window in the Class Period.  (ACC ¶¶ 105-06.)  But their "motive" theory was debunked by SEC filings showing that defendants actually bought more shares during the Class Period.  That increased plaintiffs' burden, because "'the strength of the circumstantial allegations must be correspondingly greater' if there is no motive."  *ECA & Local 134 IBEW Joint Pension Trust of Chicago*, 553 F.3d at 196 (*quoting Kalnit v. Eichler*, 264 F.3d 131, 142 (2d Cir.2001)).  While plaintiffs now argue that defendants' stock purchases prove motive, (Opp. at 34-35), if the individual defendants knew the Company faced an imminent stock price drop, purchasing stock at a higher price would be foolish, not opportunistic, and cannot reasonably support an inference of scienter.  *See, e.g., Coyne*, No. 08-1135, slip op. at 19, n 8.  Moreover, it remains undisputed that Mr. Fifer, the defendant on whom plaintiffs place the greatest blame, did not engage in any stock transactions during the Class Period, utterly undermining plaintiffs' theory.  *See San Leandro Emergency Medical Group Profit Sharing Plan v. Philip Morris Companies, Inc.*, 75 F.3d 801, 814 (2d Cir. 1996) ("fact that other defendants did not sell their shares during the relevant class period sufficiently undermines plaintiffs' claim regarding motive"); *see also Silverman*, 2008 WL 4360648, at *13 (fact that defendant alleged to have made majority of the misleading statements did not sell stock during relevant period "further negates any inference of scienter based on the sale of stock").  There is no strong inference of scienter in this case.

Moreover, the plausible non-fraudulent explanation was given by Mr. Fifer in his October 24, 2007 letter:  "I believe that we took component inventory down too fast as a part of going

17

lean and realized late that it was uncovering too many production, design-for-manufacturability, and vendor problems simultaneously." (Exhibit E to Hannan Dec. at 10.) Plaintiffs admit this inference in the ACC: "Defendant Fifer's aggressive transformation plan and inventory reductions were much more difficult to implement than defendants had originally anticipated..." (ACC ¶ 58.) Defendants' initial optimism "is not evidence of fraudulent behavior or recklessness," because expressions of confidence by management "about their stewardship and the prospects of the business they manage" are not actionable. *Rothman v. Gregor*, 220 F. 3d 81, 90 (2d Cir. 1990). As the Court concluded in *Slayton*, defendants' failure to anticipate the sheer size of the problem when they told the shareholders there would be problems defeats a securities claim: "such 'omissions and ambiguities count against inferring scienter.'" *Slayton*, 604 F.3d at 776 (*citing Tellabs*, 551 U.S. at 326). *See also Pollio v. MF Global, Ltd.*, 608 F. Supp 2d 564, 575 (S.D.N.Y. 2009) (defendants not liable for "their unsurprising inability to have 'greater clairvoyance' about facts and circumstances that did not come about, if at all, until after defendants' alleged statements were made") (internal citation omitted). Here, the negative inferences plaintiffs draw from nine accurate "actionable statements" and some corporate puffery, when weighed against the Company's statements warning that there would be "deliberate underutilization of the foundry, resulting in an expected, unfavorable impact on short-term earnings," (Ex. C to Hannan Dec. at 62), do not outweigh Mr. Fifer's plausible explanation that defendants simply "realized late" the full ramifications of the shift to lean manufacturing.[11]

---

[11] Ironically, plaintiffs argue that defendants' decision to not issue projections or more frequent disclosures during the transformation process evidenced their intent "to hide the problems that the Company was experiencing." (Opp. at 27.) Not only is there no allegation in the ACC to support this claim, but defendants' decision not to issue projections is one of the key reasons they had no duty of further disclosure. Further, the corrective disclosure, on which plaintiffs' rely, supports the more plausible inference that this decision to limit communications intra-quarter arose from defendants' recognition that the transformation would be complex and could not be adequately addressed in brief, periodic communications. (*See* Exhibit E to Hannan Dec. at 7.)

