UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

In re STURM, RUGER & COMPANY, INC.
SECURITIES LITIGATION

3:09-cv-1293 (CFD)

**RULING ON MOTION TO DISMISS**

**I.    Introduction**

The lead plaintiff, Steamfitters Local 449 Pension Fund ("the Fund"), brings this putative class action on behalf of those who purchased Sturm Ruger stock during the second and third quarters of 2007. The plaintiffs allege that the defendants failed to disclose problems with their transition to a "lean manufacturing" model, and thereby misled plaintiffs into purchasing the company's stock at an artificially inflated value. The plaintiffs bring claims under Sections 10(b) and Section 20(a) of the Securities and Exchange Act of 1934, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the Securities and Exchange Commission, 17 C.F.R. § 240.10b-5. The defendants have moved to dismiss the complaint pursuant to Federal Rule of Civil Procedure 12(b)(6).

**II.   Background[1]**

Defendant Sturm Ruger ("the company") is a company that designs, manufactures and sells firearms with headquarters in Southport, Connecticut. It sells its product to a number of

---

[1]These facts are taken from plaintiffs' Consolidated Amended Class Action Complaint, ECF No. 37. The allegations must be assumed true for the purpose of resolving the motion to dismiss.

wholesale distributors, who then distribute the firearms to retail outlets. Defendant Michael Fifer was the company's CEO in 2007. Defendant Thomas Dineen was Vice President, Treasurer, and CFO of the company during 2007. The Fund was appointed lead plaintiff in this case. The Fund purchased Sturm Ruger stock during the relevant six-month period in 2007.

Beginning in 2005 and continuing into 2006, Sturm Ruger saw declining profit margins and disappointing yearly earnings. The stock traded at a low of $5.56 per share during the second quarter of 2006. To turn the company around, the company hired Michael Fifer as its new CEO in September 2006. Fifer vowed to lead the transition to a "lean manufacturing" model, which he dubbed the "Ruger Business System." The goal was to update the company's outdated manufacturing methods and to reduce bloated levels of inventory. For example, the company required its distributors to switch from placing one annual, cancelable order to making shorter-term, binding orders on a more frequent basis, in order for the company to be better able to anticipate demand. The company also began making steep cuts in its inventory, in an attempt to reduce expenses. After the announcement of this new strategy, the company's share price rose, eventually trading at a high of above $13 in March 2007.

On April 23, 2007, the company announced net sales of $48.4 million in the first quarter of the year, and a reduction in inventory of $16.5 million. On July 24, 2007, the company announced net sales of $42.1 million in the second quarter, and reduced inventories of $10.1 million.

However, results for the third quarter of the year took a sharp turn. On October 24, 2007, the company announced that its sales for the third quarter of 2007 fell 23% compared to the same quarter the year before. In a letter to shareholders, Fifer explained that the company had reduced

its inventories of component parts too deeply, which reduced production during the quarter. The third quarter report attributed the decline in sales in part to "the Company's inability to produce and ship sufficient quantities of certain firearms already on order, which discouraged additional orders for those products." Following this announcement, the company's stock fell by $6.45 per share to $10.65 per share, a one-day decline of 37%.[2]

Plaintiff Fund filed a complaint on August 13, 2009 and plaintiff Alan Herrett filed a similar complaint on September 30, 2009. This Court consolidated the actions and appointed the Fund as lead plaintiff on January 13, 2010. The named plaintiffs jointly filed an Amended Complaint on March 11, 2010. The Amended Complaint alleges that the defendants violated Section 10(b) and Rule 10b-5 by publishing false and misleading statements about the effectiveness of the "lean manufacturing" model. Plaintiffs contend that during the first and second quarters of 2007, the defendants knew the inventory cuts they were making were jeopardizing the company's rate of production and longer-term profitability, but portrayed the changes in a positive light to investors. The plaintiffs allege the class members suffered injury because by relying on the company's misstatements, they paid artificially inflated prices for the company's stock. In addition, the plaintiffs allege the individual defendants Fifer and Dineen violated Section 20(a) of the Exchange Act because as directors and officers of the company, they had the power to cause the company to engage in the alleged wrongful conduct. In addition, Fifer and Dineen certified the quarterly reports at issue and drafted, reviewed or approved other public statements made on behalf of the company during the claimed class period. All

---

[2]The claimed class period for this lawsuit begins on April 23, 2007, the day the positive first quarter results were released, and ends at October 24, 2007, the day the poor third quarter results were released.

defendants now move to dismiss the Amended Complaint for failure to state a claim pursuant to Fed.R.Civ.P. 12(b)(6).