### III.    Plaintiffs' Loss Causation Arguments Mischaracterize the Law.

Courts can, and routinely do, grant motions to dismiss where, as here, the plaintiffs have failed to allege a link between the alleged misstatements and corrective disclosures. *In re Initial Public Offering Sec. Litig.*, 399 F. Supp. 2d 261, 266 (S.D.N.Y. 2005) (*quoting Fogarazzo v. Lehman Bros., Inc.*, 341 F. Supp. 2d 274, 287 (S.D.N.Y. 2004)) (granting motion to dismiss where plaintiffs did not allege required link between alleged misstatements and suffered loss); *Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161, 174-77 (2d Cir. 2005) (same).   According to plaintiffs, they surmounted this hurdle because, although the alleged corrective disclosures "are not worded exactly as the alleged material adverse facts alleged in the Complaint, the substance is the same."  (Opp. at 39.)  This argument, however, relies on generalizing the "subject" of all four categories of statements or omissions as simply "the production and inventory problems stemming from Defendant Fifer's transformation plan."   (Opp. at 38.)   In holding that loss causation requires the "subject" to be the same, courts have never endorsed this sort of sweeping generalization of the "subject" of a representation.  *See Lentell*, 396 F.3d at 175 (characterizing the "subject" of buy and accumulate recommendations as specific statement that "investors should buy or accumulate 24/7 Media and Interliant stock"); *see also Odyssey Healthcare, Inc. Sec. Litig.*, 424 F. Supp. 2d 880, 888 (N.D. Tex. 2005) (corrective disclosure that officer resigned in connection with "operational challenges" too general to put market on notice of misrepresentation of specific facts).  The "same subject" requirement cannot be read so broadly – as plaintiffs attempt to do here – as to obliterate the fundamental requirement that a complaint establish a causal connection between the alleged misstatements and the subsequent decline in value.

**IV.     The Court Should Dismiss Plaintiffs' Complaint With Prejudice.**

The ACC should be dismissed with prejudice and plaintiffs' request for leave to amend (Opp. at 40, n.30) should be denied.  *See, e.g.*, *Champion Enterprises Inc.*, 346 F.3d at 690 (purpose of the PSLRA's heightened pleading requirements and discovery stay is to prevent "harassing strike suits filed the moment a company's stock price falls" – a purpose not achieved "if plaintiffs were allowed to amend and amend until they got it right").  Plaintiffs have already amended their complaint.  If, after scouring countless company filings, analyst reports, other public statements, and interviewing former company employees, multiple firms with securities expertise were still unable to plead a viable claim, then further amendments would be futile.  *See, e.g.*, *Fort Worth Employers' Retirement Fund v. Biovail Corp.*, 615 F. Supp. 2d 218, 233 (S.D.N.Y. 2009) (dismissing securities complaint with prejudice where plaintiff already amended once and the pleading flaws were incurable on the facts of the case).  The PSLRA does not support giving plaintiffs a third bite at the apple.

## CONCLUSION

For the foregoing reasons, and the reasons set forth in defendants' motion to dismiss and memorandum in support, defendants respectfully request that the ACC be dismissed with prejudice.

Dated: July 19, 2010                                  Respectfully submitted,


                                                      /s/ Tracy A. Hannan
                                                      Francis H. Morrison III (ct04200)
                                                      Denise V. Zamore (ct27549)
                                                      AXINN, VELTROP & HARKRIDER, LLP
                                                      90 State House Square
                                                      Hartford, CT 06103
                                                      Telephone: (860) 275-8100
                                                      Facsimile: (860) 275-8101

Michael Dockterman
W. Allen Woolley
Tracy A. Hannan
WILDMAN, HARROLD, ALLEN & DIXON LLP
225 West Wacker Drive
Chicago, Illinois 60606
Telephone: (312) 201-2000
Facsimile:  (312) 201-2555

*Attorneys for Defendants Sturm, Ruger & Company,*
*Inc., Michael O. Fifer, and Thomas A. Dineen*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned, an attorney, hereby certifies that a copy of the foregoing Defendants' Reply to Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Dismiss Plaintiffs' Consolidated Amended Class Action Complaint and Memorandum in Support were served via the CM/ECF electronic filing system on this 19th day of July, 2010, and thereby served upon counsel for all parties.

By: <u>/s/ Tracy A. Hannan</u>
       One of the Attorneys for Defendants