**III.    Applicable Law and Discussion**

**A.  Legal Standards**

To state a claim for fraud under Section 10(b) and Rule 10b-5, plaintiffs must allege facts showing that, in connection with the purchase or sale of securities, the defendants, acting with scienter, made a misstatement or omission of a material fact upon which plaintiffs relied causing the plaintiffs to sustain injury.  <u>Ganino v. Citizens Utilities Co.</u>, 228 F.3d 154, 161 (2nd Cir. 2000).  A fact is material if there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." <u>Basic Inc. v. Levinson</u>, 485 U.S. 224, 231-32, (1988) (citation omitted); <u>Operating Local 649 Annuity Trust Fund v. Smith Barney Fund Mgmt. LLC</u>, 595 F.3d 86, 92 (2d Cir .2010).  Section 20(a) establishes joint and several liability—subject to a good faith exception—for every person who controls any person liable under any provision of the Act.  <u>Slaton v. American Exp. Co.</u>, 604 F.3d 758, 765 (2nd Cir. 2010).

To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a plaintiff must state a claim for relief that is plausible on its face.  See <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 570 (2007).  A claim is facially plausible if "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.  The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." <u>Ashcroft v. Iqbal</u>, 129 S. Ct. 1937, 1949 (2009) (internal citations omitted).  In determining whether the plaintiff has met this standard, the

Court must accept the allegations in the complaint as true and draw all reasonable inferences in the light most favorable to the non-moving party. In re NYSE Specialists Sec. Litig., 503 F.3d 89, 95 (2d Cir. 2007).

Because the plaintiffs are alleging securities fraud, they are also subject to the heightened pleading requirements imposed by Rule 9(b) of the Federal Rules of Civil Procedure as well as the Private Securities Litigation Reform Act of 1995 ("PSLRA") § 78u-4(b)(2). To satisfy the requirements of Fed.R.Civ.P. 9(b), a securities fraud claim based on misstatements must "specify the statements that the plaintiff contends were fraudulent, identify the speaker, state where and when the statements were made, and explain why the statements were fraudulent." The PSLRA heightens the pleading standard for the scienter element of the claim, and requires the plaintiffs to allege "facts [either] (1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness." § 78u-4(b)(2)

**B. Misstatements or Omissions of Material Facts**

In its complaint, the plaintiffs italicized and highlighted in bold those statements they allege are actionable under 10(b) and 10b-5. The alleged misstatements plaintiffs identify before the claimed class period were made in a letter to shareholders dated April 3, 2007 that accompanied the 2006 Annual Report. Those alleged misstatements are:

1. "[T]he company ended the year with improvements in many areas. The changes started during the year are beginning to yield real benefits for our shareholders, customers, and employees."

2. "Our CEO, Michael Fifer, who came on board in late September, has been an outstanding engineer of change."

3. "These changes have generated a sense of excitement in the Company and amongst our customers that Ruger is moving in a very positive direction. Morale is greatly improved. Demand and on-time order fulfillment are up. Employees are fully engaged, and we see nothing but opportunities ahead of us."

During the claimed class period, the alleged misstatements were made on the company's first and second quarter SEC filings, Form 10-Qs. The alleged misstatements the plaintiffs identify on the first quarter 10-Q are:

4. "[M]anagement believes that if a ["last in, first out"] LIFO liquidation continues to occur in 2007, the impact may be material to the Company's results of operations for the period but will not have a material impact on the financial position of the Company. The Company estimates that the impact of this liquidation on the results of operations for the period ended March 31, 2007 was to reduce cost of products sold by $4.4 million."

5. "Cash provided by operating activities was $18.1 million and $4.7 million for the three months ended March 31, 2007 and 2006, respectively. The increase in cash provided is principally a result of a decrease in inventory, improved net income and various fluctuations in operating asset and liability accounts during the first three months of 2007 compared to the first three months of 2006."

6. "[F]irearms orders received totaled $58.9 million, and order backlog increased $11.6 million from $16.2 million on December 31, 2006 to $27.8 million on March 31, 2007."

7. "Rifle shipments increased 9.5% as demand remained strong for the Ruger 10/22 rimfire rifles and Mini-14 centerfire rifles. . . . This comparison better reflects the greater availability and continued strong demand of revolver models, particularly the Ruger New Vaquero."

The alleged misstatements the plaintiffs identify on the second quarter 10-Q are:

8. "[M]anagement believes that if a ["last in, first out"] LIFO liquidation continues to occur in 2007, the impact may be material to the Company's results of operations for the period but will not have a material impact on the financial position of the Company. The Company estimates that the impact of this liquidation on the results of operations for the three and six month periods ended June 30, 2007 was to reduce cost of products sold by $6.5 million and $16.2 million, respectively."

9. "The 2007 reduction resulted in LIFO income and decreased cost of products sold of $6.1 million and $10.6 million for the three and six months ended June 30, 2007, respectively."

10. "The Company believes that it has adequate quantities of raw materials in inventory to provide ample time to locate and obtain additional items at then-current market cost without interruption of its manufacturing operations."

11. "Firearms unit shipments increased 31.8% for the three months ended June 30, 2007 when compared to the second quarter of 2006. Rifle shipments increased 49.3% from the comparable year period due to strong demand and product availability. Revolver shipments increased 19.8% from the comparable prior year period. Pistol shipments increased 18.8% from the comparable prior year period. Shotgun shipments increased 35.8% from the comparable prior year period."

Plaintiffs allege the above statements were materially false and misleading, and did not reflect the actual financial position of the company. They believe the "lean manufacturing" program hurt rather than helped the company's profitability because it hindered the company's ability to meet production and shipment schedules. For example, the plaintiffs claim the increase in orders (see statement #6) resulted in part from the company's new requirement that its distributors make smaller, more frequent purchase order submissions, but was not reflective of actual demand. Also, they allege order backlog (also see statement #6) was "bloated" because of the company's inability to meet shipping schedules. Relatedly, they allege that increased shipments (see statement #11) were caused by the company selling through its inventory, and not a result of increased productivity. Finally, they assert that the company's distributors were carrying large quantities of the company's unsold products, increasing the risk that future purchases would be diminished. Plaintiffs argue the company had no basis for the positive outlook on the company's financial position reflected in the first two quarterly statements in 2007.

In their motion to dismiss, the defendants argue none of the statements plaintiffs identify are actionable, for a variety of reasons. First, they argue several of the statements are "expressions of puffery and corporate optimism," and therefore do not give rise to securities violations. See Rombach v. Chang, 355 F.3d 164, 174 (2nd Cr. 2004). The first two statements above, contained in the April 3, 2007 letter to shareholders, fall within this category. Statements such as "changes started during the year are beginning to yield real benefits for our shareholders," and "Our CEO . . . has been outstanding engineer of change" are generic expressions of optimism, not the kind of statements on which investors typically rely. In addition, most of statement 3 is mere puffery: "These changes have generated a sense of excitement in the Company and amongst our customers that Ruger is moving in a very positive direction," " Morale is greatly improved," and "Employees are fully engaged, and we see nothing but opportunities ahead of us."[3]

Second, defendants argue that any forward-looking statements on which plaintiffs may have relied are not actionable because they are protected by sufficient cautionary language, and therefore fall within the PSLRA's safe harbor provision. Though the defendants do not identify them specifically, it seems that statements numbered 4, 8 and 10 contain forward-looking language.[4] The PSLRA provides that companies cannot be liable for forward-looking statements

---

[3]The third sentence in statement 3, "Demand and on-time order fulfillment are up," is a factual statement, not one of optimism or puffery, and will be addressed below.

[4]The first sentences in statements 4 and 8 say that if inventory liquidation continues to occur in 2007, "the impact may be material to the Company's results of operations for the period but will not have a material impact on the financial position of the Company." Statement 10 says, "The Company believes that it has adequate quantities of raw materials in inventory to provide ample time to locate and obtain additional items at then-current market cost without interruption of its manufacturing operations."

if the statement is "identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement." 15 U.S.C. § 78u-5(c). The qualifying, cautionary language must convey specific information about why the projections might prove inaccurate. See <u>In re Vivendi Universal, S.A.</u>, 381 F.Supp.2d 158, 183. ("Boilerplate warnings will not suffice. . . . The cautionary statements must convey substantive information about factors that realistically could cause results to differ materially from those projected in the forward-looking statements.") The cautionary language which defendants identify as triggering the PSLRA safe harbor is found in each quarterly report at the end of a section entitled, "Management's Discussion and Analysis of Financial Condition and Results of Operations." The cautionary language reads:

> The Company may, from time to time, make forward-looking statements and projections concerning future expectations. Such statements are based on current expectations and are subject to certain qualifying risks and uncertainties, such as market demand, sales levels of firearms, anticipated castings sales and earnings, the need for external financing for operations or capital expenditures, the results of pending litigation against the Company including lawsuits filed by mayors, state attorneys general and other governmental entities and membership organizations, and the impact of future firearms control and environmental legislation, any one or more of which could cause actual results to differ materially from those projected. Readers are cautioned not to place undue reliance on these forward-looking statements, which speak only as of the date made. The Company undertakes no obligation to publish revised forward-looking statements to reflect events or circumstances after the date such forward-looking statements are made or to reflect the occurrence of subsequent unanticipated events.

Defendant's Mem. in Supp. of Mot. to Dismiss, Ex. B p. 22, April 26, 2007, ECF No. 41. This passage cites to market demand and sales levels as two factors that may alter the company's projections, two of the same problems that plaintiffs allege hurt the company's profitability by the third quarter of 2007. Because Sturm Ruger's cautionary language does contain substantive

information about what may affect their financial projections, the court finds the forward-looking language in statements 4, 8 and 10 is sufficiently hedged by the later cautionary language, and therefore cannot be actionable misstatements for securities fraud.[5]

Third, the defendants argue that several of the alleged misstatements are accurate statements of historical fact, and therefore not actionable. Specifically, they point to statements about firearms sales and orders numbered 6 and 11 above, statements about the financial impact of liquidated inventory in statements numbers 4, 8, and 9 above, and the statement about cash for operating activities numbered 5 above. The plaintiffs do not claim those numbers are inaccurate, but they do argue additional information should have been disclosed to place those numbers in context. "A statement can be misleading, though not technically false, if it amounts to a half-truth by omitting some material fact." In re MBIA, Inc., Sec. Litig., 700 F.Supp.2d 566, 578 (S.D.N.Y.2010) (internal citation and quotation omitted). "The veracity of a statement or omission is measured not by its literal truth, but by its ability to accurately inform rather than mislead prospective buyers." Operating Local 649 Annuity Trust Fund v. Smith Barney Fund, 595 F.3d 86 (2d Cir. 2010).

Plaintiffs argue defendants had a duty to make clear that the transition to lean manufacturing was causing problems, and was not as successful as the company's initial public statements portrayed. Some of these alleged misstatements related to orders and shipments. For example, when on the first quarter 10-Q the company reported that "order backlog increased $11.6 million from $16.2 million on December 31, 2006 to $27.8 million on March 31, 2007,"

---

[5] Statements 4 and 8 also contain factual statements that are not forward looking, and will be addressed below.

(statement 6) plaintiffs contend this information is misleading without the additional disclosure that the order backlog was the result of slow production, not increasing demand. Also, plaintiffs claim the order numbers were artificially inflated as a result of the change in the company's ordering policy, not increasing demand (see third sentence of statement 3, "demand and on-time order fulfillment are up"). Relatedly, they allege that report of increased firearms and rifles shipments (see statements 7 and 11) were misleading because they were caused by the company selling through its inventory, and not a result of increased productivity or demand. Other statements noted the positive accounting consequences of the inventory reductions, while omitting the negative consequences of those reductions on production. Statement 5 refers to "improved net income." The company's net income could have gone up if the company spent significantly less to re-stock its inventory, but the company omitted information about how the declining inventory was slowing production. Similarly, other statements claim the impact of the inventory liquidation was to "reduce costs of products sold" (second sentences of 4 and 8), and that the LIFO liquidation "decreased costs of products sold" (statement 9). Again, the overall costs of production may have been declining if the company was spending less on materials and other production components, but the falling inventory levels were causing production to fall behind.

      Taking the allegations in the complaint as true, the court finds the company had a duty to disclose the negative consequences of the transition to lean manufacturing, and the failure to do so renders several statements misleading. The company wished to paint a rosy picture of its new business model, but it neglected to depict some of the thorns. Unlike a recent case from this district on which defendants rely, in which the court found no actionable omissions because the

challenged statements were merely goals for the quarterly earnings, in this case the challenged statements are past sales and orders numbers that could be misleading without the omitted information. Coyne v. General Electric Co., et al., No. 08-CV-1135, 2010 WL 2836730 (D.Conn. July 15, 2010) (Underhill, J.) This case is also unlike In re Star Gas Securities Litigation, No. 04-CV-1766, (D.Conn. Aug. 21, 2006) (Arterton, J.). In that case, the court found the defendant had not omitted material facts about its "Business Improvement Plan" because when the negative facts came to the company's attention, the company was concomitantly less optimistic about the plan's performance. In this case, however, the plaintiffs allege that the company knew the reasons for the inflated sales and orders numbers at the time they disclosed them, but omitted relevant information that would have put those numbers—and the overall success of the transition to lean manufacturing—in the proper context.

For these reasons, some of the statements the plaintiffs identify are non-actionable as either corporate optimism (statements 1 and 2, and all but the third sentence of statement 3) or forward-looking statements hedged by cautionary language (first sentences in statements 4 and 8, and statement 10). However, plaintiffs have sufficiently alleged that statements about increased demand, improved net income, increased orders and order backlogs, decreased costs of products sold, and increased shipments (third sentence of statement 3, second sentence of 4, statement 5, statement 6, statement 7, second sentence of 8, statement 9 and statement 11 above) were materially misleading.

**C. Evidence of Scienter**

The Supreme Court has defined scienter as "a mental state embracing intent to deceive, manipulate or defraud." Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 319 (2007)

(internal citations and quotations omitted). "Under the PSLRA, the complaint must state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." ECA & Local 134 IBEW Joint Pension Trust of Chicago v. J.P. Morgan Chase Co., 553 F.3d 187, 196 (2nd Cir. 2009). A "strong inference" of scienter exists when a "reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." Tellabs, 551 U.S. at 324. The PSLRA requires the plaintiffs to plead scienter by alleging "facts [either] (1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness." § 78u-4(b)(2).

To allege that the defendants had the opportunity to commit the fraud, the plaintiffs claim executives at Sturm Ruger were privy to confidential information about the company's operations and financial condition, but deliberately withheld adverse facts that would have given a true picture of the company's financial situation. In support of these allegations, plaintiffs claim to rely on the first-hand knowledge of three confidential witnesses: a former document control manager, a former product engineer at a New Hampshire plant, and the former general manager of the New Hampshire plant. These witnesses state that Fifer and Dineen regularly attended meetings of the Executive Operations Committee, which reviewed the effectiveness of the transition to lean manufacturing. Also, one of these witnesses claims that defendants saw internal reports which compared a daily production goal to actual daily production, revealing that the company was not meeting its production targets. These witnesses also stated that daily meetings were held at the New Hampshire plant in which the failure to meet production goals was discussed, and company vice presidents, managers and engineers attended those meetings.

The first confidential witness also claimed that Sturm Ruger used a custom-made system of spreadsheets to track inventory, and senior management saw these spreadsheets.

To allege that the defendants had the motive to commit the fraud, plaintiffs claim that during the claimed class period Dineen and other executives sold thousands of shares of their personally-held common stock when the share price was near $20.[6] Plaintiffs allege that all insider trading took place between July 30, 2007 and August 24, 2007, after the company announced favorable results from the second quarter but before they released the disappointing results from the third quarter.

Defendants respond to these allegations in two ways. First, they say the confidential witnesses' statements about defendants' insider access to information do not support a strong inference of scienter, because the most plausible explanation is that the defendants did not realize until the third quarter of 2007 that their inventory problems would hurt the company's revenue and profits. Second, with respect to their motive to defraud, defendants argue that the individual executives did not sell thousands of shares of stock, but instead had to withhold some shares to exercise options to buy more stock, and ended up with many more net shares after the transactions in question. In essence, the defendants argue the plaintiffs completely mischaracterize the nature and effects of the stock transactions. While this may in fact be true, at this stage the court accepts all allegations in the complaint as true. If it is true that Sturm Ruger executives sold many shares of personally owned stock just weeks after a favorable second

---

[6]There is no allegation that Fifer sold any personally-held stock during the class period, but because plaintiffs have alleged sufficient facts to show that he was sufficiently in control of the company during this class period, the 20(a) claim against him survives this motion to dismiss. See section III.D. below.

quarter report, the plaintiffs have pled sufficient facts to show the defendants did have the motive and opportunity to commit fraud.

A comparison to the facts of another recent case, In re Celestica Inc. Sec. Litig., No. 07 CV 312, 2010 WL 4159587 (October 14, 2010, S.D.N.Y.)[7], illustrates why plaintiffs have met the PSLRA pleading requirements here.  In that case, the district court dismissed the Section 10(b) and Rule 10b-5 claims because the plaintiffs in that case failed to allege the defendants had any personal motive for committing the fraud.  Instead, they alleged that the defendants withheld information about the failure of its restructuring plan because they did not wish to appear unprofitable.  The court in In re Celestica noted that motives most corporate executives possess, such as "the desire for the corporation to appear profitable" or "the desire to maintain a high stock price to increase executive compensation" do not constitute the requisite motive for purposes of securities fraud scienter.  Id. at *5.  In this case, by contrast, plaintiffs have specifically plead that the defendants personally stood to gain financially by delaying the bad news about Sturm Ruger's lean manufacturing model until after they sold some of their shares.  While that may not turn out to be true, at this stage such claims are sufficient to satisfy the PSLRA's pleading requirement of "motive and opportunity to commit the fraud."

Alternatively, these facts are sufficient to constitute "strong circumstantial evidence of conscious misbehavior or recklessness."  Conscious misbehavior can be established by showing "that defendants knew facts or had access to information suggesting that their public statements were not accurate."  Id. (quoting In re Centerline Holding Co. Sec. Litig., 2010 WL 2303312, at

---

[7]This case was disclosed by defendants in a notice of supplemental authority filed November 16, 2010.

*2 (2nd Cir. June 9, 2010). By specifically alleging that the defendants were at Executive Operations Committee meetings, received daily updates about production levels, and had an internal system for tracking inventory, plaintiffs have offered circumstantial evidence of conscious misbehavior or recklessness.

For these reasons, plaintiffs have alleged sufficient facts to establish defendants' scienter.

### D. Additional Elements

The complaint also clearly addresses the other necessary elements of the 10(b) and Rule 10b-5 claim, alleging that plaintiffs relied on these omissions by purchasing Sturm Ruger stock during the claimed class period, and that plaintiffs were injured by paying an inflated price for the stock. The complaint also clearly alleges that the individual defendants, Fifer and Dineen, were in sufficient control of the company to be held joint and severally liable under Section 20(a).

## IV. Conclusion

For the reasons set forth above, the defendant's motion to dismiss [Dkt. # 40] is DENIED.

SO ORDERED this 4th day of February 2011, at Hartford, Connecticut.

/s/ Christopher F. Droney

**CHRISTOPHER F. DRONEY
UNITED STATES DISTRICT JUDGE